**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO.  24-CR-417 (CKK)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **JEANDIEL SERRANO,** | **:** | |
| **Also known as "VersaceGod,"** | **:** | |
| **Also known as "@SkidStar,"** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

As an initial matter, Defendant Serrano ("Serrano") was already ordered detained by a Magistrate Judge in the Central District of California. (Attachments 1 and 2). Any subsequent review of his detention should be heard before the Honorable Judge Kollar-Kotelly. In the event this Court decides to review Serrano's detention determination, the Government submits the following memorandum and points of authorities in requesting pre-trial detention.

The Defendant poses a danger to the community and after admitting his role in a $230,000,000.00 sophisticated cyber-fraud conspiracy, he has the means and incentive to flee the Court's jurisdiction. The Government moves for pre-trial detention under Title 18, United States Code, Sections 3142(f)(2)(A) (risk of flight), 3142(f)(2)(B) (obstruction of justice), and 3142(f) (safety of the community).

At the moment, the District of Columbia Pre-Trial Services Agency has not yet completed a report. The Government is in possession of the Defendant's Pre-Trial Services Report from the Central District of California and will refer to the findings therein. (Submitted under separate cover).  The Government plans to proceed by way of proffer. *See, e.g., United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 42 (D.D.C. 2013).

**BACKGROUND**

On or about August 18, 2024, Serrano and his co-conspirators executed one of the largest cryptocurrency thefts from a private individual ("the victim") in the history of the United States. They portrayed themselves as Google and Gemini Crypto Exchange ("Gemini") technical support staff, contacting the victim to assist him with a security breach. After convincing the victim of their legitimacy, they stole the victim's savings, laundered the virtual currency through multiple exchange platforms, and professional money launderers, and proceeded to spend it on expensive rental homes, high-end automobiles, private jets, and international travel.

This D.C. resident was targeted by Serrano and his co-conspirators because they believed he held considerable amounts of virtual currency. Substantial planning went into executing the theft. A co-conspirator caused "unauthorized Google account access" notifications to be transmitted to the victim in the week leading up to the theft. The co-conspirator used proxy and VPN services to make it appear that the access attempts were occurring overseas. In reality, this was just the conspirators laying the groundwork for their imminent theft through sophisticated social engineering.

On or about August 18, 2024, members of the conspiracy called the victim and told him they were calling from the Google security team, inquiring about the recent unauthorized access attempts. They informed him that they needed to shut down his account unless he verified certain information. Through a series of prompts and misrepresentations, the co-conspirators were able to manipulate the victim into providing just enough information for them to access his Google drive where they quickly located personal financial information, including the location of his virtual currency holdings with Gemini.

Serrano and his co-conspirators called back to the victim shortly after the initial call ended and Serrano portrayed himself as a representative from the Gemini support team. While Serrano was speaking to the victim, the co-conspirators including Serrano were simultaneously communicating with one another on Discord and Telegram. As pictured below, they were strategizing on ways to manipulate the victim into providing private keys to his virtual currency holdings and enough computer access for the conspirators to steal his entire savings.



*(Serrano identified as the blue icon on the left)*

3

Through cunning misrepresentations and manipulation, Serrano was able to convince the victim into downloading a program onto his personal computer for the purpose of "protecting" his holdings with Gemini. In reality, this was a remote access program granting the conspirators real-time access to the victim's computer desktop.



*(Serrano using the Discord name VersaceGod)*

Serrano continued to manipulate the victim into opening private computer files, not knowing that Serrano and his co-conspirators had access to a mirrored image of everything appearing on his computer.



Serrano was eventually able to manipulate the victim into opening files with private keys

to over 4,100 Bitcoin ("BTC"), then valued at over $240,000,000.00 USD. While Serrano

continued to manipulate the victim, his co-conspirator used this access to quickly steal the

entirety of the victim's virtual currency holdings.

The co-conspirators proceeded to divide the proceeds five ways between members of this

conspiracy and employ sophisticated money laundering techniques to hide the proceeds and

mask their identities. They used numerous cryptocurrency exchanges such as eXch, which does

not require "Know Your Customer" ("KYC") information. In one instance, Serrano himself

created an account on TradeOgre.com to make a deposit of approximately $29,000,000 worth of

virtual currency, believing it to be clean and successfully laundered. Each and every time the

account was accessed, it utilized a VPN connection to mask its location. Serrano however failed

to us a VPN when he created the account and records from TradeOgre show that the account was

created from an IP address registered to Serrano's $47,500 per month rental home in Encino,

California.



By the time the investigative team fully identified Serrano, he was already out of the

country, vacationing in the Maldives. Meanwhile, his co-conspirator Malone Lam ("Lam") was

spending hundreds of thousands of dollars per night at Los Angeles night clubs and amassing an

impressive collection of custom Lamborghinis, Ferraris, and Porches.



*(Malone Lam Automobile Collection)*

On September 17, 2024, the Grand Jury returned a two-count indictment charging

Serrano and Lam with conspiracy to commit wire fraud and conspiracy to launder monetary

instruments, in violation of Title 18, United States Code, Sections 1349 and 1956(h).

Serrano was arrested at Los Angeles International Airport ("LAX") on September 18,

2024 when he returned back to the United States from a vacation with his girlfriend in the

Maldives.

Serrano's girlfriend was briefly interviewed upon arrival and she denied knowledge of

Serrano's involvement in criminal activity.  The interviewing FBI Agent told her that the only

way to make the situation worse would be for her to call Serrano's associates and tip them off to

the arrest.  Immediately after leaving the interview, Serrano's girlfriend promptly called his

criminal associates, tipped them off to his arrest, and these associated in turn deleted their

Telegram accounts and all incriminating evidence included in saved chats.

For his part, Serrano agreed to speak with law enforcement without an attorney and

initially denied knowledge of the theft detailed previously.[1] Serrano changed his posture soon

thereafter and admitted to his involvement in the sophisticated theft outlined above. Serrano

admitted to impersonating a Gemini employee and manipulating the Washington, D.C. based

victim through a lengthy phone call. Serrano estimated that he received anywhere from

$27,000,000 to $32,000,000 in the victim's stolen proceeds. He further admitted to purchasing

three automobiles, totaling over $1,000,000 with the stolen proceeds, as well as a $500,000

watch he was wearing at the time of his arrest. He additionally stated that some of his proceeds

were frozen on cryptocurrency exchanges due to money laundering compliance protocols and

other portions of the proceeds were sitting with additional money launderers. Serrano admitted

that he owned two cars and that they were gifts from one of his co-conspirators, given to him

with proceeds from a prior fraud. He finally admitted to possessing approximately

$20,000,000.00 in the victim's stolen virtual currency on his phone and agreed to transfer the

funds back to the FBI.

Lam, who had recently traveled from Los Angeles to Miami on a private jet, was arrested

shortly after Serrano. Lam was renting two Miami mansions at the time and FBI agents

recovered multiple luxury automobiles and watches from his residences. By way of example,

Lam purchased one watch for $2,000,000 and one of the automobiles, a Lamborghini Revuelto,

was purchased for $1,072,000. Many of Lam's vehicles have not been located as of yet, such as

---

[1] The interview is recorded and has been produced to defense counsel.

his Pagani Huayra that he purchased for $3,800,000.00. The three vehicles Serrano admitted to

purchasing have also not yet been located.

To date, at least $100,000,000 in stolen cryptocurrency remains unaccounted for.

### Serrano's CDCA Pre-Trial Services Report

Serrano was interviewed by the Pre-Trial Services Agents in the Central District of

California. He claimed to live at 15743 Hesby St., Encino, California, the same location

associated where he created his Trade Ogre account used to deposit nearly $30,000,000 in stolen

cryptocurrency. To say that Serrano's finances remain uncertain is an understatement. He

declined to discuss his income or cryptocurrency holdings and claimed to only have between

$1,000 to $10,000 in a bank account. He admitted to owning a 2024 Mercedez SL and a 2023

Ferrari FS, both owned by him *but not in his name*. He further admitted to owning upwards of

$750,000 in watches and jewelry and paying approximately $42,000 per month in rent. Serrano

finally reported that he has not worked for over a year and declined to state how he supports this

lifestyle.  Pre-Trial Services in CDCA believed there were no conditions or combination of

conditions that would reasonably assure his appearance at future proceedings. He was

subsequently ordered detained pending trial.

### Relevant Legal Authorities

This Court may detain a defendant upon motion of the government in a case that, as here,

involves "a serious risk that such person will flee" or involves "a serious risk that such person will

obstruct or attempt to obstruct justice." 18 U.S.C. §§  3142(f)(2)(A) and 3142(f)(2)(B).

While the act governing pre-trial detention requires that detention be supported by "clear

and convincing evidence" when the justification is the safety of the community, it is silent as to

the level of proof required to establish risk of flight. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). This circuit, however, has ruled that such a finding need only be supported by a "preponderance of the evidence." *Id. citing United States v. Vortis*, 785 F.2d 327, 329 (D.C.Cir.1986).

Courts commonly agree that detention based on risk of flight "is a valid regulatory device" because it "serves the principles of [our constitutional] system by guaranteeing that the defendant will stand trial and, if convicted, face punishment." *United States v. Melendez-Carrion*, 790 F.2d 984, 1002 (2d Cir.1986), *citing Bell v. Wolfish*, 441 U.S. 520, 534, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979).

To justify detention on the basis of dangerousness to the community, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).

The relevant factors in both evaluations remains the same under Title 18, United States Code, Section 3142(g) – namely, (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's past conduct and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

## ARGUMENT

*i.      Nature and Circumstances of the Offenses Charged*

The nature of the offense is serious and weighs in favor of detention. The offense required significant planning and sophisticated technology. The group masked their IP addresses, used VPN

networks, impersonated support teams from respected companies, targeted a trusting victim, and manipulated him through a series of phone calls playing on his security fears. They convinced him to download programs that granted them access to his personal files, allowing them to quickly drain his savings. Serrano's group then carefully laundered the money using virtual currency exchanges that either don't require KYC information or don't respond to US Government legal process. Serrano and his associates proceeded to live lavish lifestyles on the victim's proceeds, buying expensive jewelry, automobiles, vacations, and rental homes. Serrano himself was arrested at LAX after international travel and his co-conspirator was arrested in Miami after traveling via private jet from Los Angeles. According to Serrano's own statement, this was not the first time he and his co-conspirators executed a scheme like this, as his Mercedes and Ferrari were apparently gifts from Lam after a prior successful theft.

Serrano's girlfriend tipped off his criminal associates who attempted to flee in Miami after being alerted to his arrest. They also deleted their Telegram accounts, which contained valuable evidence of the criminal conduct. This single act shows the ease at which cyber-criminals can destroy evidence and obstruct justice when given even moment's notice.

A large portion of the victim's stolen cryptocurrency remains unaccounted for. To date, approximately $70,000,000 has been recovered or frozen on various exchanges. Even considering the millions of dollars that Serrano and his co-conspirators spent on automobiles and jewelry, well over $100,000,000 remains unaccounted for. Considering the resources still available to the members of the conspiracy and the ease of which virtual currency is laundered and dissipated, the Court should have great concern about releasing Serrano pending trial. This factor weighs strongly

in support of detention when evaluating the danger to the community, the risk of flight, and the risk that Serrano would obstruct justice.

        *ii.*      *Weight of the Evidence Against the Defendant*

The weight of the evidence against Defendant Serrano is overwhelming.  The IP address associated with his Los Angeles rental home was used to open a virtual currency account that deposited nearly $30,000,000 in stolen virtual currency. At the time of his arrest, he was in possession of approximately $20,000,000 of the victim's stolen funds.  He further admitted his role in this sophisticated fraud scheme in a consensual recorded interview with the FBI and admitted to pretending to be a Gemini employee and manipulating the victim through phone calls. He admitted to laundering the funds, buying over a million dollars-worth of automobiles, and hundreds of thousands of dollars in jewelry.  Finally, he admitted that he owns two additional cars that were gifted to him by Lam following prior successful frauds. This factor weighs strongly in favor of detention when evaluating the risk of flight.

        *iii.*     *Defendant's History and Characteristics*

The third factor, the history and characteristics of the defendant, also weighs in favor of detention.  This Court considers, among other factors, "the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history." *United States v. Taylor*, 289 F. Supp. 3d 55, 69 (D.D.C. 2018).

By his own admission, the Defendant has not held employment for over a year. At the same time, he has been renting a $40,000 per month home, owned multiple luxury automobiles, and was wearing a $500,000 watch at the time of his arrest. He has no permanent address and seemingly

has no ties to any community. If ever there was a defendant with the incentive and means to flee the jurisdiction of this Court, it would be the instant Defendant who has no ties to any community, no home, no employment, and whose criminal associates still hold well over $100,000,000 dollars in stolen cryptocurrency.  This factor weighs strongly in favor of detention when evaluating the risk of flight.

                iv.      *Danger to the Community*

     The defendant's conduct was non-violent but the financial harm is significant.  Defendant Serrano appears to have supported his lavish lifestyle through fraud for the past year, as evinced by his $47,500 rent, luxury automobiles, jewelry, and travel, coupled with his lack of employment. Defendant Serrano's frauds can be committed from anywhere with cell service or an internet connection. There is simply no way to ensure that he refrains from continuing to commit cyber-enabled fraud while on release.  This factor may not weigh in either direction with respect to his risk of flight, but certainly weighs in favor of detention when evaluating the danger to the community.

## **CONCLUSION**

     For the arguments expressed above, the Government submits that the defendant poses a flight risk, poses a risk of obstructing justice, and continues to pose a danger to the community, and requests that he continue to be detained pending trial.

                        Respectfully submitted,

                        MATTHEW M. GRAVES
                        United States Attorney
                        D.C. Bar Number 481052

                   By: */s/ Kevin Rosenberg*

Kevin Rosenberg
Assistant United States Attorney
Ohio Bar 0081448
United States Attorney's Office
601 D. Street NW
Washington, D.C.  20530
Telephone: 202-809-5351
Email: Kevin.Rosenberg@usdoj.gov