UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 24-cr-417 (CKK) |
| : | |
| MARLON FERRO, also known as : | |
| "Marlo," and "GothFerrari," : | |
| : | |

**<u>MOTION FOR *DE NOVO* REVIEW OF MAGISTRATE'S RELEASE ORDER</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court for *de novo* review of the release order for defendant Marlon Ferro ("Ferro"), issued by a United States Magistrate Judge for the Central District of California, Douglas McCormick, on May 13, 2025, and further requests the Court take up the *de novo* review when Ferro appears for his initial status conference on May 19, 2025.[1]

The Government moves for pre-trial detention under Title 18, United States Code, Sections 3142(f)(2)(A) (risk of flight) and 3142(f) (safety of the community).

Defendant is charge, among other things, with violations of Title 18, United States Code, Section 1962(d), commonly referred to as RICO Conspiracy. He, along with his coconspirator friends were members and associates of a sophisticated Social Engineering Enterprise ("SE Enterprise") operating throughout the United States and abroad, namely the United Arab Emirates, New Zealand, and elsewhere.

As alleged in the Indictment, this SE Enterprise began in or around October 2023 and continued through at least March 2025. The purposes of the SE Enterprise included, but were not limited to stealing virtual currency from victims throughout the United States under fraudulent

---

[1] Ferro was released in CDCA. Undersigned AUSA did not ask to stay his release because of a miscommunication among the prosecution team. Nonetheless, the government requests that the Court review his release *de novo* and detain Defendant Ferro pre-trial. Ferro's CDCA case number is 25-MJ-387.

pretenses; disguising, concealing, and obfuscating the source and ownership of the stolen funds through the use of virtual currency laundering techniques; and converting laundered virtual currency into fiat currency and wire transfers for use at nightclubs, for the purchase of exotic cars, jewelry, luxury handbags, clothing, private jet rentals, along with other items, property, goods, and services, and rental mansions in Los Angeles, the Hamptons, Miami, and elsewhere.

Members of the SE Enterprise executed social engineering attacks against numerous victims, ranging in profits from a few hundred thousand in stolen virtual currency, up to events where the members stole over $240,000,000 worth of virtual currency in a single evening.

Members of the enterprise, including Coconspirators Malone Lam and Conor Flansburg bragged about their exploits on messaging applications, referring to victims by full name and calling them "stupid," and "dumb f—ks."

The enterprise did more than simply call victims and trick them into providing access to their virtual currency holdings, they also targeted victims for physical home invasions. In or around July 2024, Coconspirator Marlon Ferro, in coordination with Coconspirator Malone Lam and others, flew to New Mexico to break into the home of a wheelchair bound victim in search of his hardware virtual currency wallet while others monitored the victim's location after hacking his iCloud account.  Ferro also set up a cellular telephone across from the victim's home and initiated a live stream feed of the victim's house for Lam and others to watch while Ferro committed the break-in. Ferro is also captured on ring camera breaking into the victim's home through the rear window with a brick.



In addition to the break-in being caught on camera, Ferro's cell phone also places him at the scene of the home invasion.

Ferro himself was well aware of the full scope of the SE Enterprise and willfully participated in it even after the group stole multiple hundreds of thousands of dollars in August 2024. Below are screenshots of conversations where Ferro discusses his frustration that Coconspirator Serrano ("Jeandiel" or "John") failed to properly launder his money and chose not to wait for Coconspirator Lam to finish the laundering process.




*Ferro (Left)*                                    *Ferro (Left)*

Ferro then complained that Coconspirator Serrano "fumbled" or messed up a "250m lick" or a $250 million robbery, refering to the Victim-7 theft.





Additional messages show Ferro's involvement in the home invasion conspiracy activities.

4

In the below screenshot, Ferro plans with a Coconspirator in advance of a medical procedure. He tells the Coconspirator to let him know about any "targs" or targets in advance, because he'll be unable to victimize targets during a two-week period.



In addition to the home invasions, Ferro also assisted in the money laundering by using fraudulent know your customer documents to open a digital payment card used by the group to spend their stolen virtual currency. Ferro set up the digital payment card with a company that is geo-blocked in the United States. Ferro used his Latvian "kyc guy," to create the account. Ferro then shared the virtual card with several coconspirators so they could load the card with stolen laundered virtual currency and use it at retail stores in the United States.

The following is a snapshot of Ferro discussing the card and how it was initially declined at a high-end jewelry store, "Ice Brothers," followed by a photo of the jewelry he was able to purchase.

5

 

On September 16, 2024, Ferro discussed this virtual currency digital card account with another coconspirator and the limits placed on each deposit to avoid anti-money laundering freezes.

FERRO: If you are going to pay don't use Ethereum… Malone sent 200k and it's still pending on eth…Tether only…Usdt

CC-2: Yeah bro I told him I think it's 100k per right?

\* \* \*

CC-2: Yeah Jesus bro the thing is the 200k he sent was my 200k… Yeah bro defo cause it's above 99k … It fcked it

FERRO: <u>I just hope they don't ask for kyc… I deleted my old tele with my kyc guy</u>

Seized Telegram chats captured Ferro's Ethereum wallet address and blockchain tracing shows that the address sent approximately $673,000 directly to the digital payment card.

In one final example of Ferro's involvement in the overall conspiracy, in his own words on September 3, 2025, he held the following exchange.

CC-1: I mean it's just how it should be, no random people should just be allowed in the circle because of what we do. Takes one fucking idiot to sabotage us.

FERRO: <u>Jae don't think like that because I feel like he isn't as deep in as you me and</u>

6

Malone are.

## September 18, 2024 Arrests and Post-Arrest Conduct

Ferro was present at one of Coconspirator Lam's water-front Miami rental mansions on the day of the search warrants and Lam's arrest. Ferro did not cut ties with the enterprise at that point. In fact, he became Coconspirator Lam's main conduit to the rest of the members at large. Lam directed Ferro to get in touch with several additional cybercriminals working with the group and directed Ferro to collect money on Lam's behalf. The messages below are just a sampling of the conversations captured from Alexandria Jail between Lam and Ferro.

| Date/Time | Facility | Direction | Other Party | Person Of Interest | Subject | Message |
|---|---|---|---|---|---|---|
| 12/04/2024 05:32 PM | VA - Alexandria Detention Center VA | Outgoing | Marlon Ferro (Disconnected) | MALONE LAM | RE: Hello | Get me in contact with 41, tell him I want to speak to him. Ask Ethan what he did with Jae's watch, tell him I'm the one asking. Get me in contact with Gerred, ask around for it, tell him I want to speak to him. |
| 12/05/2024 10:11 PM | VA - Alexandria Detention Center VA | Outgoing | Marlon Ferro (Disconnected) | MALONE LAM | RE: Hello | Tell that nigga 41 to stop talking about what I tell him / don't tell anyone what I tell him, not Ethan, not Cody, nobody |
| 12/07/2024 03:52 PM | VA - Alexandria Detention Center VA | Incoming | Marlon Ferro (Disconnected) | MALONE LAM | Hello | 41 Said " No response" |
| 12/07/2024 | VA - | Incoming | Marlon Ferro | MALONE | RE: call | Bet let me text him |

For context, "41" is a well-known hacker working with the group. Ethan is a reference to Coconspirator Ethan Yarally, currently a fugitive in Dubai. "Gerred" is a reference to another social engineer caller working with the enterprise.

Ferro frequently relayed messages to coconspirators at large and often connected Lam on three-way calls to associates who didn't want their numbers logged in the jail system.

Ferro also assisted Lam in using Lam's leftover remaining stolen cryptocurrency to purchase luxury handbags for his Miami girlfriend. The purses, Hermes Birkins, retail for

multiple tens of thousands of dollars. In one exchange on December 26, 2024, the Ferro discussed whether a purse was stolen in transit by a UPS employee. Ferro stated "[GF's] package got cut open and they took the Birkin, she thinks it was a worker but something don't seem right. I will get to the bottom of it there's no way a 65k bag gets stolen through transportation."

On December 10, 2024, Ferro and Lam continue to discuss Lam's finances and Ferro's attempts to help Lam budget how many handbags he can afford from jail because of the fluctuating price of XMR (Monero). Lam asked "What's the word with the Chanel bag and do you have someone that can wrap it as Christmas presents and send it away? I want the Chanel stuff and Birkin wrapped and I want a bouquet of roses all sent together too." Ferro responded "XMR is down SO much i'm gonna send you a pic, you wont be able to afford both. I say you get her two or 3 purses that are channel and then later we get her the Birkin… I sent you the screen shots showing proof of the xmr, I would cover but i also have to get liz and my parents things. I don't spawn in 10 million a week." Lam responded "isn't Conor [Flansburg] sending money? I'm so confused… And Ethan [Yarally] sent you 55k, you said I had 25k too." Lam continued by saying "bro what? firstly its not 10? to swap xmr to tether and secondly the 55k dropped to 42k, I still had money, that's just money from Ethan [Yarally] wtf are you saying lol." Ferro responded with "10% to change it into cash lol," referencing the fee charged for unlicensed crypto-to-cash exchangers.  Lam replied, "stop fucking telling me this and that you had so much of my $ that Gerred gave, not just from Ethan [Yarally]." This is another conversation where Lam discusses how Ferro received a significant amount of money from the cybercriminal "Gerred" on Lam's behalf, in addition to $55,000 from Coconspirator Yarally.

On December 14, 2024, Ferro sent Lam a photo of the designer purse he purchased on Lam's behalf for Lam's girlfriend and had delivered on Lam's behalf.

.

### **May 13, 2025 Search Warrants[2]**

The FBI executed a search warrant at Ferro's residence in Santa Ana, California on May 13, 2025. From Ferro's apartment, agents recovered one black rifle, one handgun, multiple firearm magazines at least one of which was loaded, thumb drives, a cold storage virtual currency wallet, Coconspirator Lam's passport, and a fake New York State ID car with Ferro's face and fictitious name.

Agents also observed, but did not seize, a freezer bag sized bag filled with marijuana and a sandwich bag sized bag filled with orange pills that appeared to be Adderall, next to a plastic card that appeared to be used for crush and snorting the Adderall pills.

### **FERRO's Pre-Trial Report**

During his pre-trial services interview, Ferro claimed to have lived at his current apartment for the past six months but the pre-trial officer was unable to verify his address or length of his residency at the location. Defendant admitted to traveling abroad on several occasions, including to Canada, the United Kingdom, and Cuba. Ferro stated that he has been

---

[2] Due to miscommunication on the day of the arrests, this information unfortunately not communicated to the CDCA Magistrate.

9

unemployed his entire life and "that his friends and family have been financially supporting him." He further claimed to have no assets or liabilities, but at the same time, pays $3,500 per month in rent at a Santa Ana high-rise apartment building. He also appears to be paying Coconspirator Lam's legal bills, without any identifiable assets of employment.



15 MacArthur Place, Santa Ana, California 92707

I. **ARGUMENT**

Title 18, U.S.C. § 3145(a) states:

**(a) Review of a release order** – If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release
> . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure

10

the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[3]

This Court may detain a defendant upon motion of the government in a case that, as here, involves "a serious risk that such person will flee" or involves "a serious risk that such person will obstruct or attempt to obstruct justice." 18 U.S.C. §§ 3142(f)(2)(A) and 3142(f)(2)(B).

While the act governing pre-trial detention requires that detention be supported by "clear and convincing evidence" when the justification is the safety of the community, it is silent as to the level of proof required to establish risk of flight. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). This circuit, however, has ruled that such a finding need only be supported by a

---

[3] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S. Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

11

"preponderance of the evidence." *Id. citing United States v. Vortis*, 785 F.2d 327, 329 (D.C.Cir.1986).

Courts commonly agree that detention based on risk of flight "is a valid regulatory device" because it "serves the principles of [our constitutional] system by guaranteeing that the defendant will stand trial and, if convicted, face punishment." *United States v. Melendez-Carrion*, 790 F.2d 984, 1002 (2d Cir.1986), *citing Bell v. Wolfish*, 441 U.S. 520, 534, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979).

To justify detention on the basis of dangerousness to the community, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).

The relevant factors in both evaluations remains the same under Title 18, United States Code, Section 3142(g) – namely, (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's past conduct and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In consideration of these factors, along with the applicable rebuttable presumptions, the government respectfully submits that there is no condition, or combination of conditions, that would assure the safety of the community or the defendant's appearance at future proceedings.

### A. Nature and Circumstances of the Offenses Charged

The nature of the charged offenses are serious. Defendant is charged in a 40-page Superseding Indictment, alleging that he was a member of an international cybercrime racketeering enterprise responsible for hundreds of millions of dollars in victim losses. Ferro committed

sophisticated home invasions on behalf of the enterprise. He worked with Coconspirator Lam to tracking the victim's location through an iCloud intrusion and set up a make-shift surveillance camera in front of the victim's home. Ferro was also a central figure in the money laundering activity, facilitating the expenditures money laundering offenses by using Latvian identity documents to register digital payment cards for the group to spend their stolen cryptocurrency. Finally, he continued his conduct well after Lam was arrested and incarcerated, serving as a messenger for Lam to the rest of the coconspirators and helping Lam manage his cryptocurrency holdings, pool funds from other social engineers, purchase gifts for his girlfriend, and pay Lam's bills. Ferro was then arrested with fake identification documents, a rifle, a pistol, and multiple firearms magazines, at least one of which was loaded.

If ever there was a doubt how involved Ferro was in this enterprise, he erased that doubt in a conversation with Coconspirator-2 when he acknowledged that other associated weren't "in as deep" as he and Malone. The nature and seriousness of the offense weighs in favor of detention.

### B.     Weight of the Evidence Against the Defendants

The weight of the evidence is truly overwhelming. The defendant traveled to New Mexico to break into the home of a wheelchair bound victim and was caught on a ring camera.

He is captured on Telegram messages overtly discussing the $240,000,000 cryptocurrency theft and complaining that CC-2 didn't want to wait for Coconspirator Lam to finish the laundering, and therefor "fumbled" a $250,000,000 theft. Ferro went on to request home invasion targets from CC-1 in the conversation and even plans ahead for targets, warning that he would be unavailable for two weeks.

Ferro then went on to help Lam (from inside of jail) engage in multiple transactions, in excess of $10,000, knowing the proceeds were derived from fraud. This snapshot of the evidence

summaries previously weighs strongly in favor of detention.

### C.  Defendants' History and Characteristics

Defendant has no verifiable address. He has never held employment. He claims to hold no assets and can't explain his ability to pay rent at a Santa Ana, California high-rise apartment or how he is able to pay significant legal bills. He was in possession of two firearms and a fake ID upon his arrest. He is a member of an enterprise that has access to "no identification document" private jet travel. Defendant has every incentive to flee, especially when he has no ties to any job, residence, or assets. He possessed no characteristics that would give the Court confidence that he will appear and that he would not pose a danger to the community. This factor weighs in favor of detention.

### D.  Danger to the Community

As detailed above, Ferro breaks into homes. He was in possession of multiple firearms. He helped launder stolen cryptocurrency for an enterprise responsible for over $250,000,000 in victim losses. He served as a conduit for Coconspirator Lam while Lam was incarcerated, relaying messages to members at large and pooling illicit funds from these members at Lam's behalf. He poses a danger to the community and this factor weighs in favor of detention.

### CONCLUSION

WHEREFORE, the United States respectfully requests the Court review Defendant Ferro's release order *de novo* on May 19, 2025 and detain Defendant Ferro pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Kevin Rosenberg*

>Kevin Rosenberg
>Assistant United States Attorney
>Ohio Bar 0081448
>United States Attorney's Office
>601 D. Street NW
>Washington, D.C.  20530