IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case. No. 24-CR-417 (CKK) |
| | ) | |
| TUCKER DESMOND, | ) | **Redacted** |
| Defendant. | ) | |

TUCKER DESMOND'S MEMORANDUM IN AID OF SENTENCING

## I.    INTRODUCTION.

Tucker Desmond, through counsel, submits this Memorandum in Aid of Sentencing to highlight the overwhelming mitigating factors present and assist the Court in its "overarching duty under § 3553(a) to impose a sentence sufficient but not greater than necessary to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011) (internal quotations omitted). Tucker[1] was 19 years old, emotionally immature, and struggling with the effects of significant trauma that left him vulnerable to exploitation at the time of the offense. Under pressure to spare those he considered friends, Tucker destroyed a cell phone and two computers. It was his first criminal offense and there is every reason to believe it will be his last. The sentencing guidelines and § 3553(a) factors recognize a sentence other than imprisonment is appropriate in this case. U.S. Sent'g Comm'n, *Guidelines Manual* (USSG) § 5C1.1, Application Note 9 (2025). The Defense therefore recommends a sentence of twelve (12) months' probation, with specific recommendations for therapeutic intervention and social supports.[2]

---

[1] To distinguish Tucker Desmond from his father, we refer to members of the Desmond family by their first names.

[2] As discussed more fully herein, Tucker completed a comprehensive mental health evaluation conducted by forensic psychologist Sara Boyd, Ph.D., and neuropsychologist Scott Bender, Ph.D., ABPP-CN, to assess his psychological characteristics and treatment needs. Sara Boyd, Ph.D. and Scott Bender, Ph.D., ABPP-CN, *Neuropsychological & Forensic Report for John Tucker Desmond* (Feb. 22, 2026) (**Exhibit 1**). Their detailed treatment recommendations are set forth therein. *Id*. at 11-13. Dr. Boyd's and Dr. Bender's *curricula vitae* are attached as **Exhibit 2** and **Exhibit 3**, respectively.

## II.    UNDER THE SENTENCING GUIDELINES, PROBATION IS APPROPRIATE.

Tucker agrees with the PSR's calculation of his Criminal History of I, his total offense level of 11, and the guideline recommended sentencing range of 8-14 months' imprisonment. PSR ¶¶ 36-37, 42-45, 88. In accepting responsibility for his criminal offense, Tucker has already acknowledged the facts underlying these calculations.[3] For an offense level in this range, the sentencing guidelines authorize a sentence of probation. USSG §§ 5B1.1(a)(2); 5C1.1(b), (c)(3). When a defendant also has no criminal history, like Tucker, "a sentence other than a sentence of imprisonment … is generally appropriate." USSG § 5C1.1, Application Note 9; PSR ¶ 89; *see* PSR ¶¶ 44, 46-51 (describing Tucker's absence of criminal history).

## III.    NON-GUIDELINE CONSIDERATIONS WARRANT PROBATION FOR TWELVE MONTHS.

There is no presumption of reasonableness attached to the sentencing guidelines. *See Nelson v. United States*, 555 U.S. 350, 352 (2009). They serve only as a "starting point and initial benchmark" of a just sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). Thus, after ensuring the accuracy of Tucker's guideline calculation, the analysis does not end. Rather the Court must consider facts that would support any grounds to vary below the guidelines. *See generally* 18 U.S.C. § 3553(a). A just sentence for Tucker, then, requires close consideration of multiple statutory sentencing factors. The guidelines make up but one portion of the applicable factors and are entitled to no special deference. *See* 18 U.S.C. § 3553(a)(4). The remaining factors include: the nature and circumstances of the offense and the history and characteristics of the offender, *id.* § 3553(a)(1); the need to provide a sentence that is sufficient but not greater than

---

[3] In addition to admitting his guilt, Tucker has demonstrated his acceptance of responsibility by submitting a letter to this Court that outlines in detail he remorse for his crime, full acceptance of responsibility for his actions, and the distorted thinking that contributed to his offense. Let. from Tucker Desmond to Hon. Colleen Kollar-Kotelly, at 1, 4-6 (Feb. 3, 2026) (**Exhibit 4**).

necessary for purposes of punishment, deterrence, incapacitation, and rehabilitation, *see id.* § 3553(a)(2); the kinds of sentences available, *id.* § 3553(a)(3); and the need to avoid unwarranted sentence disparities, *id.* § 3553(a)(6).

These additional factors provide for mitigating features not adequately taken into consideration by the guidelines and support a sentence of probation.

### A. Tucker's History and Characteristics Show a Struggling Young Man Who Made a Serious Mistake, Which He Has Done All He Can to Avoid Repeating.

"Highly relevant – if not essential – to the selection of an appropriate sentence is the possession of the *fullest information possible* concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 480 (emphasis added) (alterations omitted) (quoting *Williams v. New York*, 337 U.S. 241, 246-47 (1949)). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Such information is necessary to place the offense in context. Tucker requests that the Court take into account his lifetime of good citizenship and law-abiding behavior. He also asks the Court to recognize the youth, vulnerability to peer influence, and misguided sense of loyalty that contributed to this offense.

### 1. Tucker's ▮▮▮▮▮▮▮▮▮▮ led to significant emotional problems that contributed to his involvement in the offense.

Tucker is the only child of John Desmond and Nicole Dupre, seemingly traditional middle-class parents in southern California. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████ These family problems would hinder Tucker's development and increase his vulnerability to peer influences.[4]

**Tucker's early childhood was** ████████████████████████████

Tucker's first years were marked by significant health challenges, █████████████ ████████ and frequent relocations.[5] At an early age, Tucker exhibited significant promise as an athlete. He was not permitted to simply enjoy his gifts, but ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[4] *See* Boyd/Bender rep. at 10 ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[5] Tucker Desmond let. at 1-3); Letter from Nicole Dupre to Hon. Colleen Kollar-Kotelly, at 2 (Jan. 31, 2026) (**Exhibit 5**); Letter from John Desmond to Hon. Colleen Kollar-Kotelly, at 1-2 (Feb. 3, 2026) (**Exhibit 6**).

[6] Tucker Desmond let. at 2.

[7] PSR ¶ 54; *see* Tucker Desmond Let. at 2 (████████████████████████████████████████)

[8] Tucker Desmond let. at 2.

[9] *Id*. at 1.



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Jennifer Manavi, PsyD, Tucker's therapist, observed in real-time how ████

████████████████████████████████████████████████████

████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

████████████████████ Nicole and John's co-parenting was defined by ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

---

[15] Manavi let. at 1-2.
[16] *Id.;* Tucker Desmond let. at 3; PSR ¶ 55.
[17] Manavi let. at 2.
[18] Tucker Desmond let. at 3; PSR ¶ 56. Tucker recounted to Dr. Boyd that ████████████████████
████████████████████████████████████████ Boyd/Bender rep. at 4.

**████████████████████ further undermine his social development,
leaving him susceptible to his codefendants**

████████████████████████████████████████████

██ He was just beginning adolescence, to seek social outlets, and to exercise independence.

Rather than receiving necessary support for a healthy transition, however, ████████████

████████████████████████████████████████████

████████████████████████████████

Not surprisingly, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████[22]

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

---

[19] Boyd/Bender rep. at 3-4, 10; Tucker Desmond let. at 3-4; Nicole Dupre let. at 2; John Desmond let. at 2.
[20] While not invented by Generation Z – the first fully post-digital generation – the notion of "quiet quitting" in work, family, and academics has gained greater relevance since being named during the COVID pandemic, and is now recognized as a both a byproduct of trauma and a socially-acceptable response to stress and to avoid burnout.
[21] Tucker Desmond let at 3.
[22] *Id.*
[23] PSR ¶ 54.

This was one of my lowest points but it started some changes in me…. I wasn't walking around on eggshells all the time and ███████████████ I got closer to my mom again, but ███████████████████████████████████████████████████████████████████ ████████████████████████████ But with this independence, some of the guardrails were removed and I was kind of on my own.[24]

After finishing high school, Tucker enrolled in college, but he was completely unprepared to manage the demands of the academic challenges that ensued.[25] It had been more than two years since Tucker had had to sit in class, pay attention to a lecture, or take notes.[26]

Towards the end of his first semester of community college, Tucker was reacquainted with a friend, who introduced him to the codefendants in this case. These associations came at a time of unique vulnerability in Tucker's life. While he craved meaningful peer relationships, Tucker's social development was stunted. His susceptibility to peer influences, alcohol abuse, and the prospect of financial success combined to leave him extremely vulnerable to exploitation.[27] Ultimately, Tucker's emotional immaturity and deep need for fraternity led him to develop a misguided sense of loyalty to his codefendants (which they were only too happy to exploit).[28]

---

[24] *Id.* at 4.

[25] During Tucker's first two and one-half years in public high school he earned mostly Ds and Fs. Official High School Transcript for John T. Desmond (**Exhibit 8**). After transferring to online high school for the spring semester of his junior year, Tucker's grades improved markedly and never received anything lower than a C. *Id.* During his first semester at community college, Tucker received one A and three Cs. Academic Transcript for Tucker T. Desmond, at 1 (**Exhibit 9**). The following semester he took two classes, withdrawing from "Financial Accounting" and receiving an F in College Algebra. *Id.*

[26] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████

[27] Boyd/Bender rep. at 10; *see* Manavi let. at 2 (describing Tucker's "intense feelings of wanting to fit in with his peers" particularly those "that are older and perceived as 'more successful' than him."). █████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████

[28] Tucker Desmond let. at 5; Boyd/Bender rep. at 5, 10.

> **2.    Tucker was 19 years old. Even by the standards of that age, Tucker's coping mechanisms left him immature and dependent on others' approval.**

Tucker's youth and undeveloped brain at the time of the offense are crucial factors in the determination of a just sentence.[29] Youth is a relevant mitigating factor at sentencing because the human brain is not fully developed until around 25 years old. Prior to that a person is subject to greater degrees of impulsivity, poor judgement, and peer influence purely as a condition of their youth.[30] Indeed, the last region of the brain to reach maturity is the prefrontal cortex, which is "utilized in impulse control, emotional reactions, executive functioning, and decision making."[31]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

All of these factors weigh heavily on criminal offending:

> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not be complete until the age of twenty-five. The recent National Institutes of Health report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Gall,* 552 U.S. at 58 (alterations omitted) (quoting district court with approval). Consequently, the Supreme Court and the Sentencing Commission have regularly recognized age as an important factor to be considered under § 3553(a). *See Rita v. United States*, 551 U.S. 338, 364-65 (2007) (Stevens, J., concurring). Thus, courts routinely cite immaturity and youth in granting below-

---

[29] Boyd/Bender rep. at 8-9.
[30]    U.S.    Sent'g    Comm'n,    *Youthful    Offenders    in    the    Federal    System*,    at    6-7    (2017),
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2017/20170525_youthful-offenders.pdf
[31] *Id.* at 6.
[32] *Id.* at 7.

guidelines sentences. *See, e.g., United States v. Clendin*, No. 24-5346, 2025 U.S. App. LEXIS 4544, at *4 (6th Cir. Feb. 26, 2025) ("The record reflects that the district court considered Clendenin's age, … along with many other factors, and properly considered the § 3553(a) factors in imposing the below-guidelines sentence."); *United States v. Beasley*, No. 23-1700, 2024 U.S. App. LEXIS 7812, at *5 (7th Cir. Mar. 22, 2024) (citing defendant's "relative youth (age 22 at the time of sentencing)" in granting "a below-guidelines" sentence); *United States v. Feemster*, 572 F.3d 455, 459 (8th Cir. 2009) (upholding sentence of 120 months for crack distribution where Guidelines recommended range of 360 months to life incarceration because, "in considering the [24 year-old] defendant's age," district court believed sentence range was too high); *see also United States v. Flores-Nater*, 144 F.4th 56, 65 (1st Cir. 2025) (district court "abused its discretion and committed procedural error by failing" to address defendant's sentencing arguments "concerning his age at the time of the offense."); *United States v. Crenshaw*, No. 290-cr-117, 2025 U.S. Dist. LEXIS 34977, at *39 (E.D. Va. Feb. 26) (in granting compassionate release, court notes that age "is now an important consideration" under the sentencing guidelines), *appeal filed*, No.25-6173 (4th Cir. Mar. 13, 2025); *United States v. Wells*, 2023 U.S. Dist. LEXIS 60428, at *16 (D.D.C. Feb. 21, 2023) ("[T]he Court considers Wells's young age when he joined the conspiracy … to be an important factor in weighing in favor of a sentence reduction.");.

Tucker's history exacerbated the lack of maturity and underdeveloped sense of responsibility that are essential conditions of adolescence. Tucker was 19 years old at the time of his offense. ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████[33] As a primary coping strategy, Tucker became hard-wired to appease people, especially those (████████ and codefendants) from whom he craved approval. This history contributed to his codefendants' influence over Tucker, as well as his "susceptibility to the prospect of financial security and opportunity … that his codefendants seemed to offer."[34] Tucker's historical and contemporaneous use of marijuana and alcohol compounded the problems of his underdeveloped brain, making him even more susceptible.[35]

The only "cure" for Tucker's impaired judgment and decision-making is time. Nevertheless, he has done what he can to take accountability for his offense and support his rehabilitation. He has taken an honest accounting of ████████████████████████ ████████ returned to therapy, and re-enrolled in community college. Considering his youth and emotional circumstances, the Court should impose a sentence of probation with some or all of the recommendations proposed by Drs. Boyd and Bender.

> **3.    This offense represents a sharp break from Tucker's otherwise law-abiding – and, indeed, admirable – moral character.**



Although John and Nicole ██████████████████████████ ████████████████████████ they did instill many good values in their son. As the numerous letters to the Court make clear,[36] this crime is wholly out-of-character for Tucker, and ████████████████████ ████████████████ and his unique susceptibility to peer influence.

---

[33] Boyd/Bender rep. at 10.

[34] *Id.;* Manavi let. at 2-3.

[35] PSR ¶¶ 67-71.

[36] Boyd/Bender rep. at 8-11. To a person, the people who know Tucker best were shocked by his arrest and conviction because his actions were completely aberrational, against his own values, and not something that will ever be repeated. *See* Nicole Dupre let. at 3; John Desmond let. at 1, 3; Letter from Teresa Fee to Hon. Colleen Kollar-Kotelly, at 2 (Feb. 4, 2026) (**Exhibit 10**); Letter from Jose Carbajal to Hon. Colleen Kollar-Kotelly, at 2-3 (Feb. 2, 2026) (**Exhibit 11**); Letter from Laura Peterson to Hon. Colleen Kollar-Kotelly, at 2 (Feb. 1, 2026) (**Exhibit 12**); Letter from Jennifer Nicholson to Hon. Colleen Kollar-Kotelly, at 2 (Jan. 31, 2026) (**Exhibit 13**); Letter from Dana Kirby to Hon. Colleen Kollar-Kotelly, at 1-2 (Feb. 9, 2026) (**Exhibit 14**); Letter from Justin and Jennifer McKeown to Hon. Colleen Kollar-

Prior to the instant offense, Tucker had no criminal record. The absence of even a minor criminal history reflects well on Tucker's character and suggests that recidivism is unlikely. *See United States v. Huckins*, 529 F.3d 1312, 1318–19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I"); *United States v. Darway,* 255 F. App'x. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first offender status); *United States v. Smith*, 275 F. App'x 184, 186-87 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of a criminal history); *United States v. Urbina*, No. 06-CR-336, 2009 U.S. Dist. LEXIS 18239, *7-9 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of a criminal record, positive work history, and strong family ties). Because Tucker had never been so much as arrested, any punishment – including probation – will mean far more to him than to even a second-time offender. *See, e.g.*, *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) ("[A] prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned. Consideration of this factor is consistent with § 3553's directive that the sentence reflect the need for just punishment and adequate deterrence." (quotations omitted)) ; *cf. United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

---

Kotelly, at 1-2 (Feb. 3, 2026) (**Exhibit 15**); Letter from Landyn McKeown to Hon. Colleen Kollar-Kotelly, at 3-4 (Feb. 4, 2026) (**Exhibit 16**); Letter from Ava McKeown to Hon. Colleen Kollar-Kotelly, at 1 (Feb. 3, 2026) (**Exhibit 17**); Letter from Toni Amador to Hon. Colleen Kollar-Kotelly, at 1 (Feb. 5, 2026) (**Exhibit 18**); Letter from Anthony Paduano to Hon. Colleen Kollar-Kotelly, at 1 (undated) (**Exhibit 19**); Letter from Meghan Paduano to Hon. Colleen Kollar-Kotelly, at 1-2 (Jan. 30, 2026) (**Exhibit 20**).

But Tucker's good conduct goes far beyond a lack of criminality. By all accounts, he is a good man: genuine; compassionate; and respectful of all people. He loves his parents deeply, despite their bitter conflicts, and has exhibited devotion to both through very hard times. Over the course of his twenty years, Tucker has been a dutiful son, neighbor, and friend. He has shown time and again that he is charitable, supportive, and always willing to help those in need. As the character letters illustrate, he has affected numerous people in very positive ways.

Consistent with his core values, Tucker has taken decisive action – including pleading guilty, admitting his crime, and making significant changes to his life – to make amends and avoid repeating his mistakes. Although he remains vulnerable, clear therapeutic interventions are readily available to help Tucker overcome his challenging start in life. Tucker's decision to take responsibility for his offense, and future, reflects his growing maturity. Tucker's (admittedly serious) offense was a byproduct of youth, emotional impairments, an oversized need for peer validation, and a misguided sense of loyalty to those who knew how to take advantage of him. The combination of circumstances, and the resulting anomalous conduct, were aberrations that – Tucker is determined – will never reoccur.

In short, the offense does not reflect Tucker's true character. The sentence should. *See United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) ("[T]he district court received extensive evidence that the [offense] was extremely out of character for Defendant. … [W]e see no abuse of discretion in the district court's conclusion that Defendant was entitled to a downward variance based on the aberrational nature of his conduct.").

### 4.    Tucker's exemplary adjustment to pretrial release, welcoming of rehabilitative interventions, and strong community support all show that Tucker is very unlikely to recidivate.

Tucker has shown, by his actions, that he is committed to his rehabilitation and to overcoming the challenges that led him astray. He has atoned for his crime, apologized to his

family and this Court, and been a model of good citizenship while on pretrial release. He has also done all that he can to ensure that he does not repeat his errors in judgment. Tucker is worthy of compassion and leniency because, at his core, he is a good person who welcomes rehabilitative intervention.

Following his arrest on May 13, 2025, Tucker was released on bond and ordered to comply with more than a dozen conditions (including compliance with active supervision, avoidance of contact with codefendants, and restrictions on his use of smartphones and other technologies). PSR at 2; Dkt. 93 at 1-4. He never violated any of those burdensome conditions.

In that time, Tucker has made numerous changes to his life. He has returned to therapy, re-enrolled in college, and worked to build closer and more meaningful relationships with both his parents and his friends.[37] These changes have helped him to develop greater insight into his early adult difficulties and the root causes of his offense conduct:

> Even though I struggle with the consequences of my crime, I have learned a lot over the past two years. I have learned a lot about myself and how vulnerable I am to negative influences, especially people who claim to be my friends or who try to dazzle me with success. I have learned a lot about the dynamics in my family and how that contributed to me wanting to be liked and to please people. I love my parents very much but see that they put me in the middle of their emotional battles and it made me try to placate them and win their respect. I have learned that I have a lot of growing up to do and that success will not happen overnight. Real success and success I can be truly proud of will take time and hard work. First in earning an education and working hard to develop the necessary skills and abilities to create something lasting. Maybe most of all I have learned that my need to be praised and recognized can lead me astray and that I have to find satisfaction within myself to build my self-esteem and genuine self-worth.
>
> I am now back in college full-time and have recommitted myself to doing the hard work necessary to earn a four-year degree that I can use to build a sustainable career. I have reached out to all of the true friends who I abandoned so I can atone for my actions and hopefully rebuild the meaningful connections we used to share. I have begun the process of trying to ████████████████████ ████████████████████████████████ to build more honest and meaningful relationships. I know I have a lot of work to do on myself and though I

---

[37] Tucker Desmond let. at 6; Nicole Dupre let. at 3.

sometimes struggle with feeling overwhelmed and depressed, I am working hard to determine who I am and who I want to be. I think without truly knowing who I am I will always be susceptible to negative influences. Even with the best intentions in mind, loyalty towards the wrong people is never the right thing. No matter how much someone gives you, it doesn't mean they really care. If it's too good to be true, it probably is.[38]

Undoubtably, Tucker has developed a positive locus of support in his community.[39] His friends and family have stood by him because they know the offense is completely out of character. Since his arrest, Tucker has poured himself into these meaningful relationships, as the numerous letters appended to this memorandum demonstrate. He has re-established relationships with the "true friends" he felt he abandoned so he could "atone for [his] actions and … rebuild" their relationships.[40] ████████████████████████████████████████████ ████████████████████████████████████████████████████████ Admitting his crimes and taking responsibility have infused Tucker's close relationships with greater honesty and openness.[41]

In every way, Tucker's pretrial release has been positive. He has re-entered therapy to address ███████████████████████ has re-enrolled in college (where he is working toward an associate's degree in business), and is working to repair his relationship with those who are important to him.[42] This exemplary behavior while on pretrial release, the strong community of support that is an important buffer against re-offense, and Tucker's efforts to better himself all show a potential for rehabilitation that warrants a lighter sentence. *See United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming 91-month variance based in part on support defendant

---

[38] Tucker Desmond let. at 6.
[39] PSR ¶¶ 56-58; Tucker Desmond let. at 6; John Desmond let. at 3; Nicole Desmond let. at 3; Teresa Fee let. at 1-2; Jose Carbajal let. at 3; Laura Peterson let. at 2; Jennifer Nicholson let. at 2; Dana Kirby let. at 1-2; Justin and Jennifer McKeown let. at 1-2; Landyn McKeown let. at 3; Ava McKeown let. at 1; Toni Amador let. at 1; Anthony Paduano let. at 1; Meghan Paduano let. at 2.
[40] Tucker Desmond let. at 6.
[41] *Id.*; Nicole Dupre let. at 3.
[42] Tucker Desmond let. at 6; Nicole Dupre let. at 3; John Desmond let. at 3.

stood to receive "from his family [and] personal qualities indicating his potential for rehabilitation"); *United States v. Stall*, 581 F.3d 276, 285, 289 (6th Cir. 2009) (affirming substantial variance based in part on remorse and strong support network to aid in rehabilitation); *Smith*, 275 F. App'x at 186-87 (affirming downward variance based in part on the defendant's "strong family ties," his involvement in a treatment program, and the "absence of any risk that he will involve himself in similar conduct in the future"); *United States v. Subia*, 719 F. Supp. 3d 1197, 1199 (D. N.M. 2024) ("exceptional performance on pretrial supervision … justif[ied] the significant variance given in this case"). *United States v. Gomez*, No. 15 Cr. 348 (PCG), 2024 U.S. Dist. LEXIS 214690, *2 (S.D.N.Y. Nov. 21, 2024) (finding "that a variance was appropriate in light of … [defendant's] age, good behavior while on pretrial release, … and lack of a criminal record"); *Urbina*, 2009 U.S. Dist. LEXIS 18239, at *7 (imposing below-guidelines sentence because defendant with "no criminal record, positive work history, [and] strong family ties … did not pose a significant danger or risk of re-offending"); *see also United States v. Schlosser*, 558 F.3d 736, 740-42 (8th Cir. 2009) (finding that pretrial conduct is an appropriate consideration).

### 5.    Tucker has reflected on his crime and is genuinely remorseful.

Tucker's acceptance of responsibility for his offense is not an empty display. He is genuinely remorseful for his actions, as well as for the shame and embarrassment he has caused to his family and friends. As he wrote to this Court:

> I could never have imagined I would be writing a letter to a judge and facing punishment for committing a crime. No matter how embarrassed, scared, or ashamed I am for betraying my beliefs and values, I am committed to taking responsibility for my actions which is why I pleaded guilty and am now before you to face judgement. I made poor decisions and I am responsible for the consequences of those choice and for making corrections so that I never violate the law again.
>
> ….
>
> By committing this crime I hurt a lot of people and brought shame on myself and my family. When I was handcuffed and arrested I saw a look on my dad's face of

shock and disappointment. My mom was not present but has been crushed by my crime. All of our friends and neighbors know that I admitted to a crime and while they remain kind, I know they were stunned. I feel like I have ruined everything inside of my family and am looked at as the biggest waste of potential of all time…. I know that I have to face consequences for my own actions and I do not blame anyone but myself. I deeply regret my crime and misguided loyalty. I apologize for putting perceived friendships above the law. I am truly sorry for getting myself into a distorted mindset that led me to justify my illegal acts.[43]

Although Tucker's guilty plea was the first public expression of contrition, he has been making private apologies to atone for his crime and create more openness about his struggles, including asking more than a dozen friends to write letters on his behalf.[44] In her letter to this Court, Nicole Dupre describes how thoroughly her son has repented of his actions:

Tucker has expressed deep remorse for his actions. Over the last year I have seen how hard and judgmental he is on himself, describing himself as dumb, gullible, or in other negative ways. Since his arrest, Tucker has suffered from fear and depression and has sought out counseling. Although he keeps things close to his chest, he is beginning to work through the overwhelming guilt and shame he feels. Tucker is turning a corner, which is reflected on his return to college with a renewed understanding of the importance of education. He has shown a lot of humility in talking about his offense and poor choices, but also in recognizing the importance of learning to walk prior to running.[45]

John similarly observed his son grow from his experiences over the past year: Tucker is more mature; he has a growing awareness of his own vulnerability to being exploited; and he has recommitted himself to working hard and earning a degree.[46]

Tucker has admitted to a crime that will make him a felon, expose him to incarceration, and continue to infringe on his freedom for the foreseeable future. More than anything, he has begun doing the hard emotional work of addressing the underlying issues that contributed to his association with and misguided loyalty to people who would take advantage of his kindness and

---

[43] *Id.* at 1, 5-6.
[44] Nicole Dupre let. at 3; John Desmond let. at 3.
[45] *Id.*
[46] *Id.*

trust.[47] This acceptance of responsibility and sincere remorse support a probationary sentence. *See, e.g., United States v. Beach*, 275 F. App'x. 529, 532-33 (6th Cir. 2008) (district court did not exceed discretion in varying downward from guidelines range based, in part, on defendant's remorse); *United States v. Taylor*, Crim. No. 3:15-00009, 2022 U.S. Dist. LEXIS 86082, *13 (S.D. W.Va. May 12, 2022) (court "recognized the Defendant's sincere remorse and family obligations in granting downward variance"); *United States v. Johnson*, Crim. No. 18-62, 2021 U.S. Dist. LEXIS 34217, *2-3 (W.D. Pa. Feb. 24, 2021) (in granting downward variance, court took into consideration defendant's early acceptance of responsibility and showing of remorse); *United States v. Bleicher*, Crim. No. 19-99 (BRK), 2020 U.S. Dist. LEXIS 92027, *9 (D. N.J. May 7, 2020) (noting defendant's "genuine remorse" supported a significant downward variance).

**B.    The Offense, Although Serious, Was a Short-Sighted Decision Made to Protect a Friend.**

The nature and circumstances of Tucker's offense strongly support a sentence of probation. Although obstructing justice should be taken seriously, Tucker's conduct was purely situational: an impulsive decision, requested by a friend, and made out of a misguided sense of loyalty. It is in precisely such "high-pressure, time-sensitive, emotional contexts" – "particularly . . . in the presence of peers" – that youthful offenders most struggle. *United States v. Ramsay*, 538 F. Supp. 3d 407, 420, 423 (S.D.N.Y 2021). That is particularly true for offenses such as this one, where the harm is not immediately apparent, unlike (for example) violence. Thus, the severity of the offense does not outweigh the factors calling for probation.

---

[47] Tucker Desmond let. at 1, 5-6; John Desmond let. at 3; Nicole Dupre let. at 3.

C.      **Probation Suffices Both to Deter Others and to Protect the Public from the Low Probability of Any Future Crimes.**

Tucker is at low risk to reoffend based on available empirical evidence and relevant factors. For the many reasons given above, the likelihood of Tucker committing future crimes is practically nil. *See, e.g.*, Michael Massoglia and Christopher Uggen, *Settling Down and Aging Out: Toward an Interactionist Theory of Desistance and the Transition to Adulthood*, 116 Am. J. Socio. 543 (2010); U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28, Ex. 9 (2004) (listing recidivism rates for various types of offenders and considering such demographics such as gender, age, race, drug use, level of education, etc.), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf. Tucker's exceedingly low risk of re-offense renders incarceration needlessly harsh. *See United States v. Cherry*, 487 F.3d 366, 370-72 (6th Cir. 2007) (upholding 43% downward variance because defendant represented a "low risk for reoffending").

While this Court must consider general deterrence under § 3553(a), no evidence supports the finding that a harsh sentence serves to deter future criminal conduct. To the contrary, it is the *certainty* of punishment rather than the *severity* of the punishment that acts as a deterrent.[48] Relatedly, there must be some limit to the need for a single person to bear the full weight of general

---

[48] *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . .reached that conclusion, as has every major survey of the evidence"); *id.* ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 9 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); Symposium, U.S.S.C, Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, *What Social Science can Contribute to Sentencing Policy for Economic Crimes*, at 22 (Oct. 12, 2000) ("One Consistent finding in the deterrent literature is that the certainty rather than the severity of punishment is the most effective deterrent."), *available at* https://www.ussc.gov/research/research-and-publications/research-projects-and-surveys/united-states-sentencing-commissionsymposium-federal-sentencing-policy-economic-crimes-and-new; *see also* Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (according to "the best available evidence … prisons do not reduce recidivism more than noncustodial sanctions").

deterrence. *See United States v. Meyers*, 353 F. Supp. 2d 1026, 1029 n.1 (S.D. Iowa 2005) ("[T]he weight of society's need to send a message to potential wrongdoers can only be borne to a limited extent by one individual."); Paul H. Robinson, *Distributive Principles of Criminal Law*, at 223 (2008) (noting potential ethical objection to overemphasis on general deterrence, which "relies on treating the person being punished as a mere instrument by which to influence the conduct of others").

The combination of circumstances and motivations (youth, impulsivity, sensitivity to influence by peers, hard-wiring to appease, misguided loyalty, need for approval) that led an otherwise law-abiding citizen to risk imprisonment are not addressed or corrected by simply imposing a prison sentence. A sentence of probation, with therapeutic intervention, would serve as a more just and effective deterrent.

### D.    Probation Suffices to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

Tucker acknowledges that destroying potential evidence to obstruct the law constitutes a serious offense, warranting consequences, including a felony conviction that will impact him for the rest of his life. As discussed below, when defendants obstruct justice even under far worse circumstances, courts typically find that probation reflects the severity of the offense and provides just punishment. Furthermore, Tucker's conduct since his arrest "evidences a new respect for the law as well as a better understanding of the consequences of his actions. Therefore, imprisonment is unnecessary in this case to promote respect for the law." *Subia*, 719 F. Supp. 3d at 1200.

### E.    Incarceration Would Create Unwarranted Sentencing Disparities.

"Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity." *United States v. Booker*, 543 U.S. 220, 253 (2005). That goal is reflected in 18 U.S.C. § 3553(a)(6)'s command for district courts to avoid unwarranted

sentencing disparities among "defendants with similar records who have been found guilty of similar conduct." Consideration of cases involving defendants who obstructed justice, had the same adjusted offense levels, a primary guideline of §2J1.2, and no prior criminal history emphatically supports a sentence of probation in this case, consistent with § 3553(a)(6). Although every comparable case involved defendants far more culpable than Tucker, most received a sentence of probation.

### 1. Use of JSIN calculations.

As an initial matter, the Court should give no weight to the *average* and *median* sentences calculated by the Judiciary Sentencing INformation (JSIN) system, set out in the PSR. PSR ¶109. Because the JSIN analysis is disconnected from the facts of the actual cases, and because average and median sentence calculations dramatically and misleadingly inflate the sentencing outcomes, relying on them would be fundamentally unfair.

Citing generalized JSIN data, the PSR asserts that "[d]uring the last five fiscal years, there were 8 defendants whose primary guideline was §2J1.2, with a Final Offense Level of 11 and a Criminal History Category of I". PSR ¶109. It then notes three of these defendants received prison sentences that averaged twelve (12) months and had a median length of eight (8) months. When the five defendants who received no imprisonment are included, the purported average total sentence is reduced to seven (7) months. Despite revealing that the vast majority of similarly situated defendants (62%) received probation, the JSIN calculations are erroneous and misleading.

The reasons for this are numerous and disqualifying. First, the JSIN calculations are wrong. According to the data set provided, only three defendants received sentences involving active incarceration and their sentences were 20, 8, and 7 months respectively. PSR ¶109. The JSIN reports the average sentence for these three defendants was 12 months. This is mostly accurate (although the actual mean sentence for the three defendants who were incarcerated would be 11.7

21

months) but, when the five probation-only cases are included, the mean term of incarceration drops to 4.4 months, and the median sentence drops to *zero months*. Second, the JSIN data presents too little information to make a meaningful assessment of the relevant aggravation present in each of these cases. Third, the JSIN data excludes critical offender characteristics – such as age and life experience, education, occupational history, and role in offense – that would allow a meaningful assessment of whether the individuals actually committed "similar conduct." 18 U.S.C. § 3553(a)(6). Finally, the JSIN calculations provide no information concerning the defendants' acceptance of responsibility or expression of remorse.

### 2.    The actual cases underlying the JSIN calculations.

Though the PSR does not identify the cases referred to in the JSIN data set, counsel accessed the JSIN system and extracted additional data from the United States Sentencing Commission's "Individual Datafiles" for the same five fiscal years (2020-2024).[49] By cross-referencing the data with the PACER system, counsel was able to identify seven of the eight cases.[50] Like Tucker, each of the defendants had no criminal history and a guidelines range of 8-14 months. Even so, analysis of these cases makes clear they are significantly more aggravated than the case at bar.

---

[49] *See* Table A attached as **Exhibit 21** (the metadata included in Table A is publicly accessible on the Commission's website at: https://www.ussc.gov/research/datafiles/commission-datafiles).

[50] Although counsel was unable to locate the eighth case referenced in the JSIN data set, identified in Table A as USSC ID No. 2870625, much of the metadata obtained from the JSIN Datafiles is relevant, including the defendant's age and life experience (57), level of education (advanced degree), nature of offense (materially false statements to federal official, in violation of 18 U.S.C. § 1001), and sentence imposed (12-months' probation), *see* Table A (USSC ID No. 2870625), and support a probationary sentence for Tucker.

*United States v. Moinian*, 3:21-cr-02927 (S.D. Cal.)[51]
(20 months' imprisonment)

Shapour Moinian, 67 years old,[52] was a naturalized citizen (originally from Iran) and former U.S. military pilot. Moinian had earned a Bachelor of Science degree in biology and a Master of Science degree in aeronautical science, and was married with children.[53] ECF No. 71 at 6. For three years, he used his security clearance and work as a defense contractor on classified projects in the aerospace industry to sell proprietary information to Chinese intelligence services. *See id.* at 2-4. He also enlisted an associate to strip proprietary classification markings from aviation-related information, making the information even more valuable to foreign adversaries. *Id.* at 4. Moinian lied repeatedly to hide his crimes, including multiple times during background checks associated with renewing his security clearance. *Id.* at 1, 3-4. Even while his case was pending, Moinian sought a new job with a different aerospace company and lied about why his previous employment had been terminated. *Id.* at 4. Moinian also committed immigration fraud by arranging a sham marriage for his stepdaughter. *Id.* at 4, 6.

Moinian pleaded guilty to one count of Acting as an Agent of a Foreign Government and two counts of making false statements. 18 U.S.C. §§ 951; 1001. The Government recommended an above-guideline sentence of 20 months' imprisonment, arguing that a lower sentence would "not sufficiently deter those who are considering … sell[ing] information to China or other nations. ECF No. 71 at 7. The district court sentenced Moinian to **twenty months' imprisonment** as to

---

[51] *United States v. Moinian* is identified in Table A as USSC ID No. 2772233.
[52] All ages are given at the time of sentencing. Although there might be a small difference in age between commission and sentencing, the facts still reveal that all defendants were far older than Tucker when they committed the offense.
[53] *See* U.S. Dep't of Just. Off. of Pub. Affs., *Former U.S. Military Pilot Sentenced for Acting as Paid Agent of the Government of the People's Republic of China and Lying on National Security Background Forms* (Nov. 7, 2022), https://www.justice.gov/archives/opa/pr/former-us-military-pilot-sentenced-acting-paid-agent-government-people-s-republic-china-and.

Count 1 (and a shorter concurrent sentence on Counts 2 and 3) and **three years of supervised release**. ECF No. 84 at 2-3.

### *United States v. Neff*, 2:24-cr-00015 (N.D. Ala.)[54]
(8 months' imprisonment)

Bert Neff was a 50-year-old professional gambler, successful real estate investor, and youth baseball coach when he destroyed evidence, tampered with witnesses, and made false statements to the FBI.[55] ECF No. 21 at 1-2. He repeatedly committed criminal acts over a period of eight months. ECF No. 21 at 1-2. On the eve of his indictment, Neff agreed to plead guilty to Obstruction of Justice. 18 U.S.C. § 1503(a); *see* ECF No. 23 at 1. The Government recommended a period of incarceration, because Neff demonstrated "an uncommon persistence in his effort to obstruct justice," and showed a particular disregard for family members and friends by enlisting them to manipulate the federal investigation. *Id.* at 4-5. The district court sentenced Neff to **eight months' imprisonment** and **three years of supervised release**. ECF No. 23 at 2-3.

### *United States v. Ethridge*, Case No. 1:22-cr-254-RC (D.D.C.)[56]
(7 months' imprisonment)

Tyler Ethridge was a 35-year-old husband and father, who ran his own business and had been ordained as a minister. ECF No. 34 at 1; ECF No. 36, at 7. These responsibilities did not prevent him from joining the January 6, 2021 attack on the United States Capitol. Ethridge denied responsibility for his actions and insisted on a trial.

---

[54] *United States v. Neff* is identified in Table A as USSC ID No. 2881079.
[55] Mark Puleo, *Indiana Man Charged with Destroying Evidence in Alabama Baseball Betting Scandal*, N.Y. Times (Jan. 31, 2024), https://www.nytimes.com/athletic/5242451/2024/01/31/alabama-baseball-betting-scandal-indiana-ohio-evidence-tampering-charges/. Neff's criminality resulted in the firing of the University of Alabama baseball coach. *Id.*
[56] *United States v. Ethridge* is identified in Table A as USSC ID No. 2891251; *see also* U.S. Attorney's Office, D.C., *Colorado Man Sentenced to Prison on Felony and Misdemeanor Charges for Actions During Jan. 6 Capitol Breach* (Sept. 25, 2024) https://www.justice.gov/usao-dc/pr/colorado-man-sentenced-prison-felony-and-misdemeanor-charges-actions-during-jan-6.

Evidence at trial revealed the full extent of Ethridge's violent and destructive criminal activity. Ethridge was at the forefront of the first group of rioters to breach the restricted area. He removed barricades at the first beach point, which facilitated the mob overwhelming the U.S. Capitol's perimeter defenses. He ignored police efforts to repel and disperse him and the other rioters. He climbed scaffolding outside the Capitol building and exhorted other rioters to fight the police. He unlawfully entered the Capitol building, remained inside for 30 minutes, and braced himself physically to resist police efforts to force him out of the hallway near the Rotunda. He exhibited clear knowledge that his conduct was illegal, such as urging another rioter to cover his face to conceal his identity and when recording that he himself might be jailed. Despite such knowledge, he bragged on social media about participating in the riot. He was also untruthful during interviews with the FBI. ECF No. 34 at 2-3; ECF No. 55 at 3.

Ethridge was found guilty of two felonies and four misdemeanors,[57] with maximum sentences ranging from 6 months to 20 years: Civil Disorder, 18 U.S.C. § 231(a)(3); Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2); Entering or Remaining in a Restricted Building, 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, 18 U.S.C. § 1752(a)(2); Disorderly and Disruptive Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). ECF No. 34 at 16. At sentencing, Ethridge continued to show no remorse for his crimes, claiming to have merely been "in the wrong place at the wrong time," swept up in "an escalating situation," and "shattered at the fallout from that day." ECF No. 36 at 9. Although the Government argued for a sentence of 53 months in prison, the Court imposed a sentence of **seven months'**

---

[57] Ethridge's conviction for Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count 2), was later dismissed, following his trial, on motion of the Government. ECF No. 48, 49.

**imprisonment** (with shorter sentences to run concurrently for the misdemeanors) and **two years of supervised release**. ECF No. 59 at 3, 4.

*United States v. Davis*, **Case No. 4:21-cr-145 (W.D. Mo.)**[58]
(60 months' probation)

Amanda Davis, 39 years old, was the Health and Behavioral Services Manager at the Jackson County Detention Center (JCDC). ECF No. 35 at 5. She possessed a Masters of Social Work degree, was licensed in two states, had been married for three years, and owned a private practice. *Id.* at 5. Nevertheless, for more than two months, Davis abused her position of trust to smuggle contraband cell phones into the facility. *Id.* at 1-2; ECF No. 27 at 2. When confronted by the FBI, Davis and her attorney created a ruse to retrieve her cell phone from the agents and she proceeded to delete its contents, including call logs and text messages.[59] ECF No. 27 at 2.

Davis pleaded guilty to one count of obstruction. ECF No. 27 at 3. At sentencing the government noted her actions posed unique risks to public safety, because

> she willfully obstructed the administration of justice with respect to an investigation of smuggled cellular telephones into a jail by destroying evidence that was material to an official investigation. Davis's smuggling of three cellular telephones had the effect of her sponsoring criminal activity and *endangering the lives of inmates*. She had been hired to assist inmates with their mental health, but instead made that environment more dangerous. This type of serious misconduct by a mental health professional undermines the integrity of health professionals and agencies to ensure the health and safety of the community. As a result, Davis should be held to a high standard at sentencing.

ECF No. 35 at 3 (emphasis added). Even so, the government did not seek incarceration, but rather 60 months of probation. The district court sentenced Davis to a term of **60 months' probation** and **no supervised release**. ECF No. 38 at 2.

---

[58] *United States v. Davis* is identified in Table A as USSC ID No. 2839322.
[59] *See* Bill Lukitsch, *Jackson County Jail Worker Got Phones for Inmates, Destroyed the Evidence: Indictment*, Kansas City Star (June 24, 2021) (health and behavioral services manager smuggled cellphones to two inmates and then deleted her own phone to thwart investigation), https://www.kansascity.com/news/local/crime/article252350253.html.

***United States v. Mogen*, Case No. 2:23-cr-00304 (D. Utah)**[60]
(36 months' probation)

Rodney Mogen was 47 years old, married, and a highly educated[61] owner of three non-profit businesses. ECF No. 29 at 4. Nevertheless, when he came to regard his homeowners' association as hostile, he embarked on a two-year criminal vendetta against it. Mogen forged numerous federal court documents, a letter from the U.S. Postmaster, a seal of a federal court, documents purporting to be from two federal judges and a clerk of a federal court, documents purporting to be issued by a medical professional, checks purporting to be signed by a property management company, and documents purporting to be from a financial institution. ECF No. 28 at 1, 5. When confronted by the FBI, Mogen denied wrongdoing, lied, and engaged in additional criminal behavior. *Id*. at 2-3. Eventually he pleaded guilty to Forging the Signature or Seal of a Judges or Court Officers and Impersonating an Officer of Employee of the United States. 18 U.S.C. §§ 505; 912; *see* ECF No. 21 at 1-2.[62]

Mogen's "criminal acts were not a one-time, impulsive event," and the government believed he was incapable of "stopping his criminal behavior on his own." Furthermore, because Mogen was uncooperative with the presentence investigation, the Government "expressed grave concern" about his "lack of veracity" and failure to show he "truly appreciates the wrongfulness of his conduct or [that he] will modify his behavior in the future." ECF No. 28 at 4-5. Again, however, the Government recommended not incarceration but 48 months' probation, and the district court imposed a sentence of **36 months' probation** and **no supervised release**. ECF No. 31 at 3.

---

[60] *United States v. Mogen* is identified in Table A as USSC ID No. 2857379.

[61] Mogen earned a Doctorate in Business Administration, a Masters in Economics, and was both a Certified Business Planner Consultant and Accredited Asset Manager Specialist. ECF No. 29 at 4.

[62] As part of Mogen's guilty plea, the United States agreed to dismiss the remaining five charges, which included Wire Fraud, in violation of 18 U.S.C. § 1343 (count 1), and four additional counts of Forging the Signature or Seal of a Judges or Court Officers, in violation of 18 U.S.C. § 505 (counts 3-6). ECF No. 21 at 5; ECF No. 31 at 1.

***United States v. Anderson*, Case No. 1:23-cr-00029-3 (E.D. Tenn.)**[63]
(36 months' probation)

Keosha Anderson was 30 years old, a college graduate, and gainfully employed when she conspired to pressure a key witness to recant statements – including grand jury testimony – implicating her cousin in a serious crime. *See* ECF No. 76 at 2-5. Anderson pleaded guilty to one count of Conspiracy to Obstruct Justice through Witness Tampering. 18 U.S.C. § 1512(b)(2)(A), (k); *see* ECF No. 76 at 1. The court imposed a sentence of **36 months' probation** and **no supervised release**. ECF No. 136 at 2.

***United States v. Loewke*, Case No. 6:23-cr-06080 (W.D.N.Y.)**[64]
(24 months' probation)

Thomas Loewke, aged 52, was a New York State Police Sergeant who used his position of trust and connections to thwart an investigation into a friend's illegal gambling ring. *See* ECF No. 19 at 3. Loewke used confidential information to obstruct the investigation and facilitate the continued operation of the illegal gambling business. *Id.*. Based on Loewke's tip, his friend was able to destroy significant evidence in the following months to obstruct the investigation. *Id.* Loewke pleaded guilty to Obstruction of a State or Local Law Enforcement investigation. 18 U.S.C. § 1511; *see* ECF No. 19 at 1.

At sentencing, Probation requested a two-level enhancement, under USSG § 3B1.3, because Loewke abused his position of trust:

> The defendant was employed as a Seargeant for the New York State Police (NYSP). He obtained information regarding an investigation being conducted by the NYSP and tipped off the target of that investigation. The defendant provided protected information that led to the target, Ferrari, to delete the betting history, change the passwords, and change the website to conceal the offense.

---

[63] *United States v. Anderson* is identified in Table A as USSC ID No. 2862475.
[64] *United States v. Loewke* is identified in Table A as USSC ID No. 2842972.

ECF No. 25 at 3 (quoting PSR ¶ 47). The Government concurred in this recommendation. *Id.* In imposing a sentence of **twenty-four months' probation** and **no supervised release**, ECF No. 33 at 2, District Court Judge David G. Larimer observed Loewke was a non-violent offender with no prior criminal history, and prison was unnecessary to deter future crimes.[65]

### 3.    Additional, non-JSIN case.

In the process of searching for the JSIN cases, counsel uncovered one additional comparator case, which also supports a probationary sentence for Tucker. *United States v. Riley*, Case No. 1:21-cr-628 (ABJ). *Riley* is not part of the JSIN data set but involved a primary guideline of USSG §2J1.2 and CHC I offender whose guideline range equal to or higher than Tucker's.

**United States v. Riley, Case No. 1:21-cr-00628 (D.D.C.)**
(24 months' probation)

Michael Angelo Riley was a 50-year-old U.S. Capitol Police Officer with over 25 years of law enforcement experience. He used that experience and his knowledge of the judicial system to help a January 6 rioter destroy evidence of his crimes, obstruct justice, and avoid prosecution for his role in the insurrection. ECF No. 103 at 1, 5-7.[66] Weeks later, when Riley learned that he himself was under investigation, he made further efforts to obstruct justice by destroying evidence of his own criminal conduct and concocting a false story to conceal his crimes.[67] *Id.*

Throughout the proceedings, Riley adamantly denied guilt and expressed contempt for the criminal justice system. At trial, he gave materially false testimony to the jury and offered farfetched explanations for his brazen criminality. *Id.* at 8-9. After hearing nine days of evidence,

---

[65] Hailie Higgins, *Former State Trooper Sentenced to 2 Years of Probation in Connection to Gambling Ring*, News 10 (Dec. 17, 2023), https://www.whec.com/top-news/former-state-trooper-to-be-sentenced-on-monday-in-connection-with-gambling-ring/.

[66] *See also* U.S. Attorney Office Press Release, *Former U.S. Capitol Police Officer Found Guilty of Obstruction Charge Involving Investigation of Jan. 6 Capitol Breach*, Oct. 28, 2022, available at: https://www.justice.gov/usao-dc/pr/former-us-capitol-police-officer-found-guilty-obstruction-charge-involving-investigation.

[67] The facts outlining Riley's criminal activity and trial are discussed at length in the decision on his appeal. *See United States v. Riley*, 115 F.4th. 604 (D.C. Cir. 2024).

the jury convicted Riley of Obstruction of Justice for destroying evidence of his own crimes. 18 U.S.C. § 1512(c)(1); *see* ECF No. 108. Probation calculated Riley's base offense level as 14, and recommended a guideline range of 15-21 months. ECF No. 103 at 10. For its part, the Government advocated for a two-level enhancement, based on Riley's Abuse of a Position of Trust, under USSG §3B1.3, for attempting obstruct the grand jury's investigation, and a two-level Obstruction of Justice enhancement, under USSG §3C1.1, because he induced the rioter to destroy evidence[68] and created an elaborate cover story to mislead the jury at his trial. *Id.* at 11-16. The court sentenced Riley to **twenty-four months of probation**, and **no supervised release**. ECF No. 108 at 2.

### 4.    Analysis.

Only three of these defendants were sentenced to prison, resulting in an average period of incarceration of only 3.9 months.[69] Although the true sentencing outcomes in comparator cases alone support probation, other relevant factors overwhelmingly demonstrate such a sentence is the only just outcome in Tucker's case.

1.    **Age at the time of the offense.** Each of the nine cases involved defendants substantially older than Tucker. By the time of sentencing, most were over 40 and all were over 30. Certainly, all nine had completely developed adult brains at the time of their offense. *See* Point III.A.2, *supra*, at 9-11. Tucker, by contrast, was a teenager with an underdeveloped brain.

2.    **Life experience.** Consistent with his youth, Tucker lacked the lifetime of experience and knowledge that would have helped him better understand the wrongness of his actions. Four of the defendants (Moinian, Davis, Mogen, and unknown defendant 2870625) had advanced degrees and two more (Loewke and Anderson) had earned at least a bachelor's degree.

---

[68] Riley was charged separately with this offense, but the jury failed to reach a verdict on that count.
[69] When Moinian's outlier sentence of 20 months is excluded from the JSIN calculations, the average sentence of incarceration for the remaining 8 cases drops dramatically to only 1.9 months.

Two (Riley and Loewke) had extensive law enforcement training experience, while four (Ethridge, Davis, Mogen, and Neff) owned their own businesses. Most were married and/or had children. All had achieved some degree of success in adulthood. Tucker had little such experience, having entered adulthood only shortly before his offense. He had completed only a single semester at a community college, had never worked a formal job, and was living with his parents. Thus, in addition to being very young, Tucker was extremely impressionable and lacked the life experience – possessed by all comparable defendants – that would have helped him exercise better judgment.

       **3.**    **<u>Seriousness of offense conduct</u>.** Each of the identifiable defendants, and particularly the three sentenced to prison, committed far more aggravated crimes than Tucker. For three years, Moinian used his security clearance to sell proprietary information to an enemy of the United States, then repeatedly lied about it in official documents and to the FBI. Neff engaged in an eight-month pattern of criminality: tampering with grand jury witnesses; making repeated false statements to the FBI; destroying evidence; and directing witnesses to destroy evidence, disregard grand jury subpoenas, or both. Ethridge engaged in violent insurrection to prevent certification of the 2020 Electoral College vote count and later bragged about his criminal acts on social media. Based on the seriousness of these defendants' crimes and patterns of behavior, some period of incarceration was clearly warranted under the facts of those cases.

       The five identifiable defendants who received sentences of probation, however, also committed more aggravated offenses than Tucker. Davis and Anderson acted for an extended time period to threaten the safety of others. Mogen engaged in a two-year pattern of forgery, fraud, and abuse. Loewke and Riley undermined their jobs as law-enforcement officers by using their official roles to sabotage criminal investigations. Furthermore, four of the defendants were convicted of

multiple criminal counts (Moinian, Ethridge, Mogen, and Anderson), including two of the three sentenced to prison (Moinian and Ethridge).

Although Tucker acknowledges his offense is serious, his conduct pales in comparison to the identifiable "similarly situated" defendants. His crime was unsophisticated, impulsive, short in duration, it endangered no one's safety or security, and it was a direct byproduct of his immaturity.

      **4.**      <u>**Abuse of positions of public or private trust.**</u> Five of the identifiable defendants abused a position of public or private trust in committing their offenses. Moinian used his security clearance to gain valuable information that he sold to China. Riley and Loewke were police officers at the time of their offense. Ethridge was a pastor when he obstructed justice. Davis was charged with overseeing the mental health of the inmates that her criminal conduct put at risk. Yet, all except Moinian and Ethridge received probation.

      **5.**      <u>**Genuine acceptance of responsibility.**</u> Although most of the similarly situated defendants appear to have accepted responsibility for their offense, and some may have been genuinely remorseful, there were four notable exceptions. While under indictment for abusing his security clearance and consorting with the enemy, Moinian lied about his prior crimes on a job application and committed immigration fraud. Ethridge bragged about his crimes on social media, insisted on going to trial, and remained defiant at sentencing. Moinian and Ethridge both received custodial sentences. Similar to Ethridge, Riley claimed innocence, even after being convicted for obstructing justice, and repeatedly doubled-down on his claim he did nothing wrong. Mogen pleaded guilty but was uncooperative during the presentence investigation, leading the Government to conclude he was remorseless and to question whether he actually believed what he did was wrong. Despite showing no remorse, both Riley and Mogen received probation. In contrast, Tucker has expressed contrition and fully accepted responsibility for his actions in his

admissions of guilt, by pleading guilty, and in his words to probation and this Court. *See* Point III.A.5, *supra* at 16-18. Tucker's remorse is genuine, heartfelt, and (as in *Loewke*) leaves no doubt that prison is unnecessary to deter any future crime.

*        *        *

By any rational metric, Tucker is dramatically less culpable than any of the nine "similarly situated" defendants, 67% of whom received probation. Only probation would avoid an unwarranted sentence disparity.

## IV.    IMPOSITION OF A FINE.

Although the Court is authorized to impose a fine in this case, pursuant to USSG § 5E1.2(e), Tucker requests no fine be imposed because he is not capable of paying. PSR ¶ 86.

## V.    CONCLUSION

For all these reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Tucker respectfully requests that this Honorable Court impose a total sentence of twelve (12) months' probation.

Dated: February 27, 2026        Respectfully submitted,

*/s/ Joseph T. Flood*
Joseph T. Flood
Sheldon & Flood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 991-7413 (fax)

Eugene V. Gorokhov
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920
(202) 765-2173 (fax)

*Counsel for defendant Tucker Desmond*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 27, 2026, with written consent, I electronically filed the foregoing sealed document and accompanying exhibits on counsel for the government at the following address:

William.Hart@usdoj.gov

Respectfully submitted,

By:    /s/ Joseph T. Flood
       Joseph T. Flood