February 22, 2026

Joseph Flood, Esq.
10621 Jones Street, Suite 301-A
Fairfax, Virginia 22030

| | |
|---|---|
| Re. | *Neuropsychological & Forensic Evaluation Report of Dr. Bender and Dr. Boyd* |
| Case: | *United States of America v. John Tucker Desmond* |
| DOB | *June 30, 2005 (20 years old)* |
| Docket no. | *1:24CR00417-014* |

Mr. Flood,

At your request, we have conducted a psychological evaluation of your client, John Tucker Desmond. Specifically, this report documents the evaluation process, information reviewed, and findings with respect to Mr. Desmond's psychological characteristics and treatment needs. As you know, Mr. Desmond pleaded guilty to obstruction of justice, and he is due for sentencing in March 2026.

---

SOURCES OF INFORMATION

We met with Mr. Desmond separately.

Dr. Bender conducted a neurobehavioral status examination and neurocognitive testing with Mr. Desmond on October 14, 2025 for approximately 4 hours.

Dr. Boyd met with Mr. Desmond remotely, via video-conference, on January 15, 2026, January 3, 2026, January 27, 2026, and February 4, 2026, for a total of about four and one-half hours. Dr. Boyd conducted the following collateral interviews:

1. Nicole Dupre, Mr. Desmond's mother, on January 16, 2026, and January 27, 2026, for a total of about two hours by video.
2. John Desmond, Mr. Desmond's father, on January 27, 2026 by telephone for about 30 minutes.
3. Jennifer Manavi, Mr. Tucker's past treating therapist, on January 30, 2026, for about 20 minutes by telephone.

In addition to interviews, we reviewed copies of the following records in the preparation of this report:

2. Mr. Desmond's high school transcript from Coast High School (1 page).
3. Mr. Desmond's unofficial transcript as of February 2, 2026, from his college coursework to date (3 pages).
4. Coast Community College student schedule, dated January 30, 2026, for Mr. Desmond (1 page).
5. Records related to the Desmond v. Desmond case (68 pages).
6. Court records related to People vs. Nicole Marie Desmond (23 pages).
7. Application for warrant, US District Court for the District of Columbia, in case number 25-sc-613 (31 pages).
8. Letter from Dr. Manavi dated June 5, 2018 (1 page).
9. Letters written on behalf of Mr. Desmond from Nicole Dupre, Teresa Fee, Jennifer Nicholson, Laura Peterson, and Meghan Paduano.
10. Judgment for dissolution in marriage of Desmond, case no. 19D003114 (16 pages), dated May 8, 2020.
11. Presentence Investigation Report dated January 23, 2026 (27 pages), submitted by Hana Field.

---

## RESPONSE TO INFORMED CONSENT PROCESS

Before commencing any formal evaluation procedures, Dr. Boyd and Dr. Bender (separately) provided Mr. Desmond with a summary of the evaluation purpose and process, including their role, his rights, evaluation procedures, limits of confidentiality, and likely uses of information gathered during the evaluation. He readily demonstrated understanding of the essential components for informed consent and agreed to proceed. He was cooperative with all evaluation tasks.

---

## BACKGROUND

Mr. Desmond indicated that he was born and raised in California. He has no siblings and was the only child produced by the marriage of his parents. His mother described the pregnancy as an overall positive experience, without major complications. His mother was staying at home to provide care to Mr. Desmond, however his father's job demands at the time required a significant amount of travel each month, by all accounts.

Developmental history was generally normal, based on Mr. Desmond's mother's account. He was walking by about age one, and speaking by age two.

School history was somewhat mixed. Mr. Desmond did not report major problems with learning, social emotional functioning, or other educational disabilities. He recalled that he had a positive attitude toward the"social aspect" of school, but struggled to motivate himself to complete schoolwork on time and to complete homework, particularly when he was not intrinsically motivated by the topic area or activity. He also reflected that his attention span has historically been relatively short. [redacted] His high school transcript was overall consistent with Mr. Desmond's account, showing poor grades in 9th and 10th grades, and improvement starting in 11th grade. He indicated that he might seek additional education at some point, possibly in the area of marketing, however overall he appeared to be uncertain with respect to his plans for the future and his occupational development.

[redacted] Because of his father's work travel schedule, his mother was responsible for a significant amount of caregiving during that time. [redacted]

[redacted]

[redacted]

[redacted]

Mr. Desmond was living with his father at the time of this evaluation, and was dependent on his father financially as well. When speaking about the future, Mr. Desmond expressed that he placed a priority on paying his father back for the money expended on attorneys and other costs associated with Mr. Desmond's criminal case.

Mr. Desmond was generally not overtly critical of his father, and both Mr. Desmond and his mother spoke positively about his father's strong work ethic. However, it was also clear that they both experienced [redacted]

Social history included no marriages and no children. Mr. Desmond impressed as a socially capable person in terms of being likable, pleasant, polite, and appropriate. He did not exhibit behaviors or report a history that would be suggestive of the social-emotional impairments characteristic of some neurodevelopmental disorders. He did report that his interpersonal style is highly unassertive and described himself as a "people pleaser." Other collateral sources also characterized him as having difficulty directly and assertively communicating his wishes, especially when his boundaries or needs were in conflict with an authority figure or friend. Overall, his interpersonal style was consistent with an appeasement approach to conflict and limited ability to assert himself effectively.

[redacted]

[redacted]

[redacted]

Mr. Desmond's mother and father both expressed some concern about [redacted]

[redacted]

**Legal History**: Mr. Desmond did not report legal problems outside of his current circumstance.

**Instant Offense According to Law Enforcement**: In the instant offense, Mr. Desmond pleaded guilty to obstruction of justice charges that arose from his destruction of a laptop on instruction from the laptop owner. Mr. Desmond had social affiliations with other individuals involved in the criminal case, and he indicated that he had run errands for payment on occasion (for example, delivering a gift to a woman) for the men involved in the larger prosecution.

The Presentence Investigation Report included the following characterization of Mr. Desmond's criminal conduct:

> Soon after defendant Lam's arrest, defendant Evan Tangeman asked defendant Desmond to travel to defendant Lam's Los Angeles rental homes and retrieve electronic devices belonging to defendants Lam and Marlon Ferro. Defendant Desmond agreed and traveled to the rental homes owned by defendant Lam, collected one cell phone and two computers belonging to defendants Lam and Ferro, knowing that they contained incriminating evidence and knowing that the FBI was investigating defendant Lam and others. Defendant Desmond then destroyed the devices to impair their integrity or availability for use in an official proceeding, that being *US v. Lam*, 24-CR-417, and to prevent the FBI from recovering the devices as part of their investigation.

---

CLINICAL ASSESSMENT AND RESULTS

**Mental Status and Behavior Observations from Dr. Boyd**: Mr. Desmond was on time for his meetings and was attentive. He was dressed appropriately, and appeared clean and groomed. I did not observe anything unusual about his movements or gait. Interpersonally, he was pleasant, polite, relaxed, and appropriate. Social communication was intact. Affect (i.e., emotional expressiveness) had a full range, and the emotions that Mr. Desmond expressed matched the content of his statements. Speech was normal in tone, volume, and pace. Intelligence impressed as average based on verbal ability. Memory, attention, and concentration were all adequate for the purpose of interview. He did not report, and I did not observe, any signs or symptoms of serious mental illness that could cause him to lose touch with reality (e.g., Schizophrenia Spectrum).

Mr. Desmond tolerated the stress of evaluation well. He was cooperative with all of my requests, and timely in responding to queries regarding scheduling. He expressed feeling anxious about his future and a strong desire to change his social milieu and setting, but had only vague ideas about how to accomplish these changes. Overall, he impressed as markedly socially and emotionally immature for his age, and agreeable and compliant.

**Mental Status and Behavior Observations from Dr. Bender**: During the evaluation on October 14, 2025, Mr. Desmond presented as polite and forthcoming. His speech was fluent and of normal rate and volume. His eye gaze was appropriate. Affective range was full-ranging and mood was euthymic. Thought processes were logical and linear and without delusional content. His attention span was variable but not to the point of impairing; his energy level was fairly high and enthusiastic and he presented as affable but somewhat immature. He frequently answered questions with "100%, yes!" when answering in the affirmative and his descriptions of his

internal experiences were at times idiosyncratic. For example, when asked if he had ever sustained a concussion, he said yes (but acknowledged he had never been diagnosed) and that"I was dreaming right away"when describing the alteration of consciousness that accompanied the concussion. He said that he has a constant voice in his head providing running commentary, often disparaging of his actions, and perceives it to be someone else's thoughts. He denied experiencing them as commands but has heard a voice telling him to jump from a height. He described it as an impulse with which he would not comply and adamantly denied that it might be a form of suicidal ideation, though he did endorse episodic suicidal ideation. He denied experiencing auditory or visual hallucinations.

[redacted]

[redacted] He denied a history of seizures.

**Neuropsychological Testing Results from Dr. Bender**: Brief sensory motor exam was unremarkable. During formal testing, Mr. Desmond tended to answer somewhat impulsively. His scores on an abbreviated measure of intelligence fall within the average range for his age. His processing speed is somewhat variable but generally ranges from average to above-average. His auditory learning and memory scores are above average for his age and his serial reasoning and concept identification abilities are intact. Verbal fluency ranges from average to above-average. While his ability to inhibit a prepotent response (Color Word Test) is somewhat lower than other scores, his scores do not fall within the frankly impaired range.

Mr. Desmond's clinical profile on the PAI (a multiscale inventory of psychopathology and personality) is valid and indicates that alcohol and drug use has caused occasional problems in his life. The profile also indicates a history of elevated and variable mood. He endorsed being more wary and sensitive in interpersonal relationships than the average adult, and he is quite impulsive and prone to behaviors likely to be self-destructive. He endorsed anxiety and stress that would be considered generally normal. He acknowledged having been involved in illegal activities, but other potential antisocial traits, such as egocentricity, disregard for others,

disloyalty, and recklessness are not elevated. Multiple measures of performance and symptom validity indicate that Mr. Desmond is not exaggerating psychiatric symptoms or cognitive impairment.

---

FINDINGS

**Diagnostic Considerations**: Mr. Desmond does not have active and substantially impairing serious mental health symptoms at this time. [redacted]

**Other Considerations Relevant to Sentencing**—*Developmental Status*: At age 20, Mr. Desmond remains solidly within adolescence from a psychological development standpoint. It is now firmly established that adolescence is a unique developmental time period in the human lifespan. A number of anatomical and functional shifts occur during this time, and the rate of change in so rapid in adolescence that it is surpassed only by the fetal and infancy stages of human development. Some of the most salient changes include (a) shifts in proportion of gray to white brain matter, (b) rapid and early development of the brain regions associated with reward processing, and (c) lag of the prefrontal cortex, in terms of timing, behind other brain systems.

White matter is the brain tissue found in deeper regions of the brain, underneath the cortex, and most brain white matter is concentrated in a structure called the corpus callosum. White matter contains neurons coated in a sheath of myelin, and the myelin facilitates transmission of signals from one neuron to another. Problems with myelin formation and/or function has been implicated in several major psychiatric disorders, including Schizophrenia Spectrum Disorder and Bipolar Disorder—both of which commonly have their first acute episodes in adolescence or young adulthood. Neurodevelopmental disorders, including ADHD, are also characterized by reduced structural connectivity, particularly in the frontoparietal, frontoparietal, and limbic pathways of the brain, typically reflecting delayed or reduced myelination and atypical brain maturation.

During adolescence, we see a decline in the amount of gray matter (the brain tissue, also consisting of neurons, that is distributed across the surface of the brain), and an increase in white matter, until white and gray matter compose roughly equal proportions of the brain tissue. The changes in proportions of white and gray matter do not occur at the same rate across all brain areas, however, and it is significant that the dorsolateral prefrontal cortex develops late—not reaching maturity until the early 20's, on average, according to imaging research.[1] The dorsolateral prefrontal cortex (DLPFC), located behind the forehead at the front of the brain, was the most recent brain area to develop, from an evolutionary perspective, and is also the last brain region to reach maturity. The DLPFC is primarily (though not exclusively) responsible for executive functioning, which is the collection of cognitive (i.e., thought processing) functions that control behavior.

In adolescents, development of the DLPFC lags behind other brain systems, which is thought to be why they have, as a group, markedly increased impulsivity, high levels of risk-taking behavior, and little focus on future consequences of their actions. Consequently, we see that problems such as unplanned pregnancy, risky sexual behavior, suicide attempts, accidents, and delinquency peak during adolescence, showing a pronounced decline around the same time that the DLPFC reaches maturity (on average, in the early 20s in neurotypical individuals, later in youth with neurodevelopmental disorders such as ADHD).

Recent scientific advances in understanding developmental immaturity have played a substantial role in shaping legal responses to crime by juveniles *and* young adults. For example, recent Supreme Court decisions in *Roper v. Simmons* (2005), *Graham v. Florida* (2010), and *Miller v. Alabama* (2012) have emphasized how impulsivity, sensation-seeking, and susceptibility to peer influence collectively diminish culpability. Indeed, the Court in *Roper v. Simmons* (2005) noted, "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18."

*Social Reward Sensitivity of Adolescents*: Compounding the issues associated with later DLPFC development (which typically occurs between ages 17 to 21), is the earlier ascendance of brain systems associated with reward functions, particularly social reward. A "reward," in this sense, is subjectively experienced as as liking something or wanting something, and we see increased activity in the reward systems of the brain when people engage in activities such as eating, sex, gambling, substance use, and social engagement. The reward "center" of the brain is actually a collection of structures that communicate with one another, primarily concentrated in the

---

[1] Giedd, J.N. (2004). Structural Magnetic Resonance Imaging of the adolescent brain. *Annals of the New York Academy of Sciences, 1021*, p. 77-85.

mesocorticolimbic dopamine system (in the midbrain region). During adolescence, these brain regions mature far earlier than the DLPFC, and adolescent brains appear to be particularly sensitized to anticipate rewards when they are in the presence of peers. In both laboratory and real-world studies, adolescents exhibit more impulsivity and poor judgment with just the mere presence of a peer, even if the peer does not communicate with them. This can lead to negative outcomes, particularly if the peers have antisocial inclinations. For example, with respect to criminal behavior, most juveniles commit crimes while in the presence of peers, whereas adults typically commit crimes alone. A critical lesson from these adolescent research findings is that a glimpse of behavior during adolescence often does not reflect a stable trait of the individual, and consequently most authoritative texts on violence risk assessment encourage evaluators to recognize adolescence as a time of rapid change and adolescent evaluees as “moving targets” with many opportunities for effective intervention. In this case, the presence of other young men who were engaged in criminal conduct was a major risk factor for Mr. Desmond’s involvement.

[redacted] This finding’s primary significance from a psychological standpoint relates to how we select for social influence on Mr. Desmond in the coming years as he ages out of adolescence and into young adulthood. It will be key to increase prosocial influence and buttress against harmful social influence to ensure a positive developmental outcome.

[redacted]

[redacted]

*Psychosocial Maturity*: Psychosocial maturity is a developmental process of transition from dependency of childhood/adolescence to the self-sufficiency of adulthood. It involves not only the brain systems described in the foregoing, but also the adolescent’s sociocultural context and what they learn from their environment. Attaining psychosocial maturity includes

accomplishing mastery and competence, developing stable social relationships, and creating a positive sense of self worth related to moral and responsible behavior even in the absence of external supervision. Researchers report that transition to successful adulthood is most likely to occur when individuals are able to make substantial progress toward these goals between the ages of 16 and 24.

In the research literature on desistance and reoffending in adolescents, psychosocial maturity has gained prominence as a relevant factor in predicting who will engage in criminal activity and what interventions are likely to help. There are factors that appear to support psychosocial maturity, such as supportive adults who model prosocial values and healthy problem-solving strategies. There are also factors that appear to predict delayed psychosocial maturity, such as disruptions in household stability, substance abuse, abuse and neglect, ADHD, and the presence of other psychiatric disorders. Mr. Desmond has some of these factors, and would benefit from a specific focus on enhancing psychosocial maturity, ideally with interventions delivered as soon as possible.

**Recommendations:** Mr. Desmond would benefit from therapeutic interventions that are matched to his developmental status and needs at present. These interventions are best delivered in the community, based on efficacy and availability of resources/providers. Recommendations are detailed below:

1. [redacted]

2. Mr. Desmond should complete at least one year of Acceptance and Commitment Therapy (ACT). ACT is an evidence-based intervention that combines aspects of cognitive therapy, existential therapy, and behaviorism to assist the client in identifying their values and goals.

3. Dialectical Behavior Therapy (DBT) modules related to Interpersonal Effectiveness would likely be a beneficial adjunct intervention. DBT interpersonal effectiveness goals should ultimately work toward greater assertiveness in both familial and non-familial relationships, including social peer interactions.

4. Volunteering for a community organization related to poverty would likely benefit Mr. Desmond, helping him to redirect his energy toward behavior consistent with his espoused values and with prosocial behavior more generally.

5. [redacted]

6. Social influences on Mr. Desmond should be carefully considered. The next few years are an opportunity to direct him to focus on prosocial goals that are consistent with his values and incongruent with criminal conduct. Individual therapy goals should include establishing a set of expectations and boundaries regarding interpersonal relationships, and strategies for modifying or ending relationships with individuals who are not supportive of a prosocial path for Mr. Desmond. Conjoint therapy sessions can be utilized to enhance Mr. Desmond's relationships with his parents and to problem-solve establishing sound boundaries and expectations with regard to parent communication towards each other and Mr. Desmond.

7. Related to social influences, Mr. Desmond should use social media as little as possible. The culture of social media online in the United States currently has a strong focus on physical appearance, acquisition of as much money as possible, and ostentatious consumption. Social media promotes harmful body image for young men, and insufficient oversight of social media companies in the United States creates a number of risks for users, particularly younger users.[2]

8. [redacted]

9. Taking on stable adult roles in one's community is one of the most effective strategies for enhancing psychosocial maturation. Mr. Desmond should be encouraged to seek stable employment with structure, and to take on adult responsibilities that will enhance his sense of responsibility, competency, and mastery.

---

[2] Social Media: Regulatory, Legal, and Policy Considerations for the 119th Congress. (2026, February 22). https://www.congress.gov/crs-product/IF12904

10. Mr. Desmond would benefit from occupational counseling to help him clarify his professional goals and potential need for additional education. This can be done at the same time that he is participating in individual therapy.

11. [redacted]

Please contact us if you have further questions or concerns. This report is based on the information that was available to us as listed in the *Sources of Information* section of this report. If additional information becomes available, we may revise our opinions.

Respectfully submitted,

_________________________

Scott D. Bender, PhD, ABPP-CN
Associate Professor and Board-Certified Neuropsychologist
University of Virginia School of Medicine

_________________________

Sara E. Boyd, Ph.D., ABPP
Licensed Clinical Psychologist
Board-Certified Forensic Psychologist
Boyd Forensic Psychology Services