UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CR No. 24-0417-10 (CKK) |
| v. | |
| EVAN TANGEMAN, | Washington, D.C. |
| | Friday, April 24, 2026 |
| Defendant. | 10:04 a.m. |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | WILLIAM G. HART, AUSA<br>U.S. Attorney's Office<br>601 D Street NW<br>Washington, DC 20530 |
| For Defendant: | DWIGHT E. CRAWLEY, ESQ.<br>Federal Public Defender Office<br>625 Indiana Avenue NW<br>Suite 550<br>Washington, DC 20004 |
| Court Reporter: | BRYAN A. WAYNE, RPR, CRR<br>U.S. Courthouse, Room 4704-A<br>333 Constitution Avenue NW<br>Washington, DC 20001 |

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

DEPUTY CLERK: Criminal case 24-417-10, United States versus Evan Tangeman. Counsel, please come forward and state your appearances for the record.

MR. HART: Good morning, Your Honor. Will Hart for the United States.

THE COURT: Good morning.

MR. CRAWLEY: Good morning, Your Honor. Dwight Crawley on behalf of Mr. Tangeman. Mr. Tangeman is seated in court, and we're ready to go forward.

THE COURT: All right.

PROBATION OFFICER: Good morning, Your Honor. Hana Field with U.S. Probation, and with me I have our newest U.S. probation officer, Empress Hargiss.

THE COURT: Good morning. And good morning, Mr. Tangeman.

What I've handed out -- it helps if possible to get the forfeiture orders in advance. So I've signed the Consent Order of Forfeiture. What I'm handing out is what needs to be part of the sentencing format. And probation has pulled out what relates to Mr. Tangeman. So I want to make sure everybody looks at it and it's correct, because it's fulled out with other people, Mr. Desmond, presumably. Is that correct?

PROBATION OFFICER: I think so, Your Honor.

THE COURT: If it's not, then let me know.

MR. HART: I don't know. Mr. Desmond was charged with 1512. I don't know if 1512 has forfeiture authority.

THE COURT: I believe he did have a forfeiture order if I'm not mistaken.

MR. HART: I don't recall that, Your Honor.

THE COURT: Okay.

MR. HART: I don't think there was anything forfeitable based on Mr. Desmond's conduct in the case, though.

THE COURT: Let me just look at something here.

MR. HART: And, Your Honor, if it helps at all, at first I want to apologize for the late provision of the Consent Order of Forfeiture. It unfortunately is something that sometimes comes with the transition of cases between attorneys.

But basically what this includes is the items that were seized from Mr. Tangeman's home pursuant to the execution of a residential search warrant on May 13, 2025, and which he has agreed to forfeit. And that includes the vehicles.

In addition, the money judgment reflects Mr. Tangeman's involvement in two separate transactions that were specified in the statement of offense to which he agreed and which formed the factual basis for his guilty plea. So just for context, that's how we arrived --

THE COURT: Okay. It was listed I think -- we have it

listed I think as part of the plea agreement if I'm not mistaken.

MR. HART: So, my predecessor did not do a list. He described things in broad strokes, I would say, Your Honor. Which has its benefits, I suppose, and its drawbacks.

THE COURT: Okay. What I did is I asked -- since generally speaking orders of forfeiture are included in the sentencing format, since we didn't have it earlier, I asked probation to give me what language I need to use, which is what I've handed out. I just want to make sure it's accurate.

MR. HART: Yes.

THE COURT: So I'm not putting something in there that's not accurate.

MR. CRAWLEY: Your Honor, No. 3 on this document says 1,000; I think it should be 11,000.

THE COURT: It should be what?

MR. CRAWLEY: 11,000. No. 3 in the printout should be 11,000, not 1,000.

THE COURT: Okay.

MR. CRAWLEY: But I don't see anything else that stands out.

THE COURT: Okay. Well, just take a few minutes to look at it and make sure.

MR. HART: Yeah.

MR. CRAWLEY: That's it.

PROBATION OFFICER: Your Honor, that was my error. I apologize if I erroneously put 1,000. And I did want to clarify about Mr. Desmond, there was no forfeiture in the plea agreement.

THE COURT: Okay. I couldn't remember. The forfeitures have been in and out with this case so I wasn't positive. But I want to make sure that it's accurate. So I've changed the 1,000 to 11,000. I've signed the consent but this obviously goes to the sentencing, so I want to make sure it's an accurate presentation. So it sounds like at this point that it is.

Okay. Then let me go ahead and proceed. Mr. Tangeman entered a plea to a RICO conspiracy, which has a maximum sentence of 20 years incarceration and a maximum fine of $250,000. There are no objections to resolve.

I don't know whether the sentencing recommendation, is that available to others, or not? There needs to be a correction about taking Mr. Ferro out.

PROBATION OFFICER: Yes. I believe Your Honor has the recommendation released to the parties. And there was an error on page 2 where we referenced Mr. Ferro, the last sentence of the first paragraph on the second page, "For these reasons, it should be Mr. Tangeman."

THE COURT: Okay. My understanding is that it's otherwise accurate. I just want to make sure that we had put

this on the record.

So I have a -- there is, I believe, a pretrial report, presentence report, government's memorandum in aid of sentencing, defendant's position with respect to sentencing. The advisory sentencing guidelines: Eight points for money laundering; loss amount $3.5 million, 18 points; business of laundering funds, additional four points; obstruction of justice, an additional two points; minus three points for acceptance of responsibility; and minus two points for 4C.1 based on the fact that he has no criminal history points.

So the total offense level is 27. There are no convictions, no criminal history points. He's in criminal history category I.

The guideline range, then, is custody of 70 months to 87 months. Supervised release is no more than three years. He's ineligible for probation. The fine is 25,000 to 250,000. Restitution is not requested at the present time. And there's a special assessment of $100.

Since the presentence report is undisputed, I'm accepting all portions of this undisputed presentence report as findings of fact under Federal Rule of Criminal Procedure 32(i)(3)(A). As I've indicated, there is a forfeiture consent order.

I'll adopt the presentence report as written. At this point in terms of what's being recommended, the probation office is recommending a variance of 60 months. The

government's recommending 70 months, which is at the bottom of the range. The defendant has requested 52 months, which I assume was based on the JSIN, which is the judiciary's compilation of average and median, the -- 52 is the average.

So let me -- I ask to speak to the government, any comments you want to make, defense counsel and the defendant.

I did have one question in terms of he at one point was, according to the probation office, the manager of Evan's Cars, and then there was an involuntary dissolution. Mr. Tangeman said nothing about it, so I was just wondering whether that was accurate or not accurate.

THE DEFENDANT: Yes, Your Honor. I had a Rolls Royce in a Montana LLC. It was just registered.

THE COURT: So did you work for Evan's Cars?

THE DEFENDANT: No.

THE COURT: Or is it because of the --

THE DEFENDANT: That was set up for the car.

THE COURT: Okay.

THE DEFENDANT: I never occupied that, like, business, though.

THE COURT: Okay. Let me look...

Yeah, paragraph 87 in the presentence report, and that's what I was trying to figure out whether that's not accurately presented or should be eliminated or whatever.

MR. CRAWLEY: Court's indulgence.

THE COURT: Yeah, if you could take a look at it. Either one of you. It wasn't something he brought up, but I wasn't -- it's in Accurint, you know, checking it out on records. I just want to not have him associated with this if this is not correct.

(Parties conferring.)

MR. HART: Your Honor, is it permissible if I can approach ex parte, please? I think I can shed some light on this.

THE COURT: Sure.

(Ex parte bench conference, off the record.)

MR. CRAWLEY: Is the court asking --

THE COURT: I'm just asking if it's accurate the way it's presented. It's something he didn't bring up. If it's not accurate, it shouldn't be in here because these things proceed -- or it should be presented differently. That's my question.

MR. CRAWLEY: I think it's written accurately, Your Honor.

THE COURT: Okay. If it's accurate, then I don't need to --

MR. HART: Okay.

THE COURT: I don't need to know anything more. Unless you think it's somehow -- I need to know something. I just didn't want to put it in since he evidently didn't bring it

up.

MR. HART: The government's position is that it is accurate. There is additional context --

THE COURT: Okay.

MR. HART: -- if the court so desires, but it doesn't seem like that's necessary at this time.

THE COURT: All right. But I take it it can't be in the presentence report because this will be sent to people.

MR. HART: That's correct. The government has no issue with its presence in the presentence report.

THE COURT: All right. No problem then. Okay.

So at this point then let me hear from the government, defense counsel, and Mr. Tangeman if he wishes to address the court.

MR. HART: Thank you, Your Honor. And apologies for the confusion on paragraph 87.

I want to start by detailing the nature and circumstances of the offense. I'll start by saying I do agree with counsel that no one is saying that Mr. Tangeman is the mastermind of the conspiracy as he writes in his memorandum in aid of sentencing.

But I do want to emphasize that while there is no allegation that he was involved in the social engineering of actual victims, he was every bit as necessary to the successful operation of the group as his coconspirators and

codefendants who actually performed the database hacking and the social engineering of victims over the phone and through email.

And the reason why I say that is multifold: The first is that the scheme would not have been successful unless you had people like the defendant who were working in concert with the social engineers to obfuscate the source of the funds. It goes without saying that in tandem with that there would have been no attraction to actually perpetrating the scheme and taking on the risk of engaging in the conspiracy unless the defendants got to enjoy the fruits of their ill-gotten gains.

So it's individuals like the defendant who really made that possible. What might otherwise look like benign activity on the surface, in terms of the rentals of luxury homes, albeit under false identities, and the payment to various realtors and lessors for the right for the occupants to enter that home -- it all looks benign on the surface. And one way to spin this is that all the defendant did was just rent a bunch of luxury homes.

So what looks on the surface as though it's benign is really not because it provides an incentive for people to engage in the conduct in the first place. And the codefendants who were actually involved in undertaking most of the criminal risk in this case by their social engineering activities likely would not have done so unless they could

have been assured that they would have enjoyed the fruits of the illicit proceeds.

With respect to the defendant that would include the ability to live in luxury homes that cost upwards of $40,000 to rent a month and who had true values of about $9 million. As Your Honor knows from having presided over this matter since its inception, we're largely talking about a group of 18 to 20-year-old men, many of whom have no history of actual employment.

So the defendant's ability to take the cryptocurrency and convert it into fiat cash and then use it to spend on luxury items, including the luxury home rentals, does form a key part of the scam.

In addition, I would also note that there's really no dispute that he knew exactly where the money was coming from. He took many steps to obscure the identities of the actual individuals who would rent. He would send fake IDs, provide fake names and the like to cover up the fact that what was really happening was that this group of 18 to 20-year-old men, who had no history of employment and no verifiable source of income, were able to occupy these residences -- and which Your Honor can see in the photographs the government included in the memorandum are quite expensive and high end and luxury.

So is the defendant the criminal mastermind? No, he's not. But he is an enabler, and he is a middleman. And he did have

knowledge of the proceeds of the crime and was responsible for facilitating the transfer of money so that the individuals who pulled off the social engineering could actually profit and enjoy the fruits of their crime.

And just as a testament to how deeply he was embedded in this, as the statement of offense makes clear, he at the time of Mr. Lam and Mr. Serrano's arrest in September of 2024, instructed another codefendant, Mr. Desmond, to destroy the devices, knowing the incriminating material that they held.

So I think all of this paints a picture of not just someone who is a hanger-on or someone who is loosely associated with the social engineering enterprise as charged, but someone who is a vital cog even though they are not necessarily conducting the scamming themselves.

I think as a testament, one of the pieces of evidence that had stood out to me is a message we cite on page 12 of the memorandum in which it really is clear of the defendant's involvement and embedding in this enterprise when he is talking with codefendant Serrano and offering his services, not merely waiting for someone to contact him from the enterprise but offering his services, because obviously he's taking a commission every time he does this. And Mr. Serrano compliments him and says, "You have done so much for our friend group time on and in."

So I think that speaks to -- well, first, coming from a

coconspirator, it speaks volumes as to his involvement in the conspiracy, but it also speaks to the nature of the conduct as being sustained, continuous over several months, and not simply a one-off transaction engaged in.

So for all those reasons we would find that the nature and circumstances of the offense weigh very significantly in favor of the government's recommendation.

In addition, the other item that is worth highlighting at this point that is detailed in the government's memorandum is that the defendant personally profited from his work for the enterprise. You can see, as we've all seen this morning through the -- going through the forfeiture issues, that he had a great deal of luxury goods in his home, some of them for him, some of them for his girlfriend, and then obviously the cars as well, and fiat currency.

And this is an individual, as the PSR makes clear, which, putting paragraph 87 to one side, had no real history of employment or source of income and was approximately 20 years old at the time of the offense.

So, in addition to being deeply embedded with the group, committed to the goals of the conspiracy, to the point he's instructing other individuals to obstruct justice, he's also personally benefitting.

And before I move on to the other 3553(a) factors, it's worth pointing out the obvious, that the foundation of the

defendant's one-time wealth as well as the wealth of the charged enterprise and his codefendants is all built on the financial misery that they wreaked upon victims, many of whom are listed in the second superseding indictment.

What he spent on the sheepskin sandals and the watch and the cars, that's victim money that was unlawfully taken from the victims through fraud and then moved through several channels and ultimately wound its way to the defendant. So this luxury lifestyle, of which so many young men and women could only dream, was just built on a foundation of fraud.

So it goes without saying that the nature and circumstances here of this case are incredibly serious even if the defendant is only charged with money laundering.

Moving on to the history and characteristics, Your Honor. I think this is always one of the more difficult parts for the government to handle, especially in this case, where you have a young man who has pursued education, he has pursued employment, he appears from the letter I was provided most recently by defense counsel to have true ambitions for his life beyond this case. And all of that, obviously, would weigh in his favor as would his youth and lack of criminal history.

The troubling part, and the part that the government can't reconcile and that the court likely will have difficulty reconciling, is that there really is no obvious motive for him

to have done what he did. He was not under the malign influence of older adults who were manipulating him. He was not in a point of financial distress. He did not have cognitive deficits, he was not emotionally disturbed. It was not as though he was somehow inhibited from recognizing the consequences of his actions.

So the troubling thing for the government is that leaves one motive, which is greed. And I'm sure he enjoyed much of the life of luxury he was able to enjoy on the backs of the victimized individuals who are identified in the indictment.

So that paints a very troubling picture for the government and likely the court. And so, although he has these many positive things in his favor, which I am sure defense counsel will speak of, it makes it all the more unfathomable about how he was involved in this in the first place but for his own personal greed.

So taking all of this into consideration, we believe that the government has arrived at a reasonable and fair sentencing recommendation. We have attempted to take into account all the things I just mentioned, his youth, his lack of criminal history, his relative level of culpability vis-à-vis his codefendants, in our bottom-of-the-guidelines recommendation.

Where I depart from probation and defense counsel is this idea of almost an automated variance in recognition of these factors, that he's young and he has no criminal history. And

I think, you know -- I think that the government's recommendation adequately takes into account the mitigating factors. And to justify a variance, we need something more than simply he's young and he has no criminal history.

And there's every reason to think that this is slightly worse than your average money laundering scam, both due to the severity of the enterprise as a whole and the conduct, as well as the fact that he was directing his codefendants to obstruct justice, as well as the fact this was a repeated series of transactions and the way in which he benefitted personally.

So I think on balance where this lands is a bottom-of-the-guidelines sentence.

And finally on the JSIN point, which I think Your Honor alluded to, I certainly understand the desire to include the information in the PSR, which since I've been an assistant U.S. attorney I believe that's a new change from a couple years ago, and I understand the desire to obviously avoid unwarranted sentencing disparities, which is built into the statute itself.

I think where I take issue with it is that the circuit has said multiple times over the past years that the best way to promote uniformity is to follow the guidelines. So that's why, obviously, most of the times the government appears before you the touchstone of our analysis is the guidelines, and that's why I'm recommending the bottom here, because I'm

taking into account the mitigating factors and recommending a bottom-of-the-guidelines sentence.

But I feel as though we are moving away from uniformity when automatically we are giving discounts on top of the bottom of the guidelines, when I think the correct approach is simply to follow the guidelines, and mitigating factors may justify a bottom-of-the-guidelines sentence, but the guidelines should be the ultimate touchstone for the analysis.

So with that, Your Honor, if there are no further questions, that concludes my allocution.

THE COURT: The JSIN, it's useful to have some sense in considering on the parity issue, but when they -- it's something new, and the one complaint I made was that although they eliminate people who provide assistance, because that obviously skews the sentencing, is that if they're below the guidelines, you don't know why.

MR. HART: Yeah.

THE COURT: So it creates an issue in terms of there may have been particular circumstances why the cases that they're looking at there was something below, but we don't know what it is. So it has its limitations, I would agree.

Let me raise one other thing. I've been in a very complicated trial. And were there letters that were filed? Because I don't have them.

MR. HART: Sorry, Your Honor. I was provided a letter

this morning from counsel.

THE COURT: Oh.

MR. HART: I don't know if it's the intention to read it into the record. I have no objection to its --

THE COURT: Okay. If you had something -- I try to look through and make sure. Is there a letter I should be looking at?

MR. CRAWLEY: I will explain, Your Honor.

THE COURT: Okay. No problem. I just want to make sure I have the full record, if there needs to be something additional. That's fine.

MR. HART: Just so it's clear for the record, I was provided a letter written by Mr. Tangeman to this court in advance, and I've read it, and it's a lot of what I had thought beforehand regarding this from the PSR. But it certainly does lend more color to the situation. But with that, obviously the defense will explain it.

THE COURT: All right.

MR. HART: Thank you, Your Honor.

THE COURT: Thank you. I just wanted to make sure because sometimes things come in later and frankly I have been in trial.

MR. CRAWLEY: You're correct, Your Honor. Dwight Crawley on behalf of Mr. Evan Tangeman.

Mr. Tangeman late yesterday evening provided me with a

letter he had written. And when we discussed it, he indicated he did not want me to file this on the public docket. So I did not.

THE COURT: Okay. If he wants it to be a substitute for his making comments, I can take a look at it. I can either put it under seal or just simply -- as long as the government has seen it, so --

MR. CRAWLEY: Yeah.

MR. HART: We have.

THE COURT. -- we're not doing something and -- do you have any problem with -- I'll just read it, and then we don't need to file it if he doesn't want it filed.

MR. HART: No objection, Your Honor.

THE COURT: So if you want me to read it, I will. I'll just take a break and read it. I just won't file it on the docket.

MR. CRAWLEY: He would prefer that the court just read it.

THE COURT: Okay. That's fine. Let me take a break at this point before you do your allocution.

(Recess from 11:06 a.m. to 11:18 a.m.)

THE COURT: All right. I've had an opportunity to review it. May I keep the letter? I won't file it but may I keep it?

MR. CRAWLEY: Yes, Your Honor. And that is dated April

22. Is that correct?

THE COURT: Yes.

MR. CRAWLEY: Yes. That's fine. I don't think he has an objection to you keeping the letter.

So again, Your Honor, on behalf of Mr. Tangeman --

THE COURT: Okay. Hang on one second. Let me just get my papers connected...

Okay. Mr. Crawley, go ahead.

MR. CRAWLEY: Yes, Your Honor. On behalf of Mr. Tangeman, as the court has read in that letter, my client is extremely remorseful for his conduct. I even asked him, because he's had some difficulties with reading and writing and things of that sort, if he had some assistance with that, and he indicated he did have some assistance with it, that he wanted to communicate his feelings in a very well-written manner. And so he wrote down his ideas and then he had someone look at it and they assisted him in trying to make sure he was communicating effectively, Your Honor.

And after reading that, I told him they did an exceptional job in my opinion. In that letter he clearly identifies his mistakes and he clearly recognizes that what he did was not only hurtful to himself, but more importantly, it was hurtful to the victim and it caused a lot of financial hardship potentially to an innocent person or persons that did not ask to be put in this situation.

The government also pointed out something that is very true about this case. These are young individuals. These are very young individuals who acted in a very callous way regarding the savings and the financial resources of individuals that they did not know. And they spent their money freely on a lot of lavish things that most people will never, ever be able to purchase, much less purchase in the numbers and the amounts that these individuals did.

I can't for the life of me understand how they could have gone through so much money so quickly, but I guess when you're young and you're living the quote-unquote high life, it's easy to see that these individuals wanted to put themselves at the highest level of society when it comes to that word in that phrase, the "high life." Cars that cost on average 2- to $300,000 each, parties that were upwards of several hundred thousands of dollars a night, expensive handbags, expensive jewelry, watches, things of that sort.

I'm not going to make light of what he did. He knows he was wrong. But as we did touch upon and talk about, he was not the leader or the mastermind of this conspiracy, not as the organizer who decided that he was going to go in and steal someone's cryptocurrency, and not even as the individual that was responsible for converting that money into fiat cash or legitimate funds to be used to make these expensive purchases. There was an individual above him. I think the court may be

aware of that individual. I don't need to belabor that point.

That individual decided that he would cooperate with the government, and in doing so, he's expecting to receive a significant benefit. I don't know what that benefit is going to be. I haven't seen it. I wasn't made aware of it ultimately. But I think it's safe to say when we talk about sentencing disparities, it's interesting because the government holds all the cards. The government can decide to whom it wishes to engage in certain types of plea negotiations.

So, for instance, if my client were to go in and say I want to debrief, I want to talk about XYZ, it may just be that it's no longer relevant information, that the other person may have beaten that individual to the prosecutor's door. And in that sense, someone like my client may not get the benefit.

So I don't know that it's a huge disparity to ask for 52 months in this case, because I think 52 months, as it is the average for someone who is in his position, a level 27 and a criminal history category of I, that is the average.

And I do appreciate the court's position with respect to but we don't know what may have led to the sentences that fall below the 70 to 87-month range and why that may have happened.

I think it's safe to say it would be too many cases in many instances for us to really delve into each case to figure out why exactly did that defendant on that day receive that amount

of time. But I think it's also safe to say that the courts that reviewed those individuals' histories and the nature of the scheme and everything that went into their involvement must have concluded that it did warrant a variance, and that's why a variance was given. And that's what we're asking for in this case.

Again, we don't make light of Mr. Tangeman's conduct. We don't make light of the fact that what he did was criminal in every sense of the word. And it's something that I think he's demonstrated he's learned from, because -- the court may be aware of this -- there's been several attempts to interview him and other individuals associated with this case. There's actually at least two to three documentaries, whether they be on YouTube, whether they be through Netflix or some other entity, whereby individuals have given interviews, they've discussed their involvement, they've glamorized the --

THE COURT: Yes, I'm aware of it, unfortunately.

MR. CRAWLEY: And my client was not one of them. He made the conscious decision to keep himself out of that world. And when I would be contacted by individuals seeking to interview him, I wouldn't even pass that information on because I didn't even want to put him in that predicament. But he told me himself that he was aware that those individuals wanted to interview him and wanted to have contact with him, and he chose to do the right thing and not try to

glamorize or make light of his conduct in this case.

He's a young man with a lot of years ahead of him. I think he's headed in the right direction. He's demonstrated and expressed in that letter some certain goals that he has, Your Honor, going forward.

I hope he can achieve those goals. And we're simply asking this court to consider everything about his history and his past in fashioning a sentence that is just in this case, and we believe that 52 months is appropriate. Thank you.

THE COURT: All right. Mr. Tangeman, do you want to say anything additional beyond the letter? You can if you want to, or not. If you want to say something, you can stay where you are if you're more comfortable there.

(Defense conferring.)

THE DEFENDANT: I'm just very remorseful of all of the stuff that I've done, like, wrong, and I wish I could, like, take back everything and never do it. And that's all.

THE COURT: Okay. All right. In addition to the advisory sentencing guidelines, the court considers the pleadings, arguments and record in this case, in addition to the following information in determining a fair, appropriate and reasonable sentence in conformance with the factors set out in 18 U.S.C. 3553(a) and subsequent sections except for (e).

Mr. Tangeman is 22 years old. In May he'll become 23. He

has no criminal history whatsoever. In terms of education, he's a high school graduate. He evidently did have some special education classes, also one online semester of college in business.

It sounds like you're back to doing some of that. You should take courses while you're at the Bureau of Prisons. They offer a large variety of them. And you should take advantage of them in terms of completing your college degree if you want, but if nothing else, some of the practical classes that would be useful if -- sounds like you're interested in going into business.

Job history. He's had a -- from the Career Strategies Temporary Incorporated, maintenance and porter work. We have that other paragraph. It sounds like you want to earn a business degree and you certainly have had exposure to being a real estate agent, and it sounds like you're also interested in designing jewelry, which is a creative activity. I encourage you as someone who enjoys jewelry, I'm always happy to see people creating new things.

Finances. He's got a minus total net worth, very limited income. He's going to have, obviously, the forfeiture, which includes funding. So I'll find he lacks the financial ability to pay a fine.

[redacted]

[redacted]

[redacted]

(PROCEEDINGS UNDER SEAL)

[redacted]

[redacted]

[redacted]

In terms of statement of the offense, instead of my trying to summarize it, what I'm going to do is actually read what it is that you've agreed to.

The Social Engineering Enterprise was made up of a group of individuals based in California, Connecticut, New York, Florida, and abroad. The SE Enterprise began on a date unknown but by no later than October of 2023 and continued through at least in or around March of '25.

Members and associates of the enterprise served different roles and had different responsibilities. The roles included database hackers, organizers, target identifiers, callers, money launderers, residential burglars targeting hardware virtual currency wallets. Mr. Tangeman was in the money laundering end of the enterprise.

The purpose of the enterprise included but was not limited to stealing virtual currency from victims throughout the United States through fraudulent pretenses, disguising, concealing, and obfuscating the source and ownership of the stolen funds through the use of virtual currency laundering techniques, and converting the laundered virtual currency into fiat currency and wire transfers for use at nightclubs, purchase of exotic cars, jewelry, luxury handbags, clothing,

private jet rentals, and rental mansions in Los Angeles, the Hamptons, and Miami.

Members and associates of the enterprise used stolen virtual currency to purchase, among other things, nightclub services ranging up to $500,000 per evening, luxury handbags valued in the tens of thousands of dollars which were given away at nightclub parties, luxury watches valued between 100,000 up to 500,000, luxury clothing valued in the tens of thousands of dollars, rental homes in Los Angeles, the Hamptons, and Miami, private jet rentals for travel, a team of private security guards, and a fleet of exotic cars ranging in value from 100,000 up to 3.8 million.

Mr. Tangeman met the members of the enterprise in late 2023 when the enterprise members -- Malone Lam, Jeandiel Serrano, Conor Flansburg, and others -- arrived in Los Angeles and needed assistance in booking rental homes with stolen cryptocurrency. Mr. Tangeman and Money Exchanger 1 arranged for an initial short-term Airbnb for the enterprise members by receiving stolen cryptocurrency and working with a bulk cash converter in the Los Angeles area to obtain fiat cash for the home payments. Mr. Tangeman and Money Exchanger 1 charged a fee for their services.

Mr. Tangeman knew that these members of the enterprise were stealing cryptocurrency through social engineering schemes and that they had no legitimate employment. The enterprise

members remained in the Los Angeles area following the expiration of this initial rental term. The group soon began working directly with Mr. Tangeman to obtain large rental mansions throughout the Los Angeles area, paying Mr. Tangeman in stolen cryptocurrency.

Mr. Tangeman converted these stolen cryptocurrency into fiat cash and worked with real estate agents in Los Angeles to procure large mansions for the enterprise. He paid upfront security deposits and often the entire lease term, all in cash, for members of the enterprise.

Mr. Tangeman also ensured that the lease documents did not contain the true names of the members of the enterprise. Mr. Tangeman used fake identification documents or stolen identity documents to complete the rental transactions to conceal the true owners of the homes. This was all done with the goal of concealing their identities.

These members of the enterprise were unemployed young men, often under 20 years old, and they did not want to draw law enforcement attention for renting homes for 40,000 to 80,000 per month with no legitimate income. Some of these rental homes were valued according to Zillow between 4 million up to nearly 9 million.

In an August 25, 2024, group text chain Mr. Tangeman worked through a substantial cash deposit on a home for Malone Lam. Mr. Tangeman, using the user name Tate, and discussed that he

needed to -- "need at least 500K right now to give to the house owner. Is that doable." Lam asked where to send the crypto and Money Exchanger 1 responded with his USDT address.

Money Exchanger 1 instructed Lam and others to send 550,000 in cryptocurrency and he would deduct transactions from the total owed each time until they accumulated approximately $3 million which was owed to the homeowner.

Mr. Tangeman then told Lam that "the move in date all depends on how quickly I can get the USDT because I have to get it exchanged and wired over it all takes time... the 500K is going to be dropped off tonight."

Lam then asked to tour the home and Mr. Tangeman told him it wasn't a good idea because the realtor had listed a fake identity on the lease documents to conceal Lam's true ownership. Specifically, Mr. Tangeman stated, "For the house, she, the realtor, put a person that is 55 years old living there with his family. Put it under," whatever. "So let me see about touring."

Mr. Tangeman also arranged for rental homes for the members of the enterprise in Miami when the group moved to Miami in September of 2024. Mr. Tangeman procured these homes through stolen cryptocurrency sent to him by Lam. Following the September 18, 2024, search warrants at Malone Lam's two homes in Miami, Mr. Tangeman logged into the security camera system and took screenshots of FBI agents searching the homes.

Throughout the course of the conspiracy Mr. Tangeman also provided crypto-to-cash money laundering services to members of the enterprise. In July 2024 Mr. Tangeman helped Lam secure an additional rental home. Mr. Tangeman sent Lam a link to the home followed by "You can move in right away to this one as well." Lam responded, "Let's do it." Mr. Tangeman replied, "Trying to see who has cash ATM because Money Exchanger 1 doesn't do exchange anymore."

Mr. Tangeman followed up with "I'll call you in five talking to his new cash guy ATM [at the moment]." Mr. Tangeman then requested $196,880 from Mr. Lam and requested that it be sent to his USDT address. Mr. Lam said he didn't have USDT and asked for an XMR Monero address. Mr. Tangeman shared his cash guy's XMR address, and Lam sent the $196,880. Mr. Tangeman replied with "waiting for cash then going to give it to her."

While in Miami in September '24, Mr. Tangeman provided fiat cash to the members of the enterprise on numerous occasions in exchange for stolen and laundered cryptocurrency.

Following Malone Lam's arrest in Miami on September 18, 2024, Mr. Tangeman instructed another member of the enterprise to travel to Lam's Los Angeles homes, retrieve electronic devices and destroy them. This member followed the directions and did in fact destroy the devices. This was done to prevent their seizure by law enforcement and impair their integrity

for trial.

As a member of the enterprise Mr. Tangeman agreed that members of the enterprise would commit at least two racketeering acts as defined in the statute. Mr. Tangeman knew that he was engaging in financial transactions in excess of $10,000, which represented the proceeds of unlawful activity, that being the social engineering cryptocurrency thefts being executed by members of the enterprise, to include Lam and others.

He further knew that he was changing the cryptocurrency into fiat cash for the enterprise members to disguise the nature, location, source, ownership, and control of the stolen cryptocurrency. Mr. Tangeman agrees that it was reasonably foreseeable to him that at least 3.5 million would be laundered during the existence of the enterprise.

Now, in looking at the 3553(a) factors, the first of course is seriousness of the offense. And this is a serious offense. Mr. Tangeman knew members of the enterprise, that they were engaged in social engineering, stealing cryptocurrency through these social engineering skills, and generally had no other source of lawful income.

He began working with them and he obtained large rental mansions in various places. The members paid the defendant in cryptocurrency. He would convert it to fiat cash used to pay security deposits and leases and his fee on the rentals.

The defendant used fake or stolen identification documents on these leases. Mr. Tangeman laundered money on their behalf consisting of millions of dollars.

He benefitted by being paid for his services and having access to luxury cars, exclusive nightclubs, exotic trips and high-end fashion, Lamborghini, Rolls Royce. He was their facilitator for converting millions of dollars of cryptocurrency into fiat cash, and he benefitted from this by participating in their lives of luxury: $3 million rental for one home, for instance, the luxury cars and other items over a period of time. So it was not a one-time event.

Importantly, this cryptocurrency belonged to innocent victims, not the defendant and members of the enterprise. Unlikely the innocent victims will be made whole. It's unclear the motivation, greed, and the idea of being attracted to a life of luxury.

After Lam's and Ferro's arrests, and they were members of the enterprise, he instructed another member to travel to Los Angeles, retrieve the electronic devices and destroy them, which was done, and those efforts thwarted efforts by law enforcement to seize these items which would have had incriminating evidence.

In terms of looking at parity, within the enterprise itself there's really only been one other sentence. I've looked at the list in terms of trying to get some sense of it, but I

think at this point that's harder to do. I did look at the JSIN, which is 52 to 60 months. The other sentence is not comparable at all, completely different offense level, though the same criminal history, but quite a bit lower offense level.

The concern I have with the JSIN which I have indicated, it's not clear what the basis is for the variance, because it would be a variance.

[redacted]

And again, I think you need to complete your education, your training. You obviously have skills, and you're obviously creative. So put them to good use.

On the positive side, you pled guilty. There's been no equivocation. You, importantly I think, did not participate in the documentary, which I commend you for not doing. Not everybody was as smart as you were in terms of doing that, particularly since they were quite adept at getting a lot of information out.

You have no criminal history. You're young, which has its issues in terms of developmentally and maturity. Certainly

the level of culpability is not at a high level at all compared to others. And even with assistance, the letter that was written by you with some assistance indicates remorse, indicates an understanding of what you've done.

Based on that, since it appears to be your sentiment, I won't see you back in court again. I think this has been a lesson and I think you have other options.

So the other aspect of this is the deterrent to you and others. Obviously, the life of luxury is short lived and has consequences when it's supported by unlawful means, which in this case was the stolen cryptocurrency. Certainly when you're released, you'll be quite young and you'll still have a long life ahead of you. You need to decide how you plan on supporting yourself and going forward.

So I've looked at the recommendations. All the recommendations and the sentencing guideline range frankly are sort of within each other. There's the bottom of the guideline which is 70. 60 is somewhat in the middle. 52 and 60, which is the JSIN, and the recommended by the -- you're talking about 10 to 18 months' difference so they're fairly comparable.

What I think -- I've given serious thought to this. I would have been willing to consider a variance, but the one thing that concerns me greatly is, and this stood out, is that you are the one that came up with the original idea. Somebody

else did it, but you came up with the original idea to destroy the evidence and persuaded Mr. Desmond to destroy the devices for Mr. Lam and Mr. Ferro. And I think that is a very serious part of the offense since that certainly thwarted efforts in terms of coming up with evidence.

So based on that, I would not consider varying the sentence. However, I am going to give you the bottom of the sentencing guidelines, which is the 70. I will say in terms of the letter, which I will keep in my records, does show as I indicated the remorse, and you seem to have indicated your acceptance of responsibility and the consequences. So as I indicated, I think there's a level of maturity there that perhaps was not shown when you got involved in all of this when you were younger. So as I said, I really don't expect to see you back in court.

So pursuant to the Sentencing Reform Act of 1984, and in consideration of provisions of 18 U.S.C. § 3553, as well as the advisory sentencing guidelines, it's the judgment of the court that you, Evan Tangeman, are hereby committed to the custody of the Bureau of Prisons for a term of 70 months on Count 1. You're further sentenced to serve 36 months or three-year term of supervised release as to Count 1.

Other than the forfeiture, the only other payment that you need to make is the special assessment of $100 in accord with the statute which I can't waive.

While on supervision you'll abide by the following mandatory conditions as well as discretionary conditions recommended by the probation office in Part D, Sentencing Options, of the presentence report which are imposed to establish the basic expectations for your conduct while on supervision.

And the mandatory conditions include: You must not commit another federal, state, or local crime. You must not unlawfully possess a controlled substance. You must refrain from any unlawful use of a controlled substance.

You must submit to one drug test within 15 days of placement on supervision, at least two periodic drug tests thereafter, as determined by the protocol of the probation office, depending on whether your tests are positive or negative as to how often you need to be actually tested.

You must cooperate in the collection of DNA as directed by the probation office.

[redacted]

[redacted]

Computer search. Since computers were involved with the crime, there are a number of provisions that relate to that, and the explanation for that is that those were used as part of the crime itself.

So you must submit your computers -- and they have a definition -- or other electronic communications or data storage devices or media to a search. You must warn any other people who use these computers or devices capable of accessing the internet that the devices may be subject to searches pursuant to the condition.

A probation officer may conduct a search to this condition only when reasonable suspicion exists that there's a violation of a condition of supervision, and the computer or device actually contains evidence of that violation. Any search will be conducted at a reasonable time and in a reasonable manner.

Computer monitoring. You must allow the probation officer to install computer-monitoring software on any computer that you use, and they have a definition. Computer monitoring search to ensure compliance with the computer monitoring condition. You must allow the probation officer to conduct initial and periodic unannounced searches of any computers subject to the computer monitoring. They'll be conducted to

determine whether the computer contains any prohibited data prior to installation of the monitoring software, whether the monitoring software is functioning effectively after its installation, and whether there have been attempts to circumvent the monitoring software after its installation.

You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

In terms of the forfeiture, pursuant to Federal Rule of Criminal Procedure 32.2(a), you, Evan Tangeman, shall forfeit the following property, and there are 25 items:

One Patek Philippe watch, a necklace with clear gems, $11,000 in U.S. currency, black Louboutin heels, black Louboutin sandals with metal studs, white Louboutin heels, pink patent leather Louboutin heels, silver and clear Femme heels, black Louboutin heeled boots, black rubber Chanel rain boots, brown Hermes sandals, white Hermes sandals, black Hermes sandals, white Hermes sandals with Velcro straps, brown Hermes slides with sheepskin, black Hermes slides with sheepskin, black Louis Vuitton case, pink Hermes slides, black Chanel purse with gold chain, green Rene Caovilla sandals, gray Louis Vuitton backpack, black Chanel boots, one white and black 2024 Porsche 911 GT3 RS with a particular VIN number, one black 2022 Rolls Royce Ghost, Montana license plate specific with a VIN as well, and a forfeiture money judgment

in the amount of $676,880.

There is no restitution that's been requested. There is the forfeiture. Based on the fact that there is a forfeiture of money, I'm going to put that you must provide the probation officer access to any requested financial information, authorize the release of financial information, and they can share it with the U.S. Attorney's Office until the forfeiture is paid.

Financial restrictions. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer until the forfeiture is paid. I find you don't have the ability to pay a fine, and therefore waive imposition of a fine in this case.

The financial obligations are immediately payable to the Clerk of the Court here in D.C. Within 30 days of any change of address you'll notify the clerk of the court of the change until such time as the financial obligation's paid in full.

Probation office can release this report to all appropriate agencies, which is the probation office if you live in a different district, in order to execute the sentence of the court. [redacted]

Now, in terms of your rights to appeal, I'm going to go over what you had actually in the plea agreement. You've agreed to waive, which means to give up, insofar as such

waiver is permitted by law, the right to appeal the conviction in the case on any basis, including but not limited to claims that the statute to which you're pleading guilty is unconstitutional and the admitted conduct does not fall within the scope of the statute.

So as I indicated, although you can't take a direct appeal, if at a later point a higher court comes back and finds the statute unconstitutional or what you did wasn't unlawful, you can take a collateral appeal. So if the law changes you can take advantage of that.

You're agreeing to waive the right to appeal the sentence including but not limited to any term of imprisonment, forfeiture, term or condition of supervised release, authority of the court to set conditions of release, and the manner in which the sentence was determined.

There are exceptions. One if I sentence you above the statutory maximum or guideline, which I did not do. You do, however, notwithstanding the agreement to waive the right to appeal conviction and sentence, retain the right to appeal on the basis of ineffective assistance of counsel, but not on other issues regarding the conviction or sentence.

In terms of a collateral attack, other than the one which I indicated, the law changes about the constitutionality of the statute or your conduct under it, if you try to attempt to modify, change the sentence or the manner in which it's

been done, a collateral attack, in terms of filing it, you're giving up that right, except if you file a motion based on newly discovered evidence which you didn't have at the time of the sentencing, or on a claim that you received ineffective assistance of counsel.

You did reserve the right to file a motion under U.S.C. 3582(c), which means that if there are changes in the sentencing guidelines that would benefit you, you could file a motion to ask to have it apply to you retroactively.

Okay. If it's a direct appeal, it has to be filed within 14 days of the entry of judgment, or if the government files a notice of appeal. And obviously, collateral attacks would be done at a later point.

So is there a recommendation as to where you want him to go? I mean, he is not going to have any of the usual problems of, you know, guns, various other things in terms of where they place, so he should be in a minimum security facility. But I don't know where you want to recommend, if you want to give me one.

MR. CRAWLEY: Your Honor, we looked at several facilities in and around that area of California.

THE COURT: Is that where his mother lives?

MR. CRAWLEY: In Orange County.

THE COURT: Okay.

MR. CRAWLEY: So we looked at it in -- there aren't

that many that are close. I think Lompoc, which is spelled L-O-M- --

THE COURT: Well, I can recommend -- I don't know how they word it, but whatever the lowest -- what's the lowest?

MR. CRAWLEY: Federal prison camp, I think, is the lowest.

PROBATION OFFICER: I think camp is the lowest.

THE COURT: Okay. I'll recommend a prison camp. He doesn't have any other factors, frankly, that are going to create a problem for him. If you want me to put specific ones, I can, but I will certainly recommend a prison camp, which is about as low as you're going to get.

[redacted]

PROBATION OFFICER: Some of the services are different at different facilities. However, based on his factors, I believe all of his concerns could be addressed by any facility.

THE COURT: Okay.

PROBATION OFFICER: We would also recommend, Your Honor, if the court could specify on the recommendation a low level.

THE COURT: I was going to say prison camp or low level.

PROBATION OFFICER: Just to ensure the BOP understands the --

THE COURT: Yeah, I don't have any problem with that. He doesn't have any of the things that BOP is likely to look at to put him at a different level.

PROBATION OFFICER: Thank you.

[redacted]

[redacted]

MR. HART: Sorry. There was a separate issue with the sentence that I wanted to raise with the court.

THE COURT: Okay. I'm going to bring that up in a minute. I'll add vocational training.

The last part is the *Hunter* case, which is whether there's anything that needs to be brought to my attention about the sentence, objections that we haven't talked about, or something that needs to be addressed. Probation, anything?

PROBATION OFFICER: No, Your Honor.

THE COURT: Government.

MR. HART: Your Honor, we had noted that there is no request for restitution at this time. But I believe under the statute we have 90 days within sentencing.

THE COURT: Right.

MR. HART: So I don't know what the request for restitution will be. We're still in the process of hammering that down. But we would just request to make it clear on the record that we are not waiving our request for restitution.

THE COURT: No, it's just we don't have anything to put in at this point.

MR. HART: Correct, Your Honor. But we will likely be

filing something supplemental. And I believe for the sake of clarity, I believe there is a provision in the plea agreement that forfeiture will count -- or we will make a recommendation that whatever is forfeited will count against any restitution to AFMLS at Main Justice.

THE COURT: Right. Which makes sense. The forfeiture is money that he took, so it should go back to the victims. There's no reason for having it double, plus the amounts are such that assuming he can actually at some point pay it, or has to have the money to pay it, it makes no sense to do it twice. So I definitely appreciate the government indicating it can be used for both.

MR. HART: Well, I can recommend, Your Honor. I don't ultimately make the decision. AFMLS would. But that is consistent with our general recommendation in each of the cases I've handled where we've had both forfeiture money judgments and restitution obligations.

With that, Your Honor, there's no further objection to the sentence.

THE COURT: All right. And part of the thing on restitution is that there are quite a number of people involved, so presumably you're going to be figuring out who should pay the larger amounts and who the lesser amounts.

MR. HART: Correct. And then there's also -- I suspect there will be issues of joint and several liability among the

coconspirators, and I'm aware that the racketeering statute has its own forfeiture provisions. I also need to look into the restitution provisions. In any event, I believe it would be covered under the Mandatory Victims Restitution Act.

THE COURT: Okay. At this point, I'm just silent about it.

MR. HART: Understood, Your Honor. Thank you.

THE COURT: Okay. Mr. Crawley, anything else?

MR. CRAWLEY: No, Your Honor. Thank you.

MR. HART: I'm sorry. One last thing, Your Honor. We would move to dismiss Count 3 of the second superseding indictment.

THE COURT: All right. Count 3 is dismissed.

He can report when he gets a notice. Do you have things you need to do -- I usually put a date, you're not to report before X date. So do you have something that you need to do, see, or whatever. And I'll put a date that they won't have you report -- it takes them time anyway, to be frank. And what I would do at the end is have you talk to probation about what you're going to get as a notice in terms of doing it.

But sometimes people have things planned or they're visiting their mother -- you know. Whatever. And I'm perfectly happy to -- or if he's doing some event with his girlfriend or something.

(Defense conferring.)

MR. CRAWLEY: Your Honor, would it be too much to ask for 90 days?

THE COURT: Well, give me a date that you're asking for. Look at the calendar and just tell me. Is there anything in particular?

MR. CRAWLEY: July 21. He's indicated to me there's a wedding, but he doesn't have the exact date. But I'm just going to just say July 21st, Your Honor.

THE COURT: Okay. That may also give him more of an opportunity with the Bureau of Prisons to pick the right place to have him go. So let me get my calendar...

MR. CRAWLEY: Also, it would help with the whole restitution issue. If he's out, and if there is a concern over that number, I'll at least have the opportunity to speak directly with him about it, if the government thinks that maybe within that time frame they'll know.

THE COURT: Sure. We should pick a date that's not near the weekend. That's not a good time to report because they don't have all of the staffing and stuff. So like a Wednesday.

MR. CRAWLEY: So I understand from the court -- maybe I'm misunderstanding, but your order would be that he --

THE COURT: They're not going to have him report before this date. It'll be sometime after that date.

MR. CRAWLEY: Okay.

THE COURT: And they set the date afterwards.

MR. CRAWLEY: So July 21 is --

THE COURT: A Tuesday.

MR. CRAWLEY: -- is a Tuesday, yes.

THE COURT: Okay.

So he has during that period. During that period, you obviously have to follow the conditions you're under now because you'll be in the community. So don't mess up on that.

If there's things that you wish to provide to the Bureau of Prisons for them to consider, I can't think of anything in particular, but if there's reports or something and they're considering where to place him, the office here in D.C., I forgot the exact name of it, but they make decisions about where people should be placed, and if you want you can submit stuff to them if they're considering where a placement is.

[redacted] All right.

MR. CRAWLEY: Thank you, Your Honor.

THE COURT: Parties are excused. Take care.

(Proceedings adjourned at 12:10 p.m.)

* * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne