IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 24-cr-417-3 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Washington, DC |
| MARLON FERRO, | ) | May 6, 2026 |
| | ) | Time: 10:38 a.m. |
| Defendant. | ) | |

TRANSCRIPT OF SENTENCING
HELD BEFORE
THE HONORABLE JUDGE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff: Christopher R. Howland
David Benjamin Liss
U.S. ATTORNEY'S OFFICE
DISTRICT OF COLUMBIA
601 D Street, NW
Washington, DC 20530

For Defendant: Kevin Eugene Wilson
LAW OFFICE OF KEVIN E. WILSON, PLLC
2 Wisconsin Circle
Suite 700
Chevy Chase, MD 20815

Court Reporter: Rebecca Monroe, RPR
Official Court Reporter
United States Courthouse, Room 6706
333 Constitution Avenue, NW
Washington, DC 20001

P R O C E E D I N G S

THE DEPUTY CLERK: Criminal case 24-417-3, the United States of America versus Marlon Ferro.

Counsel, would you please identify yourself for the record starting with the Government.

MR. HOWLAND: Good morning, Judge. Nice to see you again. Christopher Howland and David Liss on behalf of the United States.

THE COURT: All right. Good morning.

MR. WILSON: Good morning, Your Honor. Kevin Wilson on behalf of Mr. Ferro. And Mr. Ferro is present and to my left.

And also, Your Honor, I deeply apologize for being late. I've been at the courthouse since 9:15, I was down in the cafeteria. For some reason, we were under the impression this was set for 10:30.

THE COURT: You're usually on time, so you're forgiven.

MR. WILSON: Thank you.

THE COURT: All right. And so good morning, Counsel, and good morning, Mr. Ferro.

I have two preliminary matters I want to talk about. One relates to the consent order of forfeiture, which I've been provided an amended one. I would note one thing in it that on -- if you'll look at it, on page 12 of the -- of the consent

order -- okay. Do you have it?

It says at paragraph 3: Finds proceeds that the Defendant personally obtained, a result of the offense to which she has pled guilty have been dissipated by her, et cetera, et cetera.

I think those are the only two places where you've got the wrong -- if you can substitute the additional page, I'd appreciate it. Since it's separate, it should be fairly easy, and it's also a short one.

MR. HOWLAND: We will certainly do that, Judge. I'll have a stern conversation with our forfeiture coordinator when I get back.

THE COURT: Okay. So it's also -- the change was 2.5 million as opposed to 3.5 million.

MR. HOWLAND: That's right, Judge. And that was based on follow-up discussions with the lead agents in the case as to the amount that -- at least from one of the burglaries that he participated in, he, himself, personally kept as part of the -- his reward for engaging in the scheme.

THE COURT: Okay. The other issue in terms of -- and I'm going to use the opportunity in this particular case -- in terms of doing the judgment written out, you know, you cite to the -- the rule and their -- the consent judgment has more than just what's associated with him, is that correct?

So probation has kindly separated it out in terms of

the items basically.

MR. HOWLAND: Okay.

THE COURT: So -- but it -- does it include the amount or not? I didn't see that. Sorry, all of this was done late last night and this morning, so I'm a little behind -- April here.

PROBATION OFFICER: It should have, Your Honor. Let me double-check.

THE COURT: Okay. I'm just trying to figure out what should be in there where we have as many items as we do, whether we just cite to the consent order. We usually include it, but does it make sense to include one that includes everybody else's as well -- items? It may be better to have a consent order, but then have the separate list of -- assuming you all agree that that's the correct one.

MR. HOWLAND: A list of items that belonged specifically to the Defendant, is that the Court --

THE COURT: Right. Right.

MR. HOWLAND: I would have to check with the agents as to whether we can parse out that information on a quick turnaround basis, but we can also --

THE COURT: Probation has done it. Right? I mean, what I have been provided.

I just -- to my mind, it makes no sense to attach the consent order, which has -- includes items to be forfeited that

he isn't forfeiting. So probation had done a list that had it, if I'm correct.

PROBATION OFFICER: We did do a list, but we used the forfeiture consent because we --

THE COURT: Right. Yeah. I mean, you're starting --

PROBATION OFFICER: Yeah.

THE COURT: -- you're going from the consent order, forfeiture order, presumably pulling items out; if I understand it correctly or not.

PROBATION OFFICER: We just use whatever -- the entire thing that was in the forfeiture consent, because we weren't 100 percent as well what items specifically were for him.

THE COURT: Okay. So I'm still not understanding this. Sorry.

The consent order, does it have only all the little items that are listed, does it have only what's related to Mr. Ferro, or does it have what's related to other people for forfeiting?

MR. HOWLAND: I believe -- and I can confirm this, that it has the entire list of assets that were seized as part of this investigation for everyone.

THE COURT: Okay.

MR. HOWLAND: And my understanding of the consent order is he is agreeing not to come down the line later and try

to make a claim that he has some right to those items that are listed.

THE COURT: Right. But are those in custody -- you know, do you have -- have they been seized so we don't have an issue?

The question that I have is I -- we -- generally we put the consent order. It's unusual to have a consent order with so many items that may relate to somebody else. So probation, in the last case I had, basically pulled out what they understood related to him. I still put the consent order in and then do this separate list, which somebody needs to look at to make sure it's accurate.

I just want to make sure that what I'm doing is accurate in terms of -- you know, going back and making sure that, you know, these things have been compliant.

MR. HOWLAND: Yeah, and -- let me, if I can just make sure that I'm understanding. The consent order of forfeiture would include everything, but you're asking that in the --

THE COURT: In the judgment.

MR. HOWLAND: Oh, in the judgment.

THE COURT: Yeah, I'm talking about the sentencing judgment.

MR. HOWLAND: I see.

THE COURT: Because you always refer to forfeitures or if there's restitution. So we generally, if they're a

consent order for forfeiture, refer to it and attach it.

My concern, in this case and another one that I did, is it has items in there that may be seized but that don't -- that he doesn't -- he isn't forfeiting somebody else's.

So what I had did, is refer to the consent order and then include what appears to be only related to him.

MR. HOWLAND: I see.

THE COURT: If that's a correct way of doing it, I'll do it that way.

MR. HOWLAND: We -- I have no objection to doing it that way. I would probably need at least some time to provide a list to the Court after consulting with defense counsel.

THE COURT: Okay. If you -- do what you can do.

Probation did a list, they can give it to you and have you take a look at it. It will only come up in the context of the written judgment.

MR. HOWLAND: Understood. Yeah, we can coordinate with probation and then provide a list to the Court of items that are specific to the -- this Defendant.

THE COURT: Right. And I'll refer to the consent order, but it just seemed to me to be more accurate to also include only what relates to him.

MR. HOWLAND: In the J&C itself, right?

THE COURT: I'm sorry?

MR. HOWLAND: I'm just making sure that I'm

understanding.

In the judgment and commitment order itself, that's where you list out --

THE COURT: Right.

MR. HOWLAND: -- the Court would list out the specifics --

THE COURT: Right.

MR. HOWLAND: -- and then say, There's also this --

THE COURT: So I'll have both the consent order as well as what relates to him specifically.

MR. HOWLAND: Yeah. Understood.

THE COURT: It's just the items.

MR. HOWLAND: Yeah.

THE COURT: You know, shoes and Lamborghini or whatever.

MR. HOWLAND: Understood, Judge. Yes.

THE COURT: Okay. So to make sure that it -- you know, there's something that records what it is that he is -- he, himself, is forfeiting, not the whole enterprise.

MR. HOWLAND: Understood, Judge. We'll get --

THE COURT: Okay. Does that work -- excuse me.

MR. HOWLAND: Can we get back to the Court in maybe a week with that?

THE COURT: That's fine. We can -- we can do that.

Mr. Wilson, does that work for you? Do you have any

problem with that?

MR. WILSON: I do not, Your Honor.

I also think it would be fairly easy. They executed a search warrant on Mr. Ferro's residence, so if they go back and look at the inventory sheet, that should be the itemization that they're looking for, and it should highlight everything that needs to be -- that you would need for the judgment order.

THE COURT: Yeah. If so -- as I said, what I'd ask is that she has a list now, I will refer to the consent order of forfeiture in the judgment, but what we attach to it will be the list that's specific to him.

Okay. So that's Item 1.

MR. HOWLAND: I think I understand, Judge.

I think in the consent order itself, because the consent order is him agreeing that he's not going to somehow, down the road, try to stake a claim in any of the assets. It should include the entire list and then we'll have a separate list that we'll provide to probation.

THE COURT: Yeah. So you're getting both.

MR. HOWLAND: Yeah. Yes. I'm tracking, Judge.

THE COURT: What I'll do is -- it's a little cumbersome, but I still think it's a better way of making sure it's accurate as to what he's responsible -- as opposed to somebody else.

MR. HOWLAND: We agree, Judge.

THE COURT: The next one was a little trickier. And this is the Pretrial Services report. Since I received it only last night, obviously I didn't -- couldn't do much about it. I understand both counsel have it.

MR. HOWLAND: Yes, Judge. And I've discussed it with --

THE COURT: Is that correct?

MR. WILSON: Yes.

THE COURT: All right.

MR. HOWLAND: And I've discussed it with defense counsel.

THE COURT: If you look at page 3, supervision adjustments, there's two concerns that I have.

One is the photo, which he sent through Discord -- and I'll get to Discord and Roblox in a moment -- in which he claimed was his mugshot. I must say it looks like -- as I understand it, they thought it was a passport, mugshots sometimes can look like a passport. I have some concern relating to that, particularly since when he was arrested, he had in his possession a fake passport.

The second thing is if you continue down, is he's continuing to communicate with Discord and Roblox. Now, they're gaming programs or shows, but they also can send messages and it's end-to-end encrypted, as I understand it, which is a violation of his -- assuming he is actually using

it. Since they weren't able to search, but -- so I would be interested in knowing that, but the -- he's restricted from using -- and they gave an example: Any other messaging application service that allows for end-to-end encrypted communications, which evidently Discord and Roblox do.

So although I received it, so we're not at this point doing some sort of potential violation, I do think it needs to be at least brought up.

So first question, Mr. Wilson, is has he been using Discord and Roblox?

MR. WILSON: Roblox, yes. That's a gaming application.

THE COURT: Right.

MR. WILSON: He has been using that.

He also has used Discord too. I don't know that it is an end-to-end encrypted communication, but it's my understanding that his pretrial officer was aware of those things. They talked about it.

THE COURT: I think the concern was less the gaming than it was the fact that it's -- if it is an end-to-end encrypted, is that you could send messages. And, therefore, there's no way, unless they search the computer, to see if he has sent messages, which is a problem.

MR. WILSON: And I think they were asked to go out to do that, and they have reasons for not going out to do that.

THE COURT: I can't hear you.

MR. WILSON: I think they were asked to go out and look at the computer to confirm one way or the other.

THE COURT: Right. And part of the problem, which I will deal with separately, is that they were not able to do a search. I'm not sending anybody again under -- to supervision someplace else where they cannot do searches.

So people in -- that live outside of this area may have some issues in the future, but at this point not with Mr. Ferro since he is where he is. But if I'd known earlier, I would have suggested getting the computer here so we could have had it looked at by the agents or whomever to see whether there's a problem here. Because if it is, it's a violation. I'm not going to violate him now, I'm sentencing him. We're not going to stop and do that first, but it does make a difference in terms of what I might give as a consideration.

MR. WILSON: Yes, Your Honor. I would just simply say that Mr. Ferro was on house arrest, I believe, possibly close to a year, if not over a year. He had no reported violations of any -- any of his conditions. He regularly reported --

THE COURT: Oh, no, he's -- his reporting -- these are the only two concerns that I have is the computer ones. He's been reporting, doing everything else he's supposed to.

MR. WILSON: So --

THE COURT: My question is also evidently he -- there -- there's some financial account also -- oh, Stripe, which he didn't disclose either, which may not be a major issue that he didn't disclose it, he's paying through an account, but it also means he isn't being forthcoming. Because he was asked, and they always ask in terms of any financial things so that they are in a position to do something.

He evidently has now -- I'll take a break and you can talk to your client as to whether, one, he has used Stripe. Two, whether he has -- if we did manage to search, which we probably could search Discord and Roblox -- has he sent messages.

In addition, because it's a gaming thing, but it also is a messaging service, which is what I -- I could care less about his gaming. I do care if he's sending messages.

So I can take a short break and have you talk to your client and see if there's -- and I'll only be considering it if there's an issue. Again, I'll leave it to the Government to see whether they think there's an issue in terms of, you know, sentencing and not doing anything else.

I'm not violating some sort of thing at this point since I got it at the last minute. Okay?

MR. WILSON: Okay.

THE COURT: All right. So how much time do you want?

MR. WILSON: Five minutes.

THE COURT: Well, let's -- let me give you -- this is five 'til 11. Let me give you to 11:15 and you can talk to the Government as to what they're going to say.

MR. WILSON: Okay.

THE COURT: Okay.

MR. WILSON: Thank you.

THE COURT: All right. We're on a break then.

THE DEPUTY CLERK: All rise. This Court stands in a brief recess.

(Recess.)

THE COURT: So let me start with the Government.

Any request on your part relating to this? Or additional information that would be helpful?

MR. HOWLAND: Judge, we -- myself and defense counsel and the representative from the probation office, Ms. Forbes, discussed some of the information that's in the Pretrial Services report. You know, I think defense counsel rightly pointed out that Discord, which was the service that Mr. Ferro had been exchanging messages with, is not an end-to-end encrypted service. So even though there was some confusion about whether it was, it apparently is not. And so that would not be in violation of his conditions of release.

THE COURT: Okay.

MR. HOWLAND: There was also a discussion about whether he was allowed to have a virtual currency wallet.

Apparently he was allowed to have one. And so I think at the end of the day after we've had a more careful review and discussion, there were maybe several pieces where it was close or where it was confusing. We don't think that -- and I would ask Ms. Robinson if she agrees with this -- we don't think that there were any violations of his conditions of release, at least that we're aware of.

THE COURT: Okay. So Discord is not an end-to-end encryption, so that takes it out of that.

What about Roblox, is that one or not?

MR. HOWLAND: Which one, Judge?

MR. LISS: Roblox.

MR. HOWLAND: Roblox, no, it is not end-to-end, Judge.

THE COURT: Okay. So neither one of them is. All right. So that solves that in terms of that.

In terms of the financial account, he's allowed to have one, so that's not going to -- should've provided the information, but it's not in violation to have one, so...

MR. HOWLAND: At least that's my understanding. Again, Ms. Forbes, if she has a different understanding -- I'm not infallible, as Mr. Wilson very politely told me during our discussions, nor do I claim to be, but it is important enough, and at least his probation officer in Nevada felt that it was important enough to raise with the Court. And I think that

we're satisfied that there wasn't a violation.

THE COURT: Okay. No, that's why I wanted to bring it up in terms of -- so it would -- he's allowed to have then, I take it, one financial way of doing it, the wallet, but not more. So, although, he didn't indicate which one it was, he's not in violation as a practical matter since he is allowed to have it.

So based on the information that we have, that it's not end-to-end encrypted and the business about the digital wallet, that he can have one, which he didn't report, but he does -- he's not in violation by having it. Would that be an accurate statement from Pretrial in terms of resolving some issues -- or probation, either one. I just want to see -- well, we'll leave the photo aside for a second.

PRETRIAL SERVICES OFFICER: Yes. The only last issue was the photo, but I believe that you-all had a conversation about that.

THE COURT: You turned, so we didn't hear what you said. I'm sorry.

PRETRIAL SERVICES OFFICER: I said the only last issue was -- to be addressed was the photo, but I'm not sure if the Government and the Defense had a conversation about that.

MR. HOWLAND: We did not.

THE COURT: There's a question of a photo being sent as to whether it's a mugshot or one -- even if it's a mugshot,

we -- could be used for a passport since when he was -- when arrested, he was found with a fake passport.

MR. HOWLAND: Yeah, so I don't think that there -- I mean, all of these issues, I think, raised the red flag of the probation officer in Nevada, and so it warranted, you know, doing a little bit more digging.

I don't -- as far as I know, there's no -- there was no condition of his release that said that he couldn't send a photo of himself. I mean, I think to get everything out in the open, the probation office's concern was that as the date of sentencing got closer, there were all of these issues kind of popping up that were not there before, including sending a photo that very easily could have been used as a passport photo and sending to the same person on the other end of the messaging system his PII.

And that, I think, is fair to say probation office had concerns about it, and it looks like -- and now it looks like Mr. Ferro is here in court today. So if he was thinking about it, he didn't follow through on it, but certainly given that he was arrested -- when he was arrested, he had a fake passport, that raised the -- you know, that set off some alarms for probation.

He's here today, and that's the most important thing. I accept, you know, Pretrial's representation that he had been otherwise in compliance. I don't think that it is unreasonable

or crazy for --

THE COURT: No.

MR. HOWLAND: -- a probation officer to --

THE COURT: I thought they were being diligent by raising the issues.

MR. HOWLAND: Yeah.

THE COURT: Since it came on the day of the sentencing, I thought they should not be ignored and could be answered.

MR. HOWLAND: Yeah, I think that's right, Judge.

THE COURT: So we've answered them.

MR. HOWLAND: I will just say, given all of the potential violations of his condition of release, the Government was prepared to come in to court today and ask that he be stepped back.

My understanding is that the previous AUSA on the case had agreed in principle, at least, to have Mr. Ferro turn himself in on a summons.

My concern was with all of these potential violations of the conditions of release. And so given that it doesn't appear that there were any, we will -- we're going to stand by what my -- my predecessor AUSA intended, which is that we'll -- we won't object to having Mr. Ferro turn himself in on a summons.

THE COURT: All right. Then we'll proceed. That's

sort of at the end after the sentencing.

All right. So let's move onto the sentencing then. Mr. Ferro pled to Count 1, RICO conspiracy. The maximum statutory penalties are 20 years in jail, a maximum fine of $250,000. We've discussed the Pretrial Services report, I have a presentence report, the Government's memorandum in aid of sentencing and the Defendant's position at sentencing. There are no objections to the presentence report to resolve.

In terms of the advisory sentencing guidelines, the breakdown is a base of 7 points, loss more than 3.5 million.

So is that still correct in terms of the whole -- the whole -- he's agreed to that in terms of the whole enterprise?

MR. HOWLAND: Correct, Judge. I mean, the entire enterprise -- obviously, there was a lot more than that.

THE COURT: Right.

MR. HOWLAND: But for purposes of calculating the loss and the plea agreement, under the guidelines, the minimum amount was 3.5 that we agreed on.

THE COURT: Okay. And that's what he had agreed to in the statement. So that's an additional 18 points; substantial financial hardship, an additional 2 points; sophisticated means, an additional 2 points.

Under the statute, 18 U.S.C. 1956, the money laundering, you get an additional two points. Again, sophisticated laundering under a different section, which adds

another 2 points. Minus 3 points for acceptance of responsibility. Minus 2 points for -- he does meet the -- since he has no conviction, no criminal history points, he does meet for C1.1, A and B. So there's zero points.

So he's in criminal history Category 1 and two additional points besides the acceptance of the responsibility are deducted, which gives an offense level of 28, with a criminal history of 1.

The advisory sentencing guidelines under offense Level 28, criminal history Category 1, custody is 78 to 97 months, supervised release, not more than three years, ineligible for probation.

The fine is 25,000 to 250,000, restitution -- my understanding is it's to be determined at a later point or not?

MR. HOWLAND: I think defense counsel and I have had some discussions about it, and I believe we've arrived at a figure of 2.5 million, which is the figure that is included in the consent order forfeiture. I understand that many of the funds may have already been dissipated, so there may be like a no less than $50 a month or something like that that the Court would order.

But we haven't had a more specific discussion than that. And so I would -- that will be the Government's position.

THE COURT: So in terms of the judgment, it would --

we'd obviously be referring to the forfeiture, which concludes the 2.5. And so you're -- you don't expect there to be a separate restitution order since it would be the same amount as the forfeiture.

Is that a good summary or not?

MR. HOWLAND: I think forfeiture and restitution and that piece of it is not my --

THE COURT: Well, the forfeiture and restitution obviously are different.

MR. HOWLAND: Yeah.

THE COURT: The question is whether -- I'm trying to figure out whether there is likely to be a restitution later or not. And usually -- and I didn't go back and look, but usually they have that there will be a request made that the forfeiture amount be also used as the restitution amount.

MR. HOWLAND: That is what we are requesting, Judge, 2.5 million.

THE COURT: Okay.

MR. HOWLAND: Because that is the amount that he admitted that he profited -- at least from one of the burglaries. So that's the floor. And so we would ask for a restitution finding by the Court that that's the appropriate amount.

THE COURT: Okay. So we are putting restitution in at the -- okay.

MR. HOWLAND: In the judgment and commitment order, I think that's right.

THE COURT: 2.5 million and then you would put whatever he would be paying monthly. Okay. All right. Because it wasn't clear. And a special assessment of $100.

So, obviously, the probation officer has made a recommendation of 60 months, a variance in terms of his youthfulness when he got involved. The GS -- or the JSNI [sic], which is the accumulation from the judiciary, is 65 to 68 months. The Government is asking for 78. The Defense is asking for 60.

So, at this point, I'm going to adopt the presentence report as written, there are no objections -- since the presentence report is undisputed. So I'm accepting all portions of the undisputed presentence report as findings of fact. Under federal rule of criminal procedure 32(i)(3)(A).

So I'll now hear from the Government, defense counsel, and the Defendant, if he wishes to address the Court.

MR. HOWLAND: Thank you, Judge. I, as the Court is aware, am fairly new to this case. I've done my best to get up to speed, but I will rely on the arguments that were incorporated into my esteemed predecessor's sentencing memorandum.

The thing that kind of stands out to me as somebody who is just coming into this is how both sprawling the criminal

enterprise was and how many people were involved, but also how sophisticated it was. And I don't claim to be an expert in end-to-end or Signal or Discord or any of that stuff, but younger people these days are. And so from someone who is a little bit older, this looks like a very sophisticated scheme, and they were very targeted. In fact, they used the phrase "do you have any more targets." Targeted in their approach to essentially grooming people and the Defendant, notwithstanding his youth, joined up.

He -- and once he was in, he was in. You know, when they needed someone, when the -- when the -- the RICO enterprise needed someone with a -- I don't know if the Court knows this line from a movie, "a very specific set of skills," in this case, burglarizing houses when the other members of the conspiracy couldn't get their hands on hardware wallets, that's where the Defendant came in.

And because of his specific set of skills, he was able to basically go case out these houses. He was able to do the break-ins and steal, at least in one case, $5 million from someone's home. And obviously, a bunch of kids sitting in a mansion doing this stuff virtually is dangerous and harmful, but taking it -- ratcheting it up one level or several levels to going to someone's house, breaking into someone's house, that is dangerous conduct.

And it, in some senses, changed an otherwise kind of

virtual online kind of criminal enterprise to one where you're not even safe in your own home. And that's obviously a -- it's a serious offense.

The other thing I would note about Mr. Ferro is, you know, once he was in, he was in. And he took all manner of steps to ingratiate himself to the leaders of the organization. He didn't bat an eyelash when they asked him to do the laundering. He bought all sorts of luxury goods with money that he knew that was stolen. And he moved out -- he left his home and moved to LA so that he could be closer to the central players of the conspiracy.

And so all of that is -- it's disturbing, to be honest. And, you know, with the largest heist that took place, which was $240 million, my understanding is that Mr. Ferro very fully understood what was happening and may have even taken steps to launder some of that -- those proceeds. So it's a very serious crime, I guess is the point that I'm trying to get across.

And the other aspect that I kind of think stands out to me is just how brazen these people were. I mean, if someone steals -- you know, steals money from someone, normally you try to keep that undercover. And, to be sure, they did, you know, all these different transactions to try to make it harder to follow the money trail, but at the end of the day they were dropping half a million at nightclubs, they were throwing out

Birkin bags; 10-, 15,000, $20,000 bags at these parties.

And so it wasn't as if, you know, these -- you know, the members of the conspiracy were hungry or they had kids whose mouths they need to feed. They were buying Lamborghinis and renting, you know, $10 million houses, $15,000 bags.

It's just -- it's hard for me, as someone who is older, to look at that and understand how someone could get wrapped up in that, but the Defendant did. And, as I mentioned before, once he was in, he was in. Otherwise, I think I would rely on the -- the arguments that were incorporated into the memorandum in aid of sentencing that the Government submitted.

One thing that Mr. Wilson and I discussed was, to Mr. Ferro's credit, he pled guilty and I believe he pled guilty somewhat early on, [redacted]. So I'll give that also in his credit.

All of that said, you know, the guidelines are there for a reason and we're recommending the low end of the guidelines. We think it's an appropriate sentence given the severity of the conduct, given the amount of money that was involved, given the sophistication of the different parties. Given the fact that he broke into people's homes. All of that suggests -- notwithstanding the fact that he is a young guy, that he -- that a guideline sentence is appropriate in this

case, followed by three months of supervised release, 2.5 million in restitution. And I think that that's it.

We will not object to Mr. Ferro turning himself in on a summons in a couple of weeks. I'll defer to the Court as to that, if the Court is even amenable to having him turn himself in.

I'm happy to answer any questions --

THE COURT: No, I --

MR. HOWLAND: -- that the Court may have.

THE COURT: One -- I guess one question.

Besides Mr. Tangeman, who is the other person with a RICO conspiracy, are there other examples in terms of from parity? This seems -- within the enterprise, there isn't. But in terms of the sophisticated scheme, I didn't find anything that was similar such that you could look to see what other sentences were done.

I'm just asking whether you found something I didn't.

MR. HOWLAND: Judge, if I could just have a couple of moments to consult.

THE COURT: Sure.

(Pause.)

MR. HOWLAND: To answer the Court's specific question, I believe Mr. Tangeman is the only person who has thus far been sentenced. And so -- one other thing that I forgot to mention about the conduct that, again, escalates the

seriousness and the dangerousness is that in addition to having a fake passport when he was arrested, the Defendant had two firearms.

Again, I haven't -- I'm not a firearm expert either. I'm actually not sure what I'm an expert in, but the -- they looked like very serious, scary guns in the photos. And they had shaved serial numbers; the serial numbers had been shaved off.

And if he's out, you know, looking for targets and conducting burglaries and he's got two guns in his house, that is -- that makes it even more dangerous. And I think places it even more in the heartland of cases that the guidelines are otherwise intended to cover.

And my cocounsel reminded me that I believe that -- so there were two different burglaries that Mr. Ferro participated in. One was in Texas, that's -- he successfully obtained a $5 million -- hardware containing $5 million in cryptocurrency.

The second one was in New Mexico, and I believe that no one was home when Mr. Ferro broke into the home, but it's a home that's -- the owner of the home and the resident is someone who is an older gentleman who is in a wheelchair and, you know, Mr. Ferro was there for a couple days beforehand. He -- I think he had set up a -- some sort of surveillance capacity. And so it's another factor that I think, again,

escalates the severity and the dangerousness of the Defendant's conduct.

THE COURT: All right. Mr. Wilson.

MR. WILSON: Thank you, Your Honor.

I'll start just by responding --

THE COURT: Can you pull the microphone up a bit. Perfect.

MR. WILSON: I'll start just by responding to some things that the Government mentioned and in no way am I trying to explain away this conduct, nor would Mr. Ferro want me to do that. I just want to put things in context.

Like the Government, I'm older also. Right? And I can understand when he says that some of this behavior that he saw was disturbing to him. And I think that has a lot to do with, you know, when we were growing up, we would come home from school, change clothes, and go outside and play until dinnertime or close to dark and then would come back in and we repeated that over and over and over.

And even when we graduated from high school, some of us that may have played sports in high school, we were still trying to chase those dreams. So we would come home from work and go to the park and play basketball until it was dark.

Well, we know that with the invention of all this technology, cell phones -- I go through it with my daughter, kids nowadays, they just simply don't go outside like they once

did. Instead, they're in front of a computer or in front of a cell phone, and they have things such as Instagram and TikTok and they're just able to be super creative, and sometimes in such a negative way, like in this instance.

You have a bunch of kids -- and I call them kids because we're talking about young men that are 18, 19 years old. Probably the oldest was 20 or 21 with the exception of one older guy, but the net of them, they were young kids. And instead of being outside in their play clothes, they were behind a computer or on a cell phone, and they started doing things and that led to them doing mischief. And that's what happened here.

And then, more disturbing to the Government, which I see that, is once they got this money, what did they do with it? They didn't hide it. They went to nightclubs and spent $500,000 here and all that. All these things in a shell is just simply behavior of kids. Kids.

So it takes me to, you know, a part of what Pretrial put in their report. They put in a report -- the information about the study from a young adult development project. And they talk about when these kids are young, 18, 19 years old, their brains haven't fully developed. So to expect them to make these decisions that us older people would make is just not realistic. They tend to make the very type of decisions as outlined by the Government when he described these behaviors

that were disturbing to him.

The Government also talked about the break-ins that Mr. Ferro admitted to doing. But he described it as the special skills, and this is in no way to be inflammatory or negative towards the Government, but the special skill was just picking up a brick and throwing it through a window. If that's considered special skills, I have those special skills.

As far as the -- during the surveillance of the property, that was something that they did as a collective group. Once again, they figured out how they could do that through computers and cell phones and they were able to stage that and actually have surveillance on the resident that they were choosing to mark as a target. But that wasn't some special skill that Mr. Ferro had. That was just something as a collective body that they made as a part of the scheme.

Your Honor, prior to this hearing, we submitted a sentencing memo and we thought we recommended a sentence of 60 months, which we felt was sufficient and it supports the purposes of sentencing. We understand that it is a variance from the guideline range calculated by probation, which was 78 to 97 months; however, we do believe that there are some factors that I will briefly touch on that supports our ask of 60 months with two years of supervised release.

Taking them in turn, one, Mr. Ferro accepted responsibility. And I'm going to quote how the Government

described his acceptance of responsibility.

Quote, Quickly within mere months of being charged with participating in a complex racketeering conspiracy, I think that leans in favor of a variance sentence. Second, he assisted Government in the prosecution of his own case by coming before this Court, accepting responsibility, and pleading guilty to the two counts that were pending against him.

Third, as probation pointed out, he was 18 years old when these crimes took place. And when you -- when you join that with the studies from a young adult development project, it is worthy of consideration towards the variance sentence that we're asking for.

Fourth, the sentencing commission did a study the past fiscal year, I think there were 100 and some defendants similarly situated as Mr. Ferro, be it they had a primary guideline of under 2S1.1, they had a total offense level of 28, and a criminal history score of 1, and the average sentence was 65 months. Our ask is five months lower than that, but it's in the range. And we're taking into account other factors such as his age and his quick acceptance of responsibility.

Your Honor, also --

THE COURT: May I interrupt? The one problem with the JSNI, which I'm glad they're doing it because I think it's useful, is they don't explain other than they eliminate the

cooperators, but they don't explain the sentences below the guidelines as to what factors the judges considered in those cases. So I certainly look at it as one factor to be considered and an important one in terms of looking at parity since there isn't that much out there, but it is not a complete picture because we don't -- and I, frankly -- when they went around and talked to the judges, I complained about that and said they should do something to indicate to us -- so that judges, in making this decision, will look at what other judges may have done and what they considered a reason for variance, since it's the offense level -- the criminal history and the type of crimes. So they do attach it to the type of crimes, which I think does make a difference in terms of whether you talk about a financial crime versus some other crime.

But we don't have that. I still look at it and consider it --

MR. WILSON: Yes.

THE COURT: -- but it's the one fault that I have with the way they've done it. I'm hoping they'll change it.

MR. WILSON: I definitely understand that.

Your Honor, I also will point out that -- first, I'm so thankful that you gave us the time to discuss these alleged possible violations of his pretrial release. Because you started by saying that, you know, if these are, in fact, violations, they can impact the sentence that you may otherwise

have fashioned for Mr. Ferro.

And I'm going to try not to get myself in trouble by getting into it too much, but it's very concerning to me. You know, in the report, it suggested that he was in violation because he was on Discord and Roblox, but clearly the condition is it just can't be end-to-end encryption.

And, to me, before you put something like that in writing suggesting that he's in violation, you need to do the work and verify whether it's end-to-end or not.

THE COURT: Well, they used "believe," which is why I made sure to have -- bring it up to see whether it was actually accurate or not. I don't know when they came to this information. So we got the report last night at 9:30. So I don't know whether -- you know, these are incidents that came up more recently or not. I didn't have a chance to sort of ask that question, whether they, frankly, didn't have enough time to double-check, which may have been -- may have been the case.

I'd rather they put things in and we can, you know, resolve them than have them linger out there, which is why I brought them up to make sure that everybody had a chance to consider them and see whether they are sufficiently substantive, and I don't think they are.

MR. WILSON: I guess what concerns me is it's not just in isolation the -- being suspicious of Discord and Roblox, because I think that's in line with their

responsibilities.

But when you take Discord and Roblox, which is not end-to-end, you take the virtual wallet, which he's allowed to have. You take -- we keep mentioning that he had a fake passport. He did not have a fake passport. He had a fake driver's license. His passport is not fake. Then we talk about the picture --

THE COURT: Well, I assumed that the fake driver's license supported this passport.

MR. WILSON: I'm not sure.

THE COURT: It's a matter of semantics, but the passport, I take it, was not his. I mean, in other words, it did not actually represent him.

But I take your -- you've made a distinction factually, and that's fine.

MR. WILSON: And then we talk about the photo. And then I get an e-mail questioning, Well, is your client going to show up for sentencing, as though it's a possibility he's going to run.

Keep in mind, this young man has been on home incarceration just about a year. Almost a year. And the only reason why we're in here for sentencing today, instead of a month ago when this could have been behind us, is because someone other than the Defense needed a continuance.

My client has showed up at every hearing. He reports

so much to his pretrial officer. I mean, so what it appeared to me is that this narrative was being created to suggest that my client is getting cold feet, it's getting close to sentencing, so all these things are being put in place for him to potentially either run or consider running when that's far from the truth.

This man drives -- this is, I think, the third time with his family across country to be in court, and would have been in court on time every single time but for me telling him downstairs that we didn't have court until 10:30. It's at 10:00. That is not the type of person that's planning to run.

THE COURT: Well, let me just say --

MR. WILSON: That was the narrative.

THE COURT: -- I would much prefer to have Pretrial Service be careful, raise issues, and then leave it for the Court, which is what they've done, which is the appropriate thing to do, and to have me inquire of the parties to make sure. I've had other instances where I wish they had brought some things up and didn't. So I'm not going to fault them for bringing up, you know, what they had concerns about.

I'd rather hear them than not and then find out that they actually had some substance. So they were brought up, we discussed it. I would certainly not have gone forward without having an -- everybody having an opportunity to look and see whether they were problems that I needed to consider or not.

MR. WILSON: Well, I'll just make this last comment on it and then I'll move on. It wasn't that easy for us. Thank goodness that I have an AUSA that allowed me to speak with him and he did at least hear me. Otherwise, I could have had someone up here that's ready to run with it. He's in violation because of Discord and Roblox --

THE COURT: Well, I told you to speak, and I'll be frank, I would have asked coming out, Have you talked together? If you hadn't, I would have made you. Because basically you need to find out what their positions are. And also they're in a position to provide some information that would be helpful about, you know, the end-to-end encryption or some other things that could have come up.

So I would have expected -- but, yes, I do know the two prosecutors, as I know you. So I was happy that this all went smoothly on that end because it resolved itself quickly, as opposed to being an impediment to going forward today.

MR. WILSON: So I will say this then, whereas, when we started off this morning, it was their concerns about these possible violations and they may impact the sentence that the Court fashion. Knowing that we worked through it and we know that there aren't any violations, I would hope that that would also impact the sentence that this Court ultimately decides.

THE COURT: I always consider whether they're in compliance or not.

MR. WILSON: So, Your Honor, in sum, we are asking for a variance down from the guideline. We're asking for a sentence of 60 months, which is consistent with the sentence that probation is recommending as well.

We would ask that Mr. Ferro be allowed to self-report when notified by the Marshal Services or Bureau of Prisons. We would ask that you recommend that he's allowed to go to a facility, a low-level camp perhaps near his residence, an institution that he would like for the Court to recommend, if you would, would be FCI -- I'm going to butcher the name, but Lompoc, L-O-M-P-O-C.

Also, that facility has an RDAP program, so if Your Honor would recommend RDAP for Mr. Ferro as well. And, Your Honor, we also ask that there be no fine for Mr. Ferro, especially in light of the 2.5 million in restitution and the fact that he's going to be incarcerated for at least five years.

THE COURT: That's not a problem. I certainly am not doing a fine.

MR. WILSON: Okay. That's our argument. Thank you, Your Honor.

THE COURT: Is Lompoc a low-level camp? I've heard the name, but I don't know.

MR. WILSON: I believe they have that as well.

THE COURT: They have that. Okay.

MR. WILSON: Yes.

THE COURT: All right. Mr. Ferro, you can address the Court, but you're not required to, so it's up to you.

THE DEFENDANT: (Shook head.)

THE COURT: Okay. All right. In addition to the advisory sentencing guidelines, the Court considers the pleadings, argument, and record in this case in addition to the following information in determining a fair, appropriate, and reasonable sentence, in conformance with the factors set out in 18 U.S.C., 3553(a), subsequent sections, except for (e).

Mr. Ferro is 20 years old. He has no criminal history. In terms of education, he's a high school graduate. He earned a data science certification through the Arizona State University in 2025. Evidently he has an interest in AI and cybersecurity. There is no work history.

Financial history, he has no assets, no income. He's being supported by his family financially. In terms of physical condition, there appear to be no issues. Mental and emotional health, no issues. Although, it's been indicated that he did speak to a counselor due to the stress of this case.

I don't think it rises to the level, frankly, of needing an evaluation. I do think in the substance abuse area it does in terms of -- but in the mental health, I don't see it at this point. That doesn't mean you can't ask for it.

Substance abuse, he's been using marijuana since age 18, has evidently experimented with some unprescribed Adderall, but I will say his -- on release, his drug tests have all been negative.

On a personal basis, Mr. Ferro was born in Cuba, but relocated to the United States at age 1. Since 2009, he's had no contact with his biological father Who resides in Nevada.

His mother resides in Las Vegas, works at a dental office. When the Defendant was five, mother married Mr. Mendez, who has been the father figure to the Defendant.

Mr. Mendez works as an over-the-road truck driver. So for the Defendant, the mother and Mr. Mendez, that's Mr. Ferro's family unit. He does have one sibling, a sister who is 13 years old.

There appear to be no issues growing up. The Defendant has been in a relationship since 2023; his girlfriend lives in California.

In terms of the offense, it's my habit to read, frankly, the statement of offense that he has signed and we went over as part of the plea.

So to put everything in context, I am going to discuss the social engineering enterprise because there are different parts to it. The social engineering enterprise or enterprise was made up of a group of individuals that were based in California, Connecticut, New York, Florida, and

abroad.

The enterprise began on a date unknown, but by no later than October of 2023, and continued through at least in or around March of 2025.

Members and associates of the enterprise served different roles and held different responsibilities. The roles included database hackers, organizers, target identifiers, callers, money launderers, and residential burglars targeting hardware virtual currency wallets. Mr. Ferro was a residential burglar and a money launderer for the enterprise.

The purposes of the enterprise included but were not limited to stealing virtual currency from victims throughout the United States through fraudulent pretenses, disguising, concealing, and obfuscating the source and ownership of the stolen funds through the use of virtual currency laundering techniques and converting laundered virtual currency into fiat currency, and wire transfers for use at nightclubs for the purchase of exotic cars, jewelry, luxury handbags, clothing, private jet rentals, and rental mansions in Los Angeles, The Hamptons, and Miami.

Among other things, nightclub services ranging up to $500,000 per evening, luxury handbags valued in the tens of thousands of dollars, which were given away at nightclub parties. Luxury watches valued between 100,000 up to over 500,000. Luxury clothing valued in the tens of thousands of

dollars. Rental homes in Los Angeles, The Hamptons, and Miami. Private jet rentals for travel. A team of private security guards, and a fleet of exotic cars ranging in value from 100,000 up to 3.8 million.

On or around February 23rd of 2024, Mr. Ferro agreed with another cybercriminal to commit a residential home burglary in Winnsboro, Texas from victim T.C. Mr. Ferro was provided money for travel, an address and location, and the code to the victim's safe. Mr. Ferro's goal was to steal a hardware wallet from the victim believed to contain approximately 100 Bitcoin then valued at over 5 million. Mr. Ferro travelled to Winnsboro, Texas, broke into the victim's home and stole the hardware wallet containing the 100 Bitcoin.

Mr. Ferro and the other cybercriminal then transferred the funds through various cryptocurrency exchanges to disguise the origin, source, and ownership of the funds. Mr. Ferro received a large percentage of the stolen funds for his role in the residential burglary.

Mr. Ferro met the enterprise members when he moved to California in early 2024 following the Texas burglary. Mr. Ferro met Mr. Doost and [redacted] -- [redacted] when he moved to California and needed crypto-to-cash services to convert his stolen cryptocurrency. On his arrival in California, he began using Doost to launder stolen cryptocurrency into fiat to cash

for use at Los Angeles nightclubs.

Mr. Ferro ingratiated himself in the enterprise and became close friends with [redacted] and Malone Lam. Mr. Ferro offered Mr. Lam and others his residential burglary services for cryptocurrency thefts as part of the enterprise.

In or around July 2024, Mr. Ferro agreed to travel to New Mexico from California to execute a home break-in to search for a virtual currency hardware wallet. Mr. Lam and Mr. Chetal asked Mr. Ferro to perform this home break-in because they believed that the victim held approximately 30 million in virtual currency on his hardware wallet. Mr. Ferro arrived in New Mexico and positioned a cell phone in front of the victim's home for surveillance. Mr. Lam also tracked the victim's location by logging into his iCloud account.

When the group believed the victim had departed the residence, Mr. Ferro entered the rear of the home, broke into the home by smashing a window with a brick, entered the home, and scoured the home for the hardware wallet. Mr. Ferro took various digital devices, excuse me, but was unable to find the target hardware wallet. Mr. Ferro was captured on the victim's surveillance camera breaking into his home.

And I was provided as an exhibit the video of the break-in and surveillance of the home, I guess you'd call it. Mr. Ferro solicited additional home break-in targets from Chetal in August of 2024.

On August 31st, 2024, Mr. Ferro sent Mr. Chetal a series of messages stating, quote, I'm getting surgery, so if you need targeting, let me know before those days. Mr. Ferro sent Mr. Chetal a message on September 7th, 2024 stating, "need licks," referring to robbery targets. Mr. Ferro also assisted members of the -- of the enterprise in purchasing luxury goods with stolen cryptocurrency.

On August 31st, 2024, Mr. Ferro sent Mr. Chetal a message with his year-to-date spending on Amiri or Amiri clothing which showed $250,060 in purchased clothing by Mr. Ferro on behalf of Mr. Chetal. Mr. Ferro then used Joel Cortes to ship designer clothes to Chetal after Ferro purchased the clothing in Los Angeles with stolen cryptocurrency.

Mr. Ferro learned that Lam, Chetal, Jeandiel, J-E-A-N-D-I-E-L, Serrano, and others stole approximately $248 million from victim 7 almost immediately after the theft occurred. Mr. Ferro was with Mr. Lam for portions of the crime. Mr. Ferro openly discussed the theft with Mr. Chetal on Telegram criticizing Serrano for his rush to launder his cut of the stolen money.

Mr. Ferro stated through several messages, quote, "John" -- referring to Mr. Serrano -- "is so fucking stupid. It fucking hurts. Why can't anything just go to plan. What's so hard about waiting to clean $50 million? Why is he so

impatient knowing he has trusted people cleaning it? Like what was the point of Malone sweating his ass off cleaning John's little shit little by little? Bro, he just fumbled 250 million. Lick. Just by being stupid." Unquote.

Mr. Ferro also procured fraudulent Know Your Customer documents from a Lithuanian individual and used them to open a RedotPay digital payment card account to be used by members of the enterprise to spend their stolen cryptocurrency at physical retail locations and nightclubs.

RedotPay provides digital payment cards that can be stored on mobile telephones and used to pay for goods and services in person. Users transfer cryptocurrency to the RedotPay account and draw down on the account balance through purchases, like a debit card. RedotPay account registration is geo-blocked in the United States, and the United States is listed as a restricted location on the RedotPay website.

Mr. Ferro used these foreign identification documents to create the account so that enterprise members, including Chetal, Lam, and Serrano, could use the account to spend their stolen cryptocurrency. Mr. Ferro arranged for cryptocurrency stolen by Chetal, Lam, and Serrano to be loaded onto the RedotPay account through him.

Mr. Ferro then shared the account access with Chetal, Lam, and Serrano. Members of the enterprise then used this account to purchase luxury goods at retail stores and nightclub

services throughout Miami and elsewhere.

Mr. Ferro used the identification documents of a Lithuanian individual instead of his own so as to mask the source, location, and ownership of the account and the spending occurring through the account. Many of the transactions involved purchases over $10,000 and proceeds of the specified unlawful activity.

Following Lam's arrest in September 2024, Mr. Ferro collected funds from other enterprise members to pay for Lam's attorneys knowing that the funds were proceeds of specified unlawful activity.

Specifically, Mr. Ferro received hundreds of thousands of dollars in cryptocurrency, converted into different types of cryptocurrencies, then converted it into fiat cash through illicit crypto-to-cash services. He converted the funds to wires and used the funds to pay for Lam's attorney. Not Mr. Wilson, by the way, to make clear for the record.

Mr. Ferro also facilitated and organized the purchase and shipment of Hermes Birkin bags on behalf of Lam for his Miami girlfriend while Lam was incarcerated. Mr. Ferro was arrested on May 13th, 2025, and possessed a fake identification document and two firearms.

Mr. Ferro agrees that it was reasonably foreseeable to him that at least 3.5 million in cryptocurrency would be

stolen by members of the enterprise in furtherance of the objects of the enterprise. Mr. Ferro also agrees that he was assisting other members of the enterprise to spend their stolen cryptocurrency and disguise and conceal the nature, location, source, ownership, and control of the stolen cryptocurrency.

All right. Let me move to the 3553 factors.

The first is the seriousness of the offense. This is a serious offense. Before joining the enterprise, Mr. Ferro committed a residential home burglary in Texas with another cybercriminal. Stole the victim's hardware wallet containing 100 Bitcoin, valued at $5 million, funds transferred through various cryptocurrency exchanges to disguise the origin. Mr. Ferro received a large percentage of these stolen funds.

In 2024, having moved to California, he met members of the enterprise, as I've indicated, Mr. Doost, [redacted], and eventually Mr. Lam. Mr. Ferro offered his burglary services on behalf of the enterprise involved in home -- home break out -- break-in in New Mexico. He found and took digital devices, but did not find a hardware wallet. And, as I indicated, the Defendant is on a video which was provided to the Court. Mr. Ferro also solicited from the enterprise members additional break-ins to steal hardware wallets.

Mr. Ferro also had a role in assisting enterprise members in buying luxury items. Mr. Ferro shopped for Mr. Chetal, with 248 million stolen funds. And out of that,

Mr. Ferro received a share of those stolen funds.

He assisted with laundering proceeds from various crimes, used a digital payment card. U.S.-based users could not use it, as I've indicated.

He provided fraudulent ID documents to get the card. Once had the digital card, members transferred assets to the card and used the card to purchase items.

After Mr. Lam and Mr. Serrano were arrested, he assisted Mr. Lam in using Mr. Lam's cryptocurrency to buy luxury handbags for Lam's girlfriend. In addition, he collected -- Mr. Ferro collected funds from other enterprise members to pay for Mr. Lam's original defense attorneys, again, knowing the fund proceeds resulted from unlawful activity. And when Mr. Ferro was arrested, he had two firearms and the fake documents which would support a passport.

So if you were going to summarize Mr. Ferro's role in terms of looking at the seriousness, he's burglarizing victims' homes to obtain digital wallets in order to steal the funds, get the cryptocurrency, change it to fiat funds, launder cryptocurrency through various methods, purchase luxury items with the stolen funds.

And I would note, this cryptocurrency belonged to innocent victims, not to the Defendant, not to members of the enterprise. And it's unlikely that these innocent victims are going to be made whole.

And I will say, based on the information I have, there's nothing else in his background that, frankly, explains his getting involved in all of this in terms of his homelife or anything else, other than greed. There's been a discussion of youth, which perhaps does certainly -- can affect your judgment, but not every young person engages in unlawful activity and certainly not this sophisticated. He was doing it on his own and then ingratiated himself and became -- made a choice to become part of the enterprise.

So the Defendant and members of the enterprise spent money for -- that belonged to the victims on luxuries and extravagances. So it is a serious offense.

The Defendant, in terms of any rehab needs, I think the only thing that I would see is that he should be evaluated for substance abuse programs. I don't think there's anything else in particular. I would suggest you -- you know, make use of the programs they do have; training, educational things. But in terms of actual needs, I think really only the substance abuse.

On a positive side, Mr. Ferro pled guilty, he is not equivocated, he has no criminal history. Evidently, [redacted] and he has family support, as we can see from the courtroom.

In terms of parity, as I've indicated, there's really -- it's hard to find anything in terms of this type of

crime or as sophisticated as it was. Mr. Tangeman is the only other one who has actually been charged with a RICO conspiracy that involved the enterprise. He is -- his offense level was 27, also in criminal history Category 1. Mr. Ferro's is 28 in criminal history Category 1.

And 70 months is at the low end, which is the sentence that I gave him. In terms of looking at the JSNIA [sic], the range is below the guideline, but, as I indicated, the problem I have with these stats is that they don't give you an explanation as to why there clearly has been a variance, but it obviously is below the guideline.

In terms of deterrence, the deterrent to Mr. Ferro, I mean, he was already involved in stealing through a burglary the hardware wallet to access cryptocurrency before he even became involved in the enterprise members. So I want to make sure that he's not involved in this type of crime again. As I said, nothing in his background explains his involvement, and being young only goes so far.

Certainly deterrence to others is very important, that others don't engage in this type of cryptocurrency theft. Evidently, from what I can see and some of the cases I've had, although different than this enterprise case, it's not that difficult to steal it -- the cryptocurrency, if you're fairly sophisticated.

And there's a lot of money in it and it's -- it's

obviously a temptation for some people to get involved with it because it is fairly easily accessible if you decide to engage in some criminal conduct to get it. So and Mr. Ferro, to his credit, agreed that 3.5 million was foreseeable as the amount that he and members of the enterprise stole. So this is important to be able to deter other people.

Now, in terms of a variance, I don't think he falls into a category for departure. I looked at the departures, and although they've changed slightly the format now in terms of what you've put in, it's not quite as stark as what it had been on the forms.

I don't see a basis for a departure. So obviously it would be a variance. And in a variance you have to really be very specific, according to the Court of Appeals. You've considered the guidelines, you consider whether it fits a departure. If you're going to vary, you have to give very specific reasons as to why a variance is appropriate, sort of the third level, if it's certainly contested in the court.

So in terms of looking at variance, I -- there are a couple things that stand out. One is the fact that he had already been involved in these burglaries to steal these digital wallets. And the other thing is at the other end, is even after Mr. Lam and Mr. Serrano were arrested, Mr. Ferro did not step back from the enterprise. He was still engaged with illegal actions and, you know, assisted in having -- getting

funds and having funds, knowing that these were illegal funds, provided so that it could pay for Mr. Lam's defense.

So I see sort of a concern I have at the beginning in terms of his already being involved and interested in doing this kind of criminal activity before he even gets involved with the enterprise. And then that he doesn't, upon seeing that they got arrested, and, therefore, you know, the likelihood of it being found out, and not being deterred and stepping back from it -- are concerns, frankly.

The other concern is the passport. You may want to not call it a fake passport, but it would pass as one since you would use a driver's license that's not his with that name used in the passport. Which, you know, means you're prepared to disappear, presumably to avoid being arrested at that time.

And the -- two weapons, although nobody has really made much of an issue about that, but I'm just pointing something out that is different than the -- a good portion of the other members that are in the enterprise.

So youth, being young -- obviously, the studies -- I've seen the studies, and I think it certainly is a valid conclusion from the studies. I'm not suggesting in any way that they're not valid, but I don't think it's sufficient in the -- in this case in relating to it, based on the sophisticated conduct that's involved and that he voluntarily got involved himself, both before he even got involved with the

enterprise, what he did with the enterprise, and when he should have walked away, he did not.

And also the fact that really this is -- all of this is to have luxuries and extravagance; Lamborghinis, Rolls-Royces, all sorts of other things, that, frankly, a very small part of the population has access to. So I -- to my mind, being young doesn't support it with -- in terms of what he actually used it.

So I'll take it into account in the sense of looking at where in the guidelines I would sentence him. And so I would not sentence him, as the Government has requested, at the top, but I would sentence him at the bottom.

So in terms of the sentence document itself, pursuant to the Sentencing Reform Act of 1984 and in consideration of provisions of 18 U.S.C. 3553, as well as the advisory sentencing guidelines, it's the judgment of the Court that you, Marlon Ferro, are hereby committed to the custody of the Bureau of Prisons for a term of 70 months on Count 1.

You are further sentenced to serve a 36-month or three-year term of supervised release as to Count 1. In addition, you're ordered to pay a special assessment of $100 according to 18 U.S.C. 13 -- 3013. I can't waive that. That's just something you're going to have to pay at some point.

While on supervision, you'll abide by the following mandatory conditions, as well as all discretionary conditions

recommended by the probation office in part D:

Sentencing options of the presentence report which are imposed to establish the basic expectations for your conduct while on supervision, the mandatory conditions include, you must not commit another federal, state, or local crime. You must not unlawfully possess a controlled substance. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on supervision, and at least two periods -- periodic drug test thereafter as determined by the probation office protocol. They have a protocol that says -- depending on whether your tests are negative or positive over a period of time, how many tests you need to do.

You must cooperate in the collection of DNA as directed by the probation officer. You must make a restitution in accordance with 18 U.S.C. Sections 3663 and 3663(a) or other statutes authorizing the restitution.

You'll also comply with the following special conditions:

You must participate in an evaluation and, if recommended, participate in an inpatient and/or outpatient substance abuse treatment program and follow the rules and regulations of the program. The probation officer will supervise your participation in the program, provider, location, modality, duration, intensity.

Substance abuse testing. You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods. You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the US Attorneys Office, and that's because you have both restitution as well as forfeiture in terms of their monitoring -- whether you have the funds to pay, don't have the funds to pay, and how you're using the money.

You must not incur new credit charges or open additional lines of credit, and that includes any line of credit without the approval of the probation.

In terms of the computers, I am putting things in since obviously a good portion of this crime, although maybe not totally specifically you, but the enterprise certainly was involved in the use of technology in carrying out this offense or these offenses, so you must submit your computers and they define it under the statute as 18 U.S.C. Section 1030(e)(1) or other electronic communications or data storage devices or media, to a search.

You must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition.

I will say to you, the probation office does have authority in ways of searching. So, unlike pretrial, they will be able to do this.

A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there's a violation of a condition of supervision, and that the computer or device contains evidence of this violation. Any search will be conducted at a reasonable time and in a reasonable manner.

Computer monitoring. You must allow the probation officer to install computer monitoring software on any computer, and that's defined in 18 U.S.C. Section 1030(e)(1), that you use. To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers -- again, the same definition -- subject to computer monitoring.

These searches shall be conducted to determine whether the computer contains any prohibited data. Prior to installation of the monitoring software, whether the monitoring software is functioning effectively after its installation and whether there have been attempts to circumvent the monitoring software after its installation. You must warn again any other people who use these computers that the computers may be subject to searches pursuant to this condition.

You're ordered to make restitution in an amount of $2.5 million. The Court determined that you don't have the ability to pay interest and, therefore, waives any interest or penalties that may accrue on the balance.

You must pay the balance of any restitution owed at a rate of not less than $100 each month, once they hit, to start 60 days after release. So we see at that point where you are financially. If it turns out that's too much or too little, you know, they'll come back and get it -- that's part of the reason they'll have access to your finances.

The Court finds that you don't have the ability to pay a fine and, therefore, waives imposition of a fine in this case.

The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court here in D.C. Within 30 days of any change of address, you'll notify the Clerk of the Court of the change until such time as the financial obligation is paid in full. The probation office shall release the presentence investigation report to all appropriate agencies, which includes the U.S. Probation Office in the approved district of residence in order to execute the sentence of the Court.

Treatment agencies shall return the presentence report to the probation office on the Defendant's completion or termination from treatment.

Pursuant to Rule 32.2(a) of the federal rules of criminal procedure, you, Marlon Ferro, are ordered a forfeiture money judgment in the amount of $2.5 million and to file -- and to forfeit the following property.

It then lists the property which includes cryptocurrency -- I'm not going to read it into the record since it's going to be in writing in the consent order -- vehicles, Rolls-Royce, Lamborghinis, Ferraris, and a whole series of others -- cash. And various miscellaneous, most of which are clothing of one sort or another or watches, things of that nature. And there 114 items.

The -- the two things that did concern me, which I mentioned, were the -- the two black 9mm pistol magazines, a black pistol with a light attachment, and a black rifle. I have some concern relating to that. In terms of an appeal, I'm going to go over it as it was in the plea because you had waived certain things. So let me just go through that.

You agree to waive or give up, insofar as such waiver is permitted by law, the right to appeal a conviction in the case on any basis, including but not limited to claims the statute to which you're pleading guilty is unconstitutional, and the admitted conduct doesn't fall within the scope of the statute.

As I indicated at the plea, the statute at this point is deemed constitutional, and your conduct falls within it.

However, in another case, if the Court of Appeals comes down, a higher court, and determines it's unconstitutional or what you did doesn't fall within that statute, you can then take what we call a collateral appeal. So although you can't appeal yourself, if the law changes, you are not foreclosed from being able to appeal.

You're also agreeing to waive or give up the right to appeal the sentence, including but not limited to any term of imprisonment, forfeiture, award of restitution, term of condition of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, their exceptions if sentence you above the statutory maximum or guideline, which I did not.

However, you do retain the right to appeal the conviction and sentence on the basis of ineffective assistance of counsel, but not on other issues. And then in terms of a collateral attack to appeal or challenge your conviction or sentence. And this puts aside the one earlier that I said, if the law changes.

You're waiving your right to challenge the conviction or sentence, and these are things like the 2255 or writ of habeas corpus, some other more indirect ways of appealing.

You're giving up your right to -- to file collateral attacks, except if your motion is based on newly discovered evidence. In other words, you now know something you didn't

know at the time or on a claim that you received ineffective assistance of counsel.

You did reserve the right to 18 U.S.C. 3582(c), which means that if there's a change in the guidelines, you're allowed to file a motion to ask that it be applied to you, it'd obviously be retroactive. Sometimes they are, sometimes they're not, but you have the right to see if you can benefit from whatever changes that would lower it in some way.

If you do fall into the area where you can actually appeal, you have to file it within 14 days of entry of judgment or 14 days after -- if the Government files a notice of appeal. If you can't afford the course of an appeal, you can ask to have it filed without cost to you. You can also ask to have counsel appointed to assist you.

So at this point, the -- under the *Hunter* case, which came down back in 2016, the Court requests whether there's anything -- not what's already been argued, but if there's anything else that needs to be either corrected or added.

The one thing I would note is that I will put in the recommendation that you have made relating to a low-level camp and a specific one that you wish -- which I have written down, but I'll put -- I'll put that in as a recommendation.

Is there anything from probation that I need to address or needs to be done differently?

PROBATION OFFICER: No, Your Honor.

THE COURT: Government?

MR. HOWLAND: Yes, Judge. Mostly just a clarification. The guidelines range was 78 to 97 months and I thought that I heard the Court indicate that it was intending --

THE COURT: Yeah, hold on. Let's see.

MR. HOWLAND: -- to impose the low end of the guidelines.

THE COURT: Let me look at something. Whoops.

Ah, yes. That's my mistake. In terms of -- I had another sentencing and I confused the two. So let me -- I am doing it at the low end. But I don't see, as I've indicated, that is a basis for either a departure or a variance. So I will amend the judgment and make it the 78 months, which is what is at the low end. It's at the bottom in terms of what would be done. So I apologize for that.

MR. HOWLAND: Otherwise, the Government has --

THE COURT: I'm doing a couple sentences at the same time.

MR. HOWLAND: No other clarifications, Judge.

THE COURT: Okay. We'll talk about his voluntarily reporting in a moment.

Mr. Wilson, anything else from you?

MR. HOWLAND: One other note, Judge. I will e-mail with the probation office and Ms. Patterson a list of the

forfeitable items that were directly from Mr. -- Mr. Ferro, as we discussed at the very beginning of the hearing.

THE COURT: Right. If you would do that so we're very accurate about it, then make sure Mr. Wilson gets to look at it.

MR. HOWLAND: Yes, of course.

THE COURT: Mr. Wilson, anything from you?

MR. WILSON: Just to add the recommendation for the RDAP program perhaps.

THE COURT: Yeah, no, I will -- I'll put that in, as well as the -- the facility use that you specifically requested, which was Lompoc.

MR. WILSON: And I'm not sure if it's necessary for the Government --

THE COURT: I'm sorry?

MR. WILSON: I'm not sure if the Government needs to make a motion to dismiss any other outstanding counts.

THE COURT: Yes, you should at this point.

MR. HOWLAND: We would move to dismiss any other counts in the indictment if the Defendant is named in. I don't have a copy of the indictment in front of me, but any other counts in the indictment we would move to dismiss as to Mr. Ferro.

THE COURT: Okay. The plea agreement addressed it, so it will be whatever is left there.

Mr. Ferro, I don't expect to see you back in here. I'm hoping that this experience has given you further thought about what you want to do with the rest of your life. You're obviously intelligent and it's unfortunate that you got yourself into this.

You have an interest in the computer and the technology. You just need to use it for a good purpose as opposed to what you have. And you can certainly make a good living doing, you know, work with technology, AI, all of these other things that are coming that are new and down the road if you have an interest in it. You know, you need to look at it in the context of doing something positive. You've got a long life ahead of you, you're young, you've got -- you know, what you should remember is people make mistakes, there are consequences, you accept responsibility of the consequences and then you move on.

So hopefully you will move on with your life, take a careful think about what you want to do once you get out. The Bureau of Prisons does have a bunch of programs and -- if you get into a low level, which you should.

I don't think since the -- there -- although there is the finding of the guns, I don't think that's going to prevent you from being in the low-level camp because it has nothing to do with the particular crime.

If for some reason that comes up, you should take a

look at that may be the reason and that should be not something for -- for him not to be at the low level in terms of the camp. As I said, since it's not part of the crime, I don't see any reason to have it preclude you. If for some reason it does, you should talk to your counsel about doing something different.

So in terms of -- I've given -- I'm going to take a chance on you. I have some concerns about having you report voluntarily, leaving you in the community, but I think we've taken care of the issues that were raised. You've been in compliance in other respects. And although I haven't heard from you, my sense is that based on the background that you have, your family who went to a lot of trouble to show up, and then obviously support you, that you're not going to disappoint them. They've been there, not only for yourself, but for them.

Because they've -- you know, they brought you up, they supported you, they've been there. And I'm hopeful that you will think twice before you decide to do anything that will create problems not only for yourself but for everybody else. So I'm going to take a chance on you that you will show up, you will not have absconded with a fake passport but will show up wherever it is, you know, hopefully Lompoc. We'll see.

Sometimes I'm right, sometimes I'm wrong, but I'm hopeful in this particular case that based on looking at all of it and the fact that we have disposed of the concerns that were

raised, that -- you know, that you will follow through with it.

All right. Then I think if there's nothing else, parties are excused.

If you all -- when can I get -- you need to give me the corrected amended thing. We will look at whatever it is probation provided as to what they think is just Mr. Ferro's responsibility. Okay.

MR. HOWLAND: We will do that within a day or two, Judge.

With respect to his reporting date, I'm fine -- I have no objection to having him and his counsel coordinate with the probation office within a month, within two weeks.

MR. WILSON: Usually --

THE COURT: You need to do something faster than that because it has to be with the judgment.

In terms of the reporting dates, I'm going to get to that in a minute.

MR. HOWLAND: Okay. That's it.

THE COURT: Okay. So in terms of reporting, I -- at this point, he's not working so I don't see that there is an interference with that.

Is there anything in particular that is coming up that you're requesting that it be after that time?

MR. WILSON: Well, Your Honor, usually at least in the situations I've had like this, they wait until they receive

notice from the Bureau of Prison or the Marshal Service when they are to report to a specific facility, and it's their responsibility to get to that facility within the time period --

THE COURT: Right.

MR. WILSON: -- that's laid out in the --

THE COURT: Okay. So I can -- so it's whenever they -- and you can talk to probation. Whenever you receive the notice to report to whatever facility, hopefully the one that I've -- you've requested, then you need to report. Okay.

So probation, so there's no -- it's -- the judgment goes in and he needs to report immediately upon being notified of where he's to report to.

All right. Nothing else, then parties are excused. Thank you and your family for coming.

THE DEPUTY CLERK: This Court stands adjourned.

(Proceedings concluded at 12:43 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, REBECCA MONROE, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 2nd day of June, 2026

Rebecca Monroe

______________________________

Rebecca Monroe, RPR
Official Court Reporter
Room 6706
333 Constitution Avenue, N.W.
Washington, D.C. 20001

## $

**$10** [1] - 25:5
**$10,000** [1] - 45:6
**$100** [3] - 22:5, 52:21, 56:6
**$15,000** [1] - 25:5
**$20,000** [1] - 25:1
**$240** [1] - 24:14
**$248** [1] - 43:17
**$250,000** [1] - 19:5
**$250,060** [1] - 43:10
**$50** [2] - 20:20, 43:25
**$500,000** [2] - 29:16, 40:22

## 1

**1** [11] - 9:12, 19:3, 20:5, 20:8, 20:10, 31:18, 39:6, 49:4, 49:5, 52:18, 52:20
**10** [1] - 25:1
**100** [5] - 5:12, 31:15, 41:11, 41:13, 46:11
**100,000** [2] - 40:24, 41:4
**1030(e)(1** [2] - 54:20, 55:12
**10:00** [1] - 35:11
**10:30** [2] - 2:16, 35:10
**10:38** [1] - 1:6
**11** [1] - 14:2
**114** [1] - 57:11
**11:15** [1] - 14:2
**12** [1] - 2:25
**12:43** [1] - 65:17
**13** [2] - 39:14, 52:22
**13th** [1] - 45:22
**14** [2] - 59:10, 59:11
**15** [1] - 53:8
**15,000** [1] - 25:1
**18** [13] - 19:20, 19:23, 29:6, 29:21, 31:9, 38:10, 39:2, 52:15, 52:22, 53:16, 54:20, 55:12, 59:3
**19** [2] - 29:6, 29:21
**1956** [1] - 19:23
**1984** [1] - 52:14

## 2

**2** [5] - 1:17, 19:21, 19:22, 20:1, 20:2
**2.5** [9] - 3:14, 20:17, 21:2, 21:17, 22:3, 26:2, 37:15, 56:2, 57:3
**20** [3] - 19:4, 29:7, 38:11
**20001** [2] - 1:22, 66:13
**2009** [1] - 39:6
**2016** [1] - 59:16
**2023** [2] - 39:16, 40:3
**2024** [9] - 41:5, 41:21, 42:6, 42:25, 43:1, 43:4, 43:8, 45:8, 46:14
**2025** [3] - 38:14, 40:4, 45:22
**2026** [2] - 1:6, 66:7
**20530** [1] - 1:15
**20815** [1] - 1:18
**21** [1] - 29:7
**2255** [1] - 58:21
**23rd** [1] - 41:5
**24-417-3** [1] - 2:2
**24-cr-417-3** [1] - 1:3
**248** [1] - 46:25
**25,000** [1] - 20:13
**250** [1] - 44:3
**250,000** [1] - 20:13
**27** [1] - 49:4
**28** [4] - 20:7, 20:10, 31:17, 49:4
**2nd** [1] - 66:7
**2S1.1** [1] - 31:17

## 3

**3** [3] - 3:2, 10:12, 20:1
**3.5** [5] - 3:14, 19:10, 19:18, 45:25, 50:4
**3.8** [1] - 41:4
**30** [2] - 42:10, 56:16
**3013** [1] - 52:22
**31st** [2] - 43:1, 43:8
**32(i)(3)(A)** [1] - 22:16
**32.2(a** [1] - 57:1
**333** [2] - 1:21, 66:12
**3553** [2] - 46:6, 52:15
**3553(a** [1] - 38:10
**3582(c** [1] - 59:3
**36-month** [1] - 52:19
**3663** [1] - 53:16
**3663(a** [1] - 53:16

## 5

**5** [5] - 23:19, 27:17, 41:11, 46:11
**500,000** [1] - 40:25

## 6

**6** [1] - 1:6
**60** [6] - 22:7, 22:11, 30:18, 30:23, 37:3, 56:7
**601** [1] - 1:14
**65** [2] - 22:9, 31:19
**6706** [2] - 1:21, 66:12
**68** [1] - 22:10

## 7

**7** [2] - 19:10, 43:17
**70** [2] - 49:6, 52:18
**700** [1] - 1:17
**78** [5] - 20:10, 22:10, 30:20, 60:3, 60:14
**7th** [1] - 43:4

## 9

**97** [3] - 20:10, 30:21, 60:3
**9:15** [1] - 2:14
**9:30** [1] - 33:13
**9mm** [1] - 57:13

## A

**a.m** [1] - 1:6
**abide** [1] - 52:24
**ability** [3] - 56:3, 56:11, 66:6
**able** [9] - 11:1, 12:5, 23:18, 29:3, 30:11, 50:6, 55:2, 58:6
**abroad** [1] - 40:1
**absconded** [1] - 63:21
**abuse** [7] - 38:23, 39:1, 48:15, 48:19, 53:22, 54:1, 54:2
**accept** [2] - 17:24, 62:15
**acceptance** [4] - 20:1, 20:6, 31:1, 31:21
**accepted** [1] - 30:24
**accepting** [2] - 22:14, 31:6
**access** [5] - 44:23, 49:14, 52:6, 54:5, 56:10
**accessible** [1] - 50:2
**accessing** [1] - 54:24
**accordance** [1] - 53:16
**according** [2] - 50:14, 52:22
**account** [17] - 13:2, 13:4, 15:17, 31:20, 42:14, 44:7, 44:13, 44:14, 44:18, 44:19, 44:22, 44:23, 44:25, 45:4, 45:5, 52:9
**accrue** [1] - 56:4
**accumulation** [1] - 22:9
**accurate** [8] - 6:12, 6:14, 7:21, 9:23, 16:12, 33:12, 61:4, 66:4
**Act** [1] - 52:14
**Action** [1] - 1:3
**actions** [1] - 50:25
**activity** [5] - 45:7, 45:11, 47:13, 48:7, 51:5
**actual** [1] - 48:18
**add** [1] - 61:8
**added** [1] - 59:18
**Adderall** [1] - 39:2
**addition** [6] - 13:13, 27:1, 38:5, 38:7, 47:10, 52:21
**additional** [10] - 3:7, 14:13, 19:20, 19:21, 19:22, 19:24, 20:6, 42:24, 46:21, 54:13
**address** [5] - 22:18, 38:2, 41:8, 56:16, 59:24
**addressed** [2] - 16:21, 61:24
**adds** [1] - 19:25
**adjourned** [1] - 65:16
**adjustments** [1] - 10:13
**admitted** [3] - 21:20, 30:3, 57:22
**adopt** [1] - 22:12
**adult** [2] - 29:20, 31:11
**advisory** [4] - 19:9, 20:9, 38:6, 52:15
**affect** [1] - 48:5
**afford** [1] - 59:12
**age** [3] - 31:21, 39:1, 39:6
**agencies** [2] - 56:20, 56:23
**agents** [3] - 3:16, 4:19, 12:12
**ago** [1] - 34:23
**agree** [3] - 4:15, 9:25, 57:18
**agreed** [7] - 18:17, 19:12, 19:18, 19:19, 41:5, 42:6, 50:4
**agreeing** [3] - 5:25, 9:15, 58:7
**agreement** [2] - 19:17, 61:24
**agrees** [3] - 15:5, 45:24, 46:2
**ahead** [1] - 62:13
**AI** [2] - 38:14, 62:9
**aid** [2] - 19:6, 25:11
**alarms** [1] - 17:21
**alleged** [1] - 32:22
**allow** [2] - 55:10, 55:14
**allowed** [10] - 14:25, 15:1, 15:17, 16:3, 16:6, 34:3, 36:3, 37:5, 37:7, 59:5
**allows** [1] - 11:4
**almost** [2] - 34:21, 43:17
**amenable** [1] - 26:5
**amend** [1] - 60:14
**amended** [2] - 2:24, 64:5
**AMERICA** [1] - 1:3
**America** [1] - 2:3
**Amiri** [2] - 43:9
**amount** [12] - 3:17, 4:4, 19:18, 21:3, 21:15, 21:19, 21:23, 25:21, 50:4, 56:1, 57:3
**Angeles** [4] - 40:19, 41:1, 42:1, 43:13
**answer** [2] - 26:7, 26:22
**answered** [2] - 18:9, 18:11
**apologize** [2] - 2:13, 60:16
**appeal** [11] - 57:15, 57:19, 58:4, 58:6, 58:8, 58:14, 58:17, 59:10, 59:11, 59:12
**appealing** [1] - 58:22
**Appeals** [2] - 50:14, 58:1
**appear** [3] - 18:21, 38:18, 39:15
**appeared** [1] - 35:1
**application** [2] - 11:4, 11:12
**applied** [1] - 59:5
**appointed** [1] - 59:14
**appreciate** [1] - 3:8
**approach** [1] - 23:7
**appropriate** [7] - 21:22, 25:20, 25:25, 35:16, 38:8, 50:17, 56:20
**approval** [1] - 54:14
**approved** [1] - 56:21
**April** [1] - 4:6
**area** [3] - 12:8, 38:23, 59:9
**argued** [1] - 59:17
**argument** [2] - 37:20, 38:7

**arguments** [2] - 22:21, 25:10
**Arizona** [1] - 38:13
**arranged** [1] - 44:20
**arrest** [2] - 12:18, 45:8
**arrested** [11] - 10:19, 17:2, 17:20, 27:2, 45:22, 47:8, 47:14, 50:23, 51:7, 51:14
**arrival** [1] - 41:24
**arrived** [2] - 20:16, 42:11
**aside** [2] - 16:14, 58:18
**aspect** [1] - 24:19
**ass** [1] - 44:2
**assessment** [2] - 22:5, 52:21
**assets** [4] - 5:21, 9:16, 38:16, 47:6
**assist** [1] - 59:14
**assistance** [2] - 58:15, 59:2
**assisted** [5] - 31:5, 43:5, 47:2, 47:9, 50:25
**assisting** [2] - 46:3, 46:23
**associated** [1] - 3:24
**associates** [1] - 40:5
**assumed** [1] - 34:8
**assuming** [2] - 4:14, 10:25
**attach** [4] - 4:24, 7:1, 9:10, 32:12
**attachment** [1] - 57:14
**attack** [1] - 58:17
**attacks** [1] - 58:24
**attempt** [1] - 54:3
**attempts** [1] - 55:22
**attorney** [1] - 45:17
**ATTORNEY'S** [1] - 1:13
**Attorneys** [1] - 54:8
**attorneys** [2] - 45:10, 47:12
**August** [3] - 42:25, 43:1, 43:8
**AUSA** [3] - 18:16, 18:22, 36:3
**authority** [2] - 55:1, 58:10
**authorize** [1] - 54:6
**authorizing** [1] - 53:17
**Avenue** [2] - 1:21, 66:12
**average** [1] - 31:18
**avoid** [1] - 51:14
**award** [1] - 58:9
**aware** [3] - 11:17, 15:7, 22:20

## B

**background** [3] - 48:2, 49:17, 63:12
**bags** [4] - 25:1, 25:5, 45:20
**balance** [3] - 44:13, 56:4, 56:5
**base** [1] - 19:10
**based** [8] - 3:16, 16:8, 39:25, 48:1, 51:23, 58:24, 63:12, 63:24
**basic** [1] - 53:3
**basis** [6] - 4:21, 39:5, 50:12, 57:20, 58:15, 60:13
**basketball** [1] - 28:22
**bat** [1] - 24:7
**became** [3] - 42:3, 48:8, 49:15
**become** [1] - 48:9
**BEFORE** [1] - 1:9
**beforehand** [1] - 27:23
**began** [2] - 40:2, 41:24
**beginning** [2] - 51:3, 61:2
**behalf** [5] - 2:7, 2:11, 43:11, 45:20, 46:17
**behavior** [2] - 28:13, 29:17
**behaviors** [1] - 29:25
**behind** [3] - 4:5, 29:10, 34:23
**belonged** [3] - 4:16, 47:22, 48:11
**below** [3] - 32:1, 49:8, 49:11
**benefit** [1] - 59:7
**Benjamin** [1] - 1:13
**best** [2] - 22:20, 66:6
**better** [2] - 4:13, 9:22
**between** [1] - 40:24
**biological** [1] - 39:7
**Birkin** [2] - 25:1, 45:20
**bit** [3] - 17:6, 23:5, 28:6
**Bitcoin** [3] - 41:11, 41:14, 46:11
**black** [3] - 57:13, 57:14
**blocked** [1] - 44:15
**body** [1] - 30:15
**born** [1] - 39:5
**bottom** [2] - 52:12, 60:15
**bought** [1] - 24:8
**brains** [1] - 29:22
**brazen** [1] - 24:20
**break** [12] - 13:8, 13:16, 14:7, 23:19, 30:2, 42:7, 42:9, 42:23, 42:24, 46:17, 46:18, 46:22
**break-in** [5] - 42:7, 42:9, 42:23, 42:24, 46:18
**break-ins** [3] - 23:19, 30:2, 46:22
**breakdown** [1] - 19:10
**breaking** [2] - 23:23, 42:21
**brick** [2] - 30:6, 42:17
**brief** [1] - 14:9
**briefly** [1] - 30:22
**bring** [2] - 16:2, 33:11
**bringing** [1] - 35:20
**bro** [1] - 44:3
**broke** [4] - 25:23, 27:20, 41:12, 42:16
**brought** [5] - 11:8, 33:20, 35:18, 35:22, 63:16
**bunch** [3] - 23:20, 29:5, 62:19
**Bureau** [4] - 37:6, 52:17, 62:19, 65:1
**burglar** [1] - 40:10
**burglaries** [5] - 3:17, 21:21, 27:10, 27:15, 50:21
**burglarizing** [2] - 23:14, 47:17
**burglars** [1] - 40:8
**burglary** [7] - 41:7, 41:19, 41:21, 42:4, 46:9, 46:16, 49:13
**business** [1] - 16:9
**butcher** [1] - 37:10
**buy** [1] - 47:9
**buying** [2] - 25:4, 46:24

## C

**C1.1** [1] - 20:4
**cafeteria** [1] - 2:15
**calculated** [1] - 30:20
**calculating** [1] - 19:16
**California** [7] - 39:17, 39:25, 41:21, 41:23, 41:24, 42:7, 46:14
**callers** [1] - 40:8
**camera** [1] - 42:21
**camp** [5] - 37:8, 37:22, 59:20, 62:23, 63:2
**cannot** [1] - 12:7
**capable** [1] - 54:24
**capacity** [1] - 27:25
**captured** [1] - 42:20
**card** [7] - 44:7, 44:14, 47:3, 47:5, 47:6, 47:7
**cards** [1] - 44:10
**care** [3] - 13:14, 13:15, 63:10
**careful** [3] - 15:2, 35:15, 62:18
**carrying** [1] - 54:18
**cars** [2] - 40:18, 41:3
**case** [22] - 2:2, 3:16, 3:21, 6:9, 7:2, 18:17, 22:20, 23:14, 23:18, 23:19, 26:1, 31:5, 33:17, 38:7, 38:21, 49:22, 51:23, 56:13, 57:20, 58:1, 59:15, 63:24
**cases** [3] - 27:12, 32:3, 49:21
**cash** [5] - 41:23, 41:25, 45:15, 57:9
**Category** [4] - 20:5, 20:10, 49:4, 49:5
**category** [1] - 50:8
**cell** [5] - 28:24, 29:2, 29:10, 30:11, 42:12
**central** [1] - 24:10
**certain** [1] - 57:17
**certainly** [12] - 3:10, 17:19, 32:3, 35:23, 37:18, 48:5, 48:7, 49:19, 50:18, 51:20, 54:17, 62:8
**CERTIFICATE** [1] - 66:1
**certification** [1] - 38:13
**certify** [1] - 66:3
**cetera** [2] - 3:4, 3:5
**challenge** [2] - 58:17, 58:20
**chance** [4] - 33:15, 33:20, 63:8, 63:20
**change** [7] - 3:13, 28:16, 32:19, 47:19, 56:16, 56:17, 59:4
**changed** [2] - 23:25, 50:9
**changes** [3] - 58:5, 58:19, 59:8
**charged** [2] - 31:2, 49:2
**charges** [1] - 54:12
**chase** [1] - 28:21
**Chase** [1] - 1:18
**check** [3] - 4:8, 4:19, 33:17
**Chetal** [13] - 42:8, 42:25, 43:1, 43:4, 43:8, 43:11, 43:12, 43:15, 43:19, 44:19, 44:21, 44:23, 46:25
**Chevy** [1] - 1:18
**choice** [1] - 48:9
**choosing** [1] - 30:13
**Christopher** [2] - 1:12, 2:7
**Circle** [1] - 1:17
**circumvent** [1] - 55:22
**cite** [2] - 3:22, 4:11
**claim** [5] - 6:1, 9:16, 15:23, 23:2, 59:1
**claimed** [1] - 10:16
**claims** [1] - 57:20
**clarification** [1] - 60:3
**clarifications** [1] - 60:20
**clean** [1] - 43:25
**cleaning** [2] - 44:1, 44:2
**clear** [2] - 22:5, 45:17
**clearly** [2] - 33:5, 49:10
**CLERK** [3] - 2:2, 14:8, 65:16
**Clerk** [2] - 56:15, 56:17
**client** [5] - 13:9, 13:17, 34:17, 34:25, 35:3
**close** [5] - 12:19, 15:3, 28:17, 35:3, 42:3
**closer** [2] - 17:11, 24:10
**clothes** [3] - 28:16, 29:9, 43:12
**clothing** [6] - 40:18, 40:25, 43:10, 43:13, 57:10
**cocounsel** [1] - 27:14
**code** [1] - 41:9
**cold** [1] - 35:3
**collateral** [3] - 58:4, 58:17, 58:23
**collected** [3] - 45:9, 47:11
**collection** [1] - 53:14
**collective** [2] - 30:9, 30:15
**COLLEEN** [1] - 1:9
**COLUMBIA** [2] - 1:1, 1:14
**coming** [6] - 22:25, 31:6, 36:8, 62:10, 64:22, 65:15
**comment** [1] - 36:1
**commission** [1] -

31:14
**commit** [2] - 41:6, 53:5
**commitment** [2] - 8:2, 22:1
**committed** [2] - 46:9, 52:17
**communicate** [1] - 10:22
**communication** [1] - 11:16
**communications** [2] - 11:5, 54:21
**community** [1] - 63:9
**complained** [1] - 32:7
**complete** [2] - 32:5, 66:5
**completion** [1] - 56:24
**complex** [1] - 31:3
**compliance** [4] - 17:25, 36:25, 55:13, 63:11
**compliant** [1] - 6:15
**comply** [1] - 53:18
**computer** [14] - 11:22, 12:3, 12:11, 12:23, 29:1, 29:10, 55:7, 55:10, 55:11, 55:12, 55:13, 55:16, 55:19, 62:6
**computers** [7] - 30:11, 54:15, 54:19, 54:24, 55:16, 55:24
**conceal** [1] - 46:4
**concealing** [1] - 40:14
**concern** [9] - 7:2, 10:18, 11:19, 17:10, 18:19, 51:3, 51:10, 57:12, 57:15
**concerning** [1] - 33:3
**concerns** [9] - 10:13, 12:23, 17:17, 33:23, 35:20, 36:19, 51:9, 63:8, 63:25
**concluded** [1] - 65:17
**concludes** [1] - 21:1
**conclusion** [1] - 51:21
**condition** [10] - 17:8, 18:13, 33:5, 38:18, 54:25, 55:5, 55:6, 55:14, 55:25, 58:10
**conditions** [9] - 12:20, 14:22, 15:6, 18:20, 52:25, 53:4, 53:19, 58:11
**conduct** [12] - 23:24, 25:21, 26:25, 28:2, 28:10, 50:3, 51:24, 53:4, 55:4, 55:15, 57:22, 57:25
**conducted** [2] - 55:8, 55:18
**conducting** [1] - 27:10
**confirm** [2] - 5:20, 12:3
**conformance** [1] - 38:9
**confused** [1] - 60:11
**confusing** [1] - 15:4
**confusion** [1] - 14:20
**Connecticut** [1] - 39:25
**consent** [24] - 2:23, 2:25, 3:23, 4:11, 4:14, 4:25, 5:4, 5:7, 5:11, 5:16, 5:24, 6:7, 6:10, 6:17, 7:1, 7:5, 7:20, 8:9, 9:9, 9:14, 9:15, 20:18, 57:7
**consequences** [2] - 62:15
**consider** [6] - 32:16, 33:21, 35:5, 35:25, 36:24, 50:15
**consideration** [3] - 12:16, 31:12, 52:14
**considered** [5] - 30:7, 32:2, 32:4, 32:10, 50:15
**considering** [1] - 13:17
**considers** [1] - 38:6
**consistent** [1] - 37:3
**conspiracy** [7] - 19:3, 23:15, 24:11, 25:3, 26:12, 31:3, 49:2
**constitutes** [1] - 66:4
**Constitution** [2] - 1:21, 66:12
**constitutional** [1] - 57:25
**consult** [1] - 26:19
**consulting** [1] - 7:12
**contact** [1] - 39:7
**contain** [1] - 41:10
**containing** [3] - 27:17, 41:13, 46:10
**contains** [2] - 55:7, 55:19
**contested** [1] - 50:18
**context** [4] - 7:16, 28:11, 39:21, 62:12
**continuance** [1] - 34:24
**continue** [1] - 10:21
**continued** [1] - 40:3
**continuing** [1] - 10:22
**control** [1] - 46:5
**controlled** [2] - 53:6, 53:7
**conversation** [3] - 3:11, 16:16, 16:22
**convert** [1] - 41:23
**converted** [3] - 45:13, 45:14, 45:16
**converting** [1] - 40:16
**conviction** [5] - 20:3, 57:19, 58:15, 58:17, 58:20
**cooperate** [1] - 53:14
**cooperators** [1] - 32:1
**coordinate** [2] - 7:17, 64:11
**coordinator** [1] - 3:11
**copy** [1] - 61:21
**corpus** [1] - 58:22
**correct** [7] - 3:24, 4:15, 5:2, 7:8, 10:7, 19:11, 19:13
**corrected** [2] - 59:18, 64:5
**correctly** [1] - 5:9
**Cortes** [1] - 43:12
**cost** [1] - 59:13
**counsel** [13] - 2:4, 7:12, 10:4, 10:11, 14:14, 14:17, 20:15, 22:18, 58:16, 59:2, 59:14, 63:5, 64:11
**Counsel** [1] - 2:20
**counselor** [1] - 38:20
**Count** [3] - 19:3, 52:18, 52:20
**country** [1] - 35:8
**counts** [4] - 31:7, 61:17, 61:20, 61:22
**couple** [5] - 26:4, 26:18, 27:23, 50:20, 60:18
**course** [2] - 59:12, 61:6
**court** [7] - 17:18, 18:14, 35:8, 35:9, 35:10, 50:18, 58:2
**COURT** [102] - 1:1, 2:9, 2:17, 2:20, 3:13, 3:20, 4:3, 4:9, 4:18, 4:22, 5:5, 5:7, 5:14, 5:23, 6:3, 6:19, 6:21, 6:24, 7:8, 7:13, 7:20, 7:24, 8:4, 8:7, 8:9, 8:12, 8:14, 8:17, 8:21, 8:24, 9:8, 9:19, 9:21, 10:1, 10:7, 10:9, 10:12, 11:13, 11:19, 12:1, 12:4, 12:22, 13:1, 13:24, 14:1, 14:5, 14:7, 14:11, 14:23, 15:8, 15:15, 16:2, 16:18, 16:24, 18:2, 18:4, 18:7, 18:11, 18:25, 19:15, 19:19, 20:25, 21:8, 21:11, 21:18, 21:24, 22:3, 26:8, 26:10, 26:20, 28:3, 28:6, 31:23, 32:18, 33:10, 34:8, 34:11, 35:12, 35:14, 36:7, 36:24, 37:18, 37:22, 37:25, 38:2, 38:5, 60:1, 60:6, 60:9, 60:18, 60:21, 61:3, 61:7, 61:10, 61:15, 61:18, 61:24, 64:14, 64:19, 65:5, 65:7, 66:1
**Court** [39] - 1:20, 1:20, 4:17, 7:12, 7:18, 8:5, 8:22, 14:8, 15:25, 20:20, 21:22, 22:18, 22:19, 23:12, 26:4, 26:5, 26:9, 31:6, 35:16, 36:21, 36:23, 37:9, 38:3, 38:6, 46:20, 50:14, 52:16, 56:2, 56:11, 56:15, 56:17, 56:22, 58:1, 58:10, 59:16, 60:4, 65:16, 66:11
**Court's** [1] - 26:22
**Courthouse** [1] - 1:21
**courthouse** [1] - 2:14
**courtroom** [1] - 48:23
**cover** [1] - 27:13
**crazy** [1] - 18:1
**create** [2] - 44:18, 63:19
**created** [1] - 35:2
**creative** [1] - 29:3
**credit** [6] - 25:13, 25:17, 50:4, 54:12, 54:13, 54:14
**crime** [10] - 24:17, 32:14, 43:19, 49:1, 49:16, 53:5, 54:16, 62:24, 63:3
**crimes** [4] - 31:10, 32:12, 47:3
**criminal** [17] - 2:2, 20:3, 20:5, 20:8, 20:10, 22:16, 22:25, 24:1, 31:18, 32:11, 38:11, 48:21, 49:4, 49:5, 50:3, 51:5, 57:2
**Criminal** [1] - 1:3
**criticizing** [1] - 43:20
**crypto** [2] - 41:23, 45:15
**crypto-to-cash** [2] - 41:23, 45:15
**cryptocurrencies** [1] - 45:14
**cryptocurrency** [24] - 27:18, 41:16, 41:24, 41:25, 42:5, 43:7, 43:14, 44:8, 44:12, 44:20, 45:13, 45:25, 46:4, 46:5, 46:12, 47:9, 47:19, 47:20, 47:22, 49:14, 49:20, 49:23, 57:6
**Cuba** [1] - 39:5
**cumbersome** [1] - 9:22
**currency** [8] - 14:25, 40:9, 40:12, 40:15, 40:16, 40:17, 42:8, 42:11
**custody** [3] - 6:3, 20:10, 52:17
**Customer** [1] - 44:5
**cut** [1] - 43:20
**cybercriminal** [3] - 41:6, 41:15, 46:10
**cybersecurity** [1] - 38:15

## D

**D.C** [2] - 56:15, 66:13
**dangerous** [3] - 23:21, 23:24, 27:11
**dangerousness** [2] - 27:1, 28:1
**dark** [2] - 28:17, 28:22
**data** [3] - 38:13, 54:21, 55:19
**database** [1] - 40:7
**date** [4] - 17:10, 40:2, 43:9, 64:10
**Dated** [1] - 66:7
**dates** [1] - 64:16
**daughter** [1] - 28:24
**David** [2] - 1:13, 2:7
**days** [8] - 23:4, 27:23, 43:3, 53:8, 56:7, 56:16, 59:10, 59:11
**DC** [3] - 1:5, 1:15, 1:22
**deal** [1] - 12:5
**debit** [1] - 44:14
**decide** [2] - 50:2, 63:18
**decides** [1] - 36:23
**decision** [1] - 32:9
**decisions** [2] - 29:23, 29:24
**deducted** [1] - 20:7
**deemed** [1] - 57:25

**deeply** [1] - 2:13
**Defendant** [19] - 1:7, 1:16, 3:3, 4:17, 7:19, 22:18, 23:8, 23:16, 25:8, 27:2, 39:9, 39:10, 39:12, 39:16, 46:20, 47:23, 48:10, 48:13, 61:20
**DEFENDANT** [1] - 38:4
**Defendant's** [3] - 19:7, 28:1, 56:24
**defendants** [1] - 31:15
**defense** [8] - 7:12, 10:10, 14:14, 14:17, 20:15, 22:17, 47:12, 51:2
**Defense** [3] - 16:22, 22:10, 34:24
**defer** [1] - 26:4
**define** [1] - 54:20
**defined** [1] - 55:12
**definitely** [1] - 32:20
**definition** [1] - 55:16
**dental** [1] - 39:8
**departed** [1] - 42:15
**departure** [4] - 50:8, 50:12, 50:16, 60:13
**departures** [1] - 50:8
**DEPUTY** [3] - 2:2, 14:8, 65:16
**described** [3] - 29:25, 30:3, 31:1
**designer** [1] - 43:12
**deter** [1] - 50:6
**determine** [2] - 54:2, 55:18
**determined** [4] - 20:14, 53:10, 56:2, 58:12
**determines** [1] - 58:2
**determining** [1] - 38:8
**deterred** [1] - 51:8
**deterrence** [2] - 49:12, 49:19
**deterrent** [1] - 49:12
**developed** [1] - 29:22
**development** [2] - 29:20, 31:11
**device** [1] - 55:7
**devices** [5] - 42:19, 46:18, 54:21, 54:24, 54:25
**difference** [2] - 12:16, 32:13
**different** [13] - 15:21, 19:25, 21:9, 24:23, 25:22, 27:15, 39:23, 40:6, 45:14, 49:22, 51:17, 63:6
**differently** [1] - 59:24
**difficult** [1] - 49:23
**digging** [1] - 17:6
**digital** [9] - 16:9, 42:19, 44:7, 44:10, 46:18, 47:3, 47:6, 47:18, 50:22
**diligent** [1] - 18:4
**dinnertime** [1] - 28:17
**directed** [1] - 53:15
**directly** [1] - 61:1
**disappear** [1] - 51:14
**disappoint** [1] - 63:14
**disclose** [2] - 13:3, 13:4
**Discord** [14] - 10:14, 10:15, 10:22, 11:5, 11:10, 11:15, 13:11, 14:18, 15:8, 23:3, 33:5, 33:24, 34:2, 36:6
**discovered** [1] - 58:24
**discretionary** [1] - 52:25
**discuss** [2] - 32:22, 39:22
**discussed** [8] - 10:5, 10:10, 14:16, 19:5, 25:12, 35:23, 43:19, 61:2
**discussion** [4] - 14:24, 15:3, 20:22, 48:4
**discussions** [3] - 3:16, 15:23, 20:16
**disguise** [3] - 41:17, 46:4, 46:12
**disguising** [1] - 40:13
**dismiss** [3] - 61:17, 61:19, 61:22
**disposed** [1] - 63:25
**dissipated** [2] - 3:4, 20:19
**distinction** [1] - 34:14
**District** [1] - 56:15
**DISTRICT** [4] - 1:1, 1:1, 1:10, 1:14
**district** [1] - 56:21
**disturbing** [4] - 24:12, 28:14, 29:13, 30:1
**DNA** [1] - 53:14
**document** [2] - 45:23, 52:13
**documents** [5] - 44:6, 44:17, 45:2, 47:5, 47:15
**dollars** [3] - 40:23, 41:1, 45:13
**done** [10] - 4:4, 4:22, 5:1, 22:20, 26:16, 32:10, 32:19, 35:16, 59:24, 60:16
**Doost** [3] - 41:22, 41:25, 46:15
**double** [2] - 4:8, 33:17
**double-check** [2] - 4:8, 33:17
**down** [10] - 2:14, 5:25, 9:16, 10:21, 37:2, 44:13, 58:1, 59:16, 59:21, 62:10
**downstairs** [1] - 35:10
**draw** [1] - 44:13
**dreams** [1] - 28:21
**driver** [1] - 39:11
**driver's** [3] - 34:6, 34:8, 51:12
**drives** [1] - 35:7
**dropping** [1] - 24:25
**drug** [3] - 39:3, 53:8, 53:9
**due** [1] - 38:20
**duration** [1] - 53:25
**during** [2] - 15:22, 30:8

## E

**e)** [1] - 38:10
**e-mail** [2] - 34:17, 60:24
**early** [2] - 25:14, 41:21
**earned** [1] - 38:13
**easily** [2] - 17:13, 50:2
**easy** [3] - 3:8, 9:3, 36:2
**education** [1] - 38:12
**educational** [1] - 48:17
**effectively** [1] - 55:21
**either** [6] - 13:3, 16:13, 27:4, 35:5, 59:18, 60:13
**electronic** [1] - 54:21
**eliminate** [1] - 31:25
**elsewhere** [1] - 45:1
**emotional** [1] - 38:19
**encrypted** [6] - 10:24, 11:4, 11:16, 11:21, 14:20, 16:9
**encryption** [3] - 15:9, 33:6, 36:12
**end** [37] - 10:24, 11:4, 11:16, 11:20, 14:19, 15:2, 15:8, 15:13, 16:9, 17:14, 19:1, 23:3, 24:24, 25:19, 33:6, 33:9, 34:3, 36:12, 36:16, 49:6, 50:22, 60:7, 60:12, 60:15
**end-to-end** [13] - 10:24, 11:4, 11:16, 11:20, 14:19, 15:8, 15:13, 16:9, 23:3, 33:6, 33:9, 34:3, 36:12
**engage** [2] - 49:20, 50:2
**engaged** [1] - 50:24
**engages** [1] - 48:6
**engaging** [1] - 3:19
**engineering** [2] - 39:22, 39:23
**ensure** [1] - 55:13
**entered** [2] - 42:16, 42:17
**enterprise** [44] - 8:19, 19:12, 19:14, 23:1, 23:12, 24:1, 26:13, 39:22, 39:23, 39:24, 40:2, 40:5, 40:10, 40:11, 41:20, 42:2, 42:5, 43:6, 44:8, 44:18, 44:24, 45:9, 46:1, 46:2, 46:3, 46:8, 46:15, 46:17, 46:21, 46:23, 47:11, 47:24, 48:9, 48:10, 49:3, 49:15, 49:22, 50:5, 50:24, 51:6, 51:18, 52:1, 54:17
**entire** [4] - 5:11, 5:21, 9:17, 19:13
**entry** [1] - 59:10
**equivocated** [1] - 48:21
**escalates** [2] - 26:25, 28:1
**especially** [1] - 37:15
**essentially** [1] - 23:8
**establish** [1] - 53:3
**esteemed** [1] - 22:22
**et** [2] - 3:4, 3:5
**Eugene** [1] - 1:16
**evaluated** [1] - 48:14
**evaluation** [2] - 38:23, 53:20
**evening** [1] - 40:22
**eventually** [1] - 46:16
**evidence** [2] - 55:7, 58:25
**evidently** [7] - 11:5, 13:1, 13:8, 38:14, 39:2, 48:21, 49:21
**example** [1] - 11:3
**examples** [1] - 26:12
**except** [2] - 38:10, 58:24
**exception** [1] - 29:7
**exceptions** [1] - 58:12
**exchanges** [2] - 41:16, 46:12
**exchanging** [1] - 14:19
**excuse** [2] - 8:21, 42:19
**excused** [2] - 64:3, 65:14
**execute** [2] - 42:7, 56:21
**executed** [1] - 9:3
**exhibit** [1] - 42:22
**exists** [1] - 55:5
**exotic** [2] - 40:18, 41:3
**expect** [3] - 21:2, 29:22, 62:1
**expectations** [1] - 53:3
**expected** [1] - 36:14
**experience** [1] - 62:2
**experimented** [1] - 39:2
**expert** [3] - 23:2, 27:4, 27:5
**explain** [3] - 28:10, 31:25, 32:1
**explains** [2] - 48:2, 49:17
**explanation** [1] - 49:10
**extravagance** [1] - 52:4
**extravagances** [1] - 48:12
**eyelash** [1] - 24:7

## F

**facilitated** [1] - 45:19
**facility** [6] - 37:8, 37:12, 61:11, 65:2, 65:3, 65:9
**fact** [10] - 11:20, 22:16, 23:6, 25:23, 25:24, 32:24, 37:16, 50:20, 52:3, 63:25
**factor** [2] - 27:25, 32:3
**factors** [5] - 30:22, 31:20, 32:2, 38:9, 46:6
**factually** [1] - 34:15
**fair** [2] - 17:16, 38:8
**fairly** [5] - 3:8, 9:3, 22:20, 49:23, 50:2
**fake** [13] - 10:20, 17:2, 17:20, 27:2, 34:4, 34:5, 34:6, 34:8, 45:22, 47:14, 51:11, 63:21

**fall** [3] - 57:22, 58:3, 59:9
**falls** [2] - 50:7, 57:25
**family** [6] - 35:8, 38:17, 39:13, 48:22, 63:13, 65:15
**far** [5] - 17:7, 26:24, 30:8, 35:5, 49:18
**fashion** [1] - 36:21
**fashioned** [1] - 33:1
**faster** [1] - 64:14
**father** [2] - 39:7, 39:10
**fault** [2] - 32:18, 35:19
**favor** [1] - 31:4
**FCI** [1] - 37:10
**February** [1] - 41:5
**federal** [3] - 22:16, 53:5, 57:1
**feed** [1] - 25:4
**feet** [1] - 35:3
**felt** [2] - 15:24, 30:18
**Ferraris** [1] - 57:8
**Ferro** [87] - 2:3, 2:11, 2:21, 5:18, 12:10, 12:18, 14:18, 17:18, 18:17, 18:23, 19:3, 24:4, 24:14, 26:3, 27:15, 27:20, 27:23, 28:10, 30:3, 30:14, 30:24, 31:16, 33:1, 37:5, 37:13, 37:14, 38:2, 38:11, 39:5, 40:9, 41:5, 41:7, 41:12, 41:15, 41:18, 41:20, 41:22, 42:2, 42:3, 42:6, 42:9, 42:11, 42:16, 42:18, 42:20, 42:24, 43:1, 43:3, 43:5, 43:8, 43:11, 43:12, 43:15, 43:18, 43:19, 43:22, 44:5, 44:17, 44:20, 44:23, 45:2, 45:8, 45:12, 45:19, 45:21, 45:24, 46:2, 46:8, 46:13, 46:16, 46:21, 46:23, 46:24, 47:1, 47:11, 47:14, 48:20, 49:12, 50:3, 50:23, 52:17, 57:2, 61:1, 61:23, 62:1
**FERRO** [1] - 1:6
**Ferro's** [7] - 9:4, 25:13, 39:13, 41:9, 47:16, 49:4, 64:6
**fiat** [4] - 40:16, 41:25, 45:15, 47:19
**figure** [5] - 4:9, 20:17, 21:12, 39:10
**figured** [1] - 30:10
**file** [4] - 57:3, 58:23, 59:5, 59:10
**filed** [1] - 59:13
**files** [1] - 59:11
**finances** [1] - 56:10
**financial** [12] - 13:2, 13:6, 15:17, 16:4, 19:21, 32:14, 38:16, 54:5, 54:6, 54:7, 56:14, 56:18
**financially** [2] - 38:17, 56:8
**findings** [1] - 22:15
**fine** [9] - 8:24, 19:4, 20:13, 34:15, 37:14, 37:19, 56:12, 64:10
**firearm** [1] - 27:4
**firearms** [3] - 27:3, 45:23, 47:14
**first** [4] - 11:9, 12:15, 32:21, 46:7
**fiscal** [1] - 31:15
**fits** [1] - 50:15
**five** [5] - 13:25, 14:2, 31:19, 37:16, 39:9
**flag** [1] - 17:4
**fleet** [1] - 41:3
**floor** [1] - 21:21
**Florida** [1] - 39:25
**follow** [5] - 3:16, 17:19, 24:24, 53:22, 64:1
**follow-up** [1] - 3:16
**followed** [1] - 26:1
**following** [6] - 38:8, 41:21, 45:8, 52:24, 53:18, 57:4
**FOR** [1] - 1:1
**Forbes** [2] - 14:15, 15:21
**foreclosed** [1] - 58:5
**foregoing** [1] - 66:4
**foreign** [1] - 44:17
**foreseeable** [2] - 45:24, 50:4
**forfeit** [1] - 57:4
**forfeitable** [1] - 61:1
**forfeited** [1] - 4:25
**forfeiting** [4] - 5:1, 5:19, 7:4, 8:19
**forfeiture** [17] - 2:23, 3:11, 5:4, 5:8, 5:11, 6:17, 7:1, 9:10, 20:18, 21:1, 21:4, 21:6, 21:8, 21:14, 54:9, 57:2, 58:9
**forfeitures** [1] - 6:24
**forgiven** [1] - 2:18
**forgot** [1] - 26:25
**format** [1] - 50:9
**forms** [1] - 50:11
**forthcoming** [1] - 13:5
**forward** [2] - 35:23, 36:17
**fourth** [1] - 31:14
**frank** [1] - 36:8
**frankly** [7] - 32:6, 33:16, 38:22, 39:19, 48:2, 51:9, 52:5
**fraudulent** [3] - 40:13, 44:5, 47:5
**friends** [1] - 42:3
**front** [4] - 29:1, 42:12, 61:21
**fucking** [2] - 43:23, 43:24
**full** [2] - 56:18, 66:5
**fully** [2] - 24:15, 29:22
**fumbled** [1] - 44:3
**functioning** [1] - 55:21
**fund** [1] - 47:13
**funds** [22] - 20:19, 40:15, 41:16, 41:17, 41:18, 45:9, 45:10, 45:16, 46:11, 46:13, 46:25, 47:1, 47:11, 47:18, 47:19, 47:21, 51:1, 54:10
**furtherance** [1] - 46:1
**future** [1] - 12:9

## G

**gaming** [5] - 10:23, 11:11, 11:19, 13:13, 13:15
**generally** [2] - 6:6, 6:25
**gentleman** [1] - 27:22
**geo** [1] - 44:15
**geo-blocked** [1] - 44:15
**girlfriend** [3] - 39:16, 45:21, 47:10
**given** [10] - 17:19, 18:12, 18:20, 25:20, 25:21, 25:22, 25:23, 40:23, 62:2, 63:7
**glad** [1] - 31:24
**goal** [1] - 41:9
**goodness** [1] - 36:3
**goods** [4] - 24:8, 43:6, 44:11, 44:25
**Government** [23] - 2:5, 13:18, 14:3, 14:11, 16:22, 18:14, 22:10, 22:17, 25:11, 28:9, 28:12, 29:13, 29:25, 30:2, 30:5, 30:25, 31:5, 52:11, 59:11, 60:1, 60:17, 61:14, 61:16
**Government's** [2] - 19:6, 20:23
**graduate** [1] - 38:12
**graduated** [1] - 28:19
**greed** [1] - 48:4
**grooming** [1] - 23:8
**group** [3] - 30:10, 39:24, 42:15
**growing** [2] - 28:15, 39:15
**GS** [1] - 22:8
**guards** [1] - 41:3
**guess** [4] - 24:17, 26:10, 33:23, 42:23
**guideline** [7] - 25:25, 30:20, 31:17, 37:2, 49:8, 49:11, 58:13
**guidelines** [14] - 19:9, 19:17, 20:9, 25:18, 25:20, 27:12, 32:2, 38:6, 50:15, 52:10, 52:16, 59:4, 60:3, 60:8
**guilty** [6] - 3:4, 25:13, 31:7, 48:20, 57:21
**guns** [3] - 27:6, 27:10, 62:22
**guy** [2] - 25:24, 29:8

## H

**habeas** [1] - 58:22
**habit** [1] - 39:18
**hackers** [1] - 40:7
**half** [1] - 24:25
**Hamptons** [2] - 40:20, 41:1
**handbags** [3] - 40:18, 40:22, 47:10
**hands** [1] - 23:15
**happy** [2] - 26:7, 36:15
**hard** [3] - 25:6, 43:25, 48:25
**harder** [1] - 24:23
**hardship** [1] - 19:21
**hardware** [13] - 23:15, 27:17, 40:9, 41:10, 41:13, 42:8, 42:11, 42:18, 42:20, 46:10, 46:19, 46:22, 49:14
**harmful** [1] - 23:21
**head** [1] - 38:4
**health** [2] - 38:19, 38:24
**hear** [5] - 12:1, 16:18, 22:17, 35:21, 36:4
**heard** [3] - 37:22, 60:4, 63:11
**hearing** [3] - 30:16, 34:25, 61:2
**heartland** [1] - 27:12
**heist** [1] - 24:13
**held** [2] - 40:6, 42:10
**HELD** [1] - 1:9
**helpful** [2] - 14:13, 36:11
**hereby** [2] - 52:17, 66:3
**Hermes** [1] - 45:20
**hide** [1] - 29:15
**high** [3] - 28:19, 28:20, 38:12
**higher** [1] - 58:2
**highlight** [1] - 9:6
**himself** [11] - 3:18, 8:19, 17:9, 18:18, 18:23, 24:6, 26:3, 26:5, 42:2, 48:8, 51:25
**history** [12] - 20:3, 20:5, 20:8, 20:10, 31:18, 32:11, 38:12, 38:15, 38:16, 48:21, 49:4, 49:5
**hit** [1] - 56:6
**hold** [1] - 60:6
**home** [25] - 23:20, 24:2, 24:10, 27:20, 27:21, 28:15, 28:21, 34:20, 41:6, 41:13, 42:7, 42:9, 42:13, 42:16, 42:17, 42:18, 42:21, 42:23, 42:24, 46:9, 46:17
**homelife** [1] - 48:3
**homes** [3] - 25:23, 41:1, 47:18
**honest** [1] - 24:13
**Honor** [15] - 2:10, 2:13, 4:7, 9:2, 12:17, 28:4, 30:16, 31:22, 32:21, 37:1, 37:13, 37:14, 37:21, 59:25, 64:24
**HONORABLE** [1] - 1:9
**hope** [1] - 36:22
**hopeful** [2] - 63:17, 63:24
**hopefully** [3] - 62:17, 63:22, 65:9
**hoping** [2] - 32:19, 62:2
**house** [4] - 12:18, 23:23, 27:10
**houses** [3] - 23:14, 23:18, 25:5
**Howland** [2] - 1:12,

2:7
**HOWLAND** [60] - 2:6, 3:10, 3:15, 4:2, 4:16, 4:19, 5:20, 5:24, 6:16, 6:20, 6:23, 7:7, 7:10, 7:17, 7:23, 7:25, 8:5, 8:8, 8:11, 8:13, 8:16, 8:20, 8:22, 9:13, 9:20, 9:25, 10:5, 10:10, 14:14, 14:24, 15:11, 15:13, 15:20, 16:23, 17:3, 18:3, 18:6, 18:10, 18:12, 19:13, 19:16, 20:15, 21:6, 21:10, 21:16, 21:19, 22:1, 22:19, 26:9, 26:18, 26:22, 60:2, 60:7, 60:17, 60:20, 60:24, 61:6, 61:19, 64:8, 64:18
**hundreds** [1] - 45:12
**hungry** [1] - 25:3
**Hunter** [1] - 59:15
**hurts** [1] - 43:24

## I

**iCloud** [1] - 42:14
**ID** [1] - 47:5
**identification** [3] - 44:17, 45:2, 45:22
**identifiers** [1] - 40:7
**identify** [1] - 2:4
**ignored** [1] - 18:8
**illegal** [2] - 50:25, 51:1
**illicit** [1] - 45:15
**immediately** [3] - 43:17, 56:14, 65:12
**impact** [3] - 32:25, 36:20, 36:23
**impatient** [1] - 44:1
**impediment** [1] - 36:17
**important** [6] - 15:23, 15:25, 17:23, 32:4, 49:19, 50:6
**impose** [1] - 60:7
**imposed** [1] - 53:3
**imposition** [1] - 56:12
**impression** [1] - 2:15
**imprisonment** [1] - 58:9
**IN** [1] - 1:1
**incarcerated** [2] - 37:16, 45:21
**incarceration** [1] - 34:21
**incidents** [1] - 33:14
**include** [8] - 4:3, 4:11, 4:12, 6:18, 7:6, 7:22, 9:17, 53:4
**included** [3] - 20:17, 40:7, 40:11
**includes** [5] - 4:12, 4:25, 54:13, 56:20, 57:5
**including** [4] - 17:12, 44:18, 57:20, 58:8
**income** [1] - 38:16
**incorporated** [2] - 22:22, 25:10
**incur** [1] - 54:12
**indicate** [3] - 16:5, 32:8, 60:4
**indicated** [8] - 38:19, 46:15, 46:19, 47:4, 48:24, 49:9, 57:24, 60:12
**indictment** [3] - 61:20, 61:21, 61:22
**indirect** [1] - 58:22
**individual** [2] - 44:6, 45:3
**individuals** [1] - 39:24
**ineffective** [2] - 58:15, 59:1
**ineligible** [1] - 20:12
**infallible** [1] - 15:22
**inflammatory** [1] - 30:4
**information** [13] - 4:20, 14:13, 14:16, 15:19, 16:8, 29:19, 33:13, 36:11, 38:8, 48:1, 54:5, 54:6, 54:7
**ingratiate** [1] - 24:6
**ingratiated** [2] - 42:2, 48:8
**initial** [1] - 55:15
**innocent** [2] - 47:23, 47:24
**inpatient** [1] - 53:21
**inquire** [1] - 35:17
**insofar** [1] - 57:18
**Instagram** [1] - 29:2
**install** [1] - 55:11
**installation** [3] - 55:20, 55:21, 55:23
**instance** [1] - 29:4
**instances** [1] - 35:18
**instead** [4] - 29:1, 29:9, 34:22, 45:3
**institution** [1] - 37:9
**intelligent** [1] - 62:4
**intended** [2] - 18:22, 27:13
**intending** [1] - 60:5
**intensity** [1] - 53:25
**interest** [5] - 38:14, 56:3, 62:6, 62:11
**interested** [2] - 11:2, 51:4
**interference** [1] - 64:21
**Internet** [1] - 54:24
**interrupt** [1] - 31:23
**invention** [1] - 28:23
**inventory** [1] - 9:5
**investigation** [2] - 5:22, 56:19
**involved** [18] - 22:8, 23:1, 25:22, 45:6, 46:17, 48:3, 49:3, 49:13, 49:15, 49:16, 50:1, 50:21, 51:4, 51:5, 51:24, 51:25, 54:18
**involvement** [1] - 49:17
**isolation** [1] - 33:24
**issue** [8] - 3:20, 6:5, 13:3, 13:18, 13:19, 16:15, 16:21, 51:16
**issues** [11] - 12:9, 16:13, 17:4, 17:11, 18:5, 35:15, 38:18, 38:19, 39:15, 58:16, 63:10
**it'd** [1] - 59:5
**Item** [1] - 9:12
**itemization** [1] - 9:5
**items** [18] - 4:1, 4:10, 4:13, 4:16, 4:25, 5:8, 5:12, 5:17, 6:1, 6:8, 7:3, 7:18, 8:12, 46:24, 47:7, 47:20, 57:11, 61:1
**itself** [5] - 7:23, 8:2, 9:14, 36:16, 52:13

## J

**J&C** [1] - 7:23
**jail** [1] - 19:4
**Jeandiel** [1] - 43:15
**JEANDIEL** [1] - 43:16
**jet** [2] - 40:19, 41:2
**jewelry** [1] - 40:18
**Joel** [1] - 43:12
**John** [1] - 43:23
**John's** [1] - 44:2
**join** [1] - 31:10
**joined** [1] - 23:9
**joining** [1] - 46:8
**JSNI** [2] - 22:9, 31:24
**JSNIA** [1] - 49:8
**Judge** [21] - 2:6, 3:10, 3:15, 8:16, 8:20, 9:13, 9:20, 9:25, 10:5, 14:14, 15:11, 15:14, 18:10, 19:13, 21:16, 22:19, 26:18, 60:2, 60:20, 60:24, 64:9
**JUDGE** [2] - 1:9, 1:10
**judges** [4] - 32:2, 32:7, 32:9
**judgment** [18] - 3:22, 3:23, 6:19, 6:20, 6:22, 7:16, 8:2, 9:7, 9:10, 20:25, 22:1, 48:6, 52:16, 57:3, 59:10, 60:14, 64:15, 65:11
**judiciary** [1] - 22:9
**July** [1] - 42:6
**June** [1] - 66:7

## K

**keep** [3] - 24:22, 34:4, 34:20
**kept** [1] - 3:18
**Kevin** [2] - 1:16, 2:10
**KEVIN** [1] - 1:16
**kids** [9] - 23:20, 25:3, 28:25, 29:5, 29:8, 29:17, 29:21
**kind** [6] - 17:11, 22:24, 23:25, 24:1, 24:19, 51:5
**kindly** [1] - 3:25
**knowing** [6] - 11:2, 36:21, 44:1, 45:10, 47:13, 51:1
**known** [1] - 12:10
**knows** [1] - 23:13
**KOLLAR** [1] - 1:9
**KOLLAR-KOTELLY** [1] - 1:9
**KOTELLY** [1] - 1:9

## L

**L-O-M-P-O-C** [1] - 37:11
**LA** [1] - 24:10
**laid** [1] - 65:6
**Lam** [15] - 42:3, 42:4, 42:8, 42:13, 43:15, 43:18, 44:19, 44:21, 44:24, 45:20, 45:21, 46:16, 47:8, 47:9, 50:23
**Lam's** [7] - 45:8, 45:9, 45:17, 47:9, 47:10, 47:12, 51:2
**Lamborghini** [1] - 8:14
**Lamborghinis** [3] - 25:4, 52:4, 57:8
**large** [2] - 41:18, 46:13
**largest** [1] - 24:13
**Las** [1] - 39:8
**last** [8] - 4:5, 6:9, 10:3, 13:22, 16:15, 16:20, 33:13, 36:1
**late** [2] - 2:14, 4:5
**launder** [4] - 24:16, 41:25, 43:20, 47:19
**laundered** [1] - 40:16
**launderer** [1] - 40:10
**launderers** [1] - 40:8
**laundering** [5] - 19:24, 19:25, 24:8, 40:15, 47:2
**law** [3] - 57:19, 58:5, 58:19
**LAW** [1] - 1:16
**lead** [1] - 3:16
**leaders** [1] - 24:6
**leans** [1] - 31:4
**learned** [1] - 43:15
**least** [15] - 3:17, 7:11, 11:8, 15:7, 15:20, 15:24, 18:17, 21:20, 23:19, 36:4, 37:16, 40:3, 45:25, 53:9, 64:24
**leave** [3] - 13:18, 16:14, 35:15
**leaving** [1] - 63:9
**led** [1] - 29:11
**left** [3] - 2:12, 24:9, 61:25
**less** [4] - 11:19, 13:14, 20:20, 56:6
**level** [13] - 20:7, 23:22, 31:17, 32:11, 37:8, 37:22, 38:22, 49:3, 50:18, 59:20, 62:20, 62:23, 63:2
**Level** [1] - 20:10
**levels** [1] - 23:22
**license** [3] - 34:6, 34:9, 51:12
**lick** [1] - 44:4
**licks** [1] - 43:5
**life** [3] - 62:3, 62:13, 62:17
**light** [2] - 37:15, 57:14
**likelihood** [1] - 51:8
**likely** [1] - 21:12
**limited** [3] - 40:12, 57:20, 58:8
**line** [4] - 5:25, 23:13, 33:25, 54:13

**lines** [1] - 54:13
**linger** [1] - 33:19
**LISS** [1] - 15:12
**Liss** [2] - 1:13, 2:7
**list** [16] - 4:14, 4:16, 5:1, 5:3, 5:21, 6:11, 7:12, 7:14, 7:18, 8:3, 8:5, 9:9, 9:11, 9:17, 9:18, 60:25
**listed** [3] - 5:17, 6:2, 44:16
**lists** [1] - 57:5
**Lithuanian** [2] - 44:6, 45:3
**live** [1] - 12:8
**lives** [1] - 39:17
**living** [1] - 62:9
**loaded** [1] - 44:21
**local** [1] - 53:5
**location** [6] - 41:8, 42:14, 44:16, 45:4, 46:4, 53:25
**locations** [1] - 44:9
**logging** [1] - 42:14
**Lompoc** [4] - 37:11, 37:22, 61:12, 63:22
**look** [19] - 2:25, 6:11, 7:15, 9:5, 10:12, 10:18, 12:3, 21:13, 25:7, 26:15, 32:3, 32:9, 32:15, 35:24, 60:9, 61:4, 62:11, 63:1, 64:5
**looked** [3] - 12:12, 27:6, 50:8
**looking** [8] - 9:6, 27:9, 32:4, 47:17, 49:7, 50:19, 52:9, 63:24
**looks** [4] - 10:16, 17:17, 23:5
**Los** [4] - 40:19, 41:1, 42:1, 43:13
**loss** [2] - 19:10, 19:17
**low** [11] - 25:19, 37:8, 37:22, 49:6, 59:20, 60:7, 60:12, 60:15, 62:20, 62:23, 63:2
**low-level** [4] - 37:8, 37:22, 59:20, 62:23
**lower** [2] - 31:19, 59:8
**luxuries** [2] - 48:11, 52:4
**luxury** [10] - 24:8, 40:18, 40:22, 40:24, 40:25, 43:6, 44:25, 46:24, 47:10, 47:20

## M

**magazines** [1] - 57:13
**mail** [2] - 34:17, 60:24
**major** [1] - 13:3
**Malone** [2] - 42:3, 44:2
**man** [2] - 34:20, 35:7
**manage** [1] - 13:10
**mandatory** [2] - 52:25, 53:4
**manner** [3] - 24:5, 55:9, 58:11
**mansion** [1] - 23:21
**mansions** [1] - 40:19
**March** [1] - 40:4
**marijuana** [1] - 39:1
**mark** [1] - 30:13
**Marlon** [3] - 2:3, 52:17, 57:2
**MARLON** [1] - 1:6
**married** [1] - 39:9
**Marshal** [2] - 37:6, 65:1
**mask** [1] - 45:3
**matter** [2] - 16:6, 34:11
**matters** [1] - 2:22
**maximum** [3] - 19:3, 19:4, 58:13
**MD** [1] - 1:18
**mean** [10] - 4:22, 5:5, 17:4, 17:9, 19:13, 24:20, 34:12, 35:1, 38:25, 49:13
**means** [4] - 13:5, 19:22, 51:13, 59:4
**media** [1] - 54:22
**meet** [2] - 20:2, 20:4
**members** [21] - 23:14, 25:3, 40:5, 41:20, 43:6, 44:7, 44:18, 44:24, 45:9, 46:1, 46:3, 46:14, 46:21, 46:24, 47:6, 47:12, 47:23, 48:10, 49:15, 50:5, 51:18
**memo** [1] - 30:17
**memorandum** [3] - 19:6, 22:23, 25:11
**men** [1] - 29:6
**Mendez** [3] - 39:10, 39:11, 39:12
**mental** [2] - 38:18, 38:24
**mention** [1] - 26:25
**mentioned** [3] - 25:8, 28:9, 57:13
**mentioning** [1] - 34:4
**mere** [1] - 31:2
**message** [2] - 43:4, 43:9
**messages** [8] - 10:24, 11:21, 11:23, 13:12, 13:15, 14:19, 43:2, 43:22
**messaging** [3] - 11:3, 13:14, 17:15
**met** [3] - 41:20, 41:22, 46:14
**methods** [2] - 47:20, 54:4
**Mexico** [4] - 27:19, 42:7, 42:12, 46:18
**Miami** [4] - 40:20, 41:1, 45:1, 45:21
**microphone** [1] - 28:6
**might** [1] - 12:16
**million** [26] - 3:14, 19:10, 20:17, 21:17, 22:3, 23:19, 24:14, 24:25, 25:5, 26:2, 27:17, 37:15, 41:4, 41:11, 42:10, 43:17, 43:25, 44:4, 45:25, 46:11, 46:25, 50:4, 56:2, 57:3
**mind** [3] - 4:24, 34:20, 52:7
**minimum** [1] - 19:17
**minus** [2] - 20:1, 20:2
**minute** [2] - 13:22, 64:17
**minutes** [1] - 13:25
**miscellaneous** [1] - 57:9
**mischief** [1] - 29:11
**mistake** [1] - 60:10
**mistakes** [1] - 62:14
**mobile** [1] - 44:11
**modality** [1] - 53:25
**moment** [2] - 10:15, 60:22
**moments** [1] - 26:19
**money** [14] - 19:23, 24:8, 24:21, 24:24, 25:21, 29:14, 40:8, 40:10, 41:8, 43:21, 48:11, 49:25, 54:11, 57:3
**monitoring** [8] - 54:9, 55:10, 55:11, 55:14, 55:17, 55:20, 55:22
**Monroe** [2] - 1:20, 66:11
**MONROE** [1] - 66:3
**month** [4] - 20:20, 34:23, 56:6, 64:12
**monthly** [1] - 22:4
**months** [15] - 20:11, 22:7, 22:10, 26:1, 30:18, 30:21, 30:23, 31:2, 31:19, 37:3, 49:6, 52:18, 60:3, 60:14
**morning** [7] - 2:6, 2:9, 2:10, 2:20, 2:21, 4:5, 36:19
**most** [2] - 17:23, 57:9
**mostly** [1] - 60:2
**mother** [3] - 39:8, 39:9, 39:12
**motion** [3] - 58:24, 59:5, 61:17
**mouths** [1] - 25:4
**move** [7] - 19:2, 36:2, 46:6, 61:19, 61:22, 62:16, 62:17
**moved** [5] - 24:9, 24:10, 41:20, 41:22, 46:14
**movie** [1] - 23:13
**MR** [95] - 2:6, 2:10, 2:19, 3:10, 3:15, 4:2, 4:16, 4:19, 5:20, 5:24, 6:16, 6:20, 6:23, 7:7, 7:10, 7:17, 7:23, 7:25, 8:5, 8:8, 8:11, 8:13, 8:16, 8:20, 8:22, 9:2, 9:13, 9:20, 9:25, 10:5, 10:8, 10:10, 11:11, 11:14, 11:24, 12:2, 12:17, 12:25, 13:23, 13:25, 14:4, 14:6, 14:14, 14:24, 15:11, 15:12, 15:13, 15:20, 16:23, 17:3, 18:3, 18:6, 18:10, 18:12, 19:13, 19:16, 20:15, 21:6, 21:10, 21:16, 21:19, 22:1, 22:19, 26:9, 26:18, 26:22, 28:4, 28:8, 32:17, 32:20, 33:23, 34:10, 34:16, 35:13, 36:1, 36:18, 37:1, 37:20, 37:24, 38:1, 60:2, 60:7, 60:17, 60:20, 60:24, 61:6, 61:8, 61:13, 61:16, 61:19, 64:8, 64:13, 64:18, 64:24, 65:6
**mugshot** [3] - 10:16, 16:25
**mugshots** [1] - 10:17
**must** [18] - 10:16, 53:5, 53:6, 53:7, 53:8, 53:14, 53:15, 53:20, 54:1, 54:3, 54:4, 54:12, 54:19, 54:23, 55:10, 55:14, 55:23, 56:5

## N

**N.W** [1] - 66:12
**name** [3] - 37:10, 37:23, 51:12
**named** [1] - 61:20
**narrative** [2] - 35:2, 35:13
**nature** [2] - 46:4, 57:11
**near** [1] - 37:8
**necessary** [1] - 61:13
**need** [14] - 7:11, 9:7, 25:4, 33:8, 36:10, 43:3, 43:4, 53:13, 59:23, 62:7, 62:11, 64:4, 64:14, 65:10
**needed** [5] - 23:11, 23:12, 34:24, 35:25, 41:23
**needing** [1] - 38:23
**needs** [9] - 6:11, 9:7, 11:7, 48:13, 48:18, 59:18, 59:24, 61:16, 65:12
**negative** [4] - 29:4, 30:5, 39:4, 53:12
**net** [1] - 29:8
**Nevada** [3] - 15:24, 17:5, 39:7
**new** [3] - 22:20, 54:12, 62:10
**New** [5] - 27:19, 39:25, 42:7, 42:12, 46:18
**newly** [1] - 58:24
**next** [1] - 10:1
**nice** [1] - 2:6
**night** [3] - 4:5, 10:3, 33:13
**nightclub** [3] - 40:21, 40:23, 44:25
**nightclubs** [5] - 24:25, 29:15, 40:17, 42:1, 44:9
**nobody** [1] - 51:15
**normally** [1] - 24:21
**note** [5] - 2:24, 24:4, 47:22, 59:19, 60:24
**notes** [1] - 66:5
**nothing** [5] - 48:2, 49:17, 62:23, 64:2, 65:14
**notice** [3] - 59:11, 65:1, 65:9
**notified** [2] - 37:6, 65:12
**notify** [1] - 56:16
**notwithstanding** [2] - 23:8, 25:24
**nowadays** [1] - 28:25

**numbers** [2] - 27:7
**NW** [2] - 1:14, 1:21

## O

**obfuscating** [1] - 40:14
**object** [2] - 18:23, 26:3
**objection** [2] - 7:10, 64:11
**objections** [2] - 19:8, 22:13
**objects** [1] - 46:2
**obligation** [1] - 56:18
**obligations** [1] - 56:14
**obstruct** [1] - 54:3
**obtain** [1] - 47:18
**obtained** [2] - 3:3, 27:17
**obviously** [15] - 10:3, 19:14, 21:1, 21:9, 22:6, 23:20, 24:2, 49:11, 50:1, 50:12, 51:19, 54:16, 59:6, 62:4, 63:14
**occurred** [1] - 43:18
**occurring** [1] - 45:5
**October** [1] - 40:3
**OF** [6] - 1:1, 1:3, 1:8, 1:14, 1:16, 66:1
**offense** [13] - 3:3, 20:7, 20:9, 24:3, 31:17, 32:11, 39:18, 39:19, 46:7, 46:8, 48:12, 49:3, 54:18
**offenses** [1] - 54:19
**offered** [2] - 42:4, 46:16
**office** [11] - 14:15, 17:16, 39:9, 53:1, 53:10, 54:7, 55:1, 56:18, 56:24, 60:25, 64:12
**OFFICE** [2] - 1:13, 1:16
**Office** [2] - 54:8, 56:20
**office's** [1] - 17:10
**OFFICER** [7] - 4:7, 5:3, 5:6, 5:10, 16:15, 16:20, 59:25
**officer** [12] - 11:17, 15:24, 17:5, 18:3, 22:6, 35:1, 53:15, 53:23, 54:5, 55:4, 55:11, 55:14
**Official** [2] - 1:20, 66:11
**OFFICIAL** [1] - 66:1
**old** [5] - 29:7, 29:21, 31:9, 38:11, 39:14
**older** [6] - 23:5, 25:7, 27:22, 28:12, 29:8, 29:23
**oldest** [1] - 29:7
**once** [9] - 23:10, 24:5, 25:9, 28:25, 29:14, 30:10, 47:6, 56:6, 62:18
**one** [51] - 2:23, 2:24, 3:9, 3:17, 4:12, 4:15, 7:2, 10:1, 10:14, 12:3, 13:9, 15:1, 15:10, 15:11, 15:15, 15:18, 15:19, 16:4, 16:5, 16:10, 16:13, 16:25, 21:20, 23:19, 23:22, 24:1, 25:12, 26:10, 26:24, 27:16, 27:19, 27:20, 29:8, 30:24, 31:23, 32:3, 32:4, 32:18, 39:13, 49:2, 50:20, 51:11, 53:8, 57:10, 58:18, 59:19, 59:21, 60:24, 65:9
**ones** [1] - 12:23
**online** [1] - 24:1
**open** [3] - 17:10, 44:6, 54:12
**openly** [1] - 43:19
**opportunity** [2] - 3:21, 35:24
**opposed** [4] - 3:14, 9:23, 36:17, 62:8
**options** [1] - 53:2
**order** [29] - 2:23, 3:1, 4:11, 4:14, 4:25, 5:7, 5:8, 5:16, 5:25, 6:7, 6:10, 6:17, 7:1, 7:5, 7:21, 8:2, 8:9, 9:7, 9:9, 9:14, 9:15, 20:18, 20:21, 21:3, 22:1, 47:18, 56:21, 57:7
**ordered** [3] - 52:21, 56:1, 57:2
**organization** [1] - 24:6
**organized** [1] - 45:19
**organizers** [1] - 40:7
**origin** [2] - 41:17, 46:12
**original** [1] - 47:12
**otherwise** [7] - 17:25, 23:25, 25:9, 27:13, 32:25, 36:4, 60:17
**outlined** [1] - 29:25
**outpatient** [1] - 53:21
**outside** [4] - 12:8, 28:16, 28:25, 29:9
**outstanding** [1] - 61:17
**over-the-road** [1] - 39:11
**owed** [1] - 56:5
**own** [4] - 24:2, 31:5, 45:3, 48:8
**owner** [1] - 27:21
**ownership** [4] - 40:14, 41:17, 45:4, 46:5

## P

**p.m** [1] - 65:17
**page** [3] - 2:25, 3:7, 10:12
**paid** [1] - 56:18
**paragraph** [1] - 3:2
**parity** [3] - 26:13, 32:4, 48:24
**park** [1] - 28:22
**parse** [1] - 4:20
**part** [13] - 3:18, 5:21, 12:4, 14:12, 29:18, 30:15, 39:20, 42:5, 48:9, 52:6, 53:1, 56:9, 63:3
**participate** [2] - 53:20, 53:21
**participated** [2] - 3:18, 27:16
**participating** [1] - 31:3
**participation** [1] - 53:24
**particular** [5] - 3:21, 48:16, 62:24, 63:24, 64:22
**particularly** [1] - 10:19
**parties** [6] - 25:1, 25:22, 35:17, 40:24, 64:3, 65:14
**parts** [1] - 39:23
**pass** [1] - 51:11
**passport** [18] - 10:17, 10:18, 10:20, 17:1, 17:2, 17:13, 17:21, 27:2, 34:5, 34:6, 34:9, 34:12, 47:15, 51:10, 51:11, 51:13, 63:21
**past** [1] - 31:15
**Patterson** [1] - 60:25
**Pause** [1] - 26:21
**pay** [12] - 44:11, 45:9, 45:16, 47:12, 51:2, 52:21, 52:23, 54:10, 56:3, 56:5, 56:12
**payable** [1] - 56:14
**paying** [2] - 13:4, 22:4
**payment** [3] - 44:7, 44:10, 47:3
**penalties** [2] - 19:4, 56:4
**pending** [1] - 31:7
**people** [13] - 5:18, 12:8, 23:1, 23:4, 23:8, 24:20, 29:23, 44:1, 50:1, 50:6, 54:23, 55:24, 62:14
**people's** [1] - 25:23
**per** [1] - 40:22
**percent** [1] - 5:12
**percentage** [2] - 41:18, 46:13
**perfect** [1] - 28:7
**perform** [1] - 42:9
**perhaps** [3] - 37:8, 48:5, 61:9
**period** [2] - 53:12, 65:4
**periodic** [2] - 53:9, 55:15
**periods** [1] - 53:9
**permitted** [1] - 57:19
**person** [6] - 17:14, 26:11, 26:23, 35:11, 44:12, 48:6
**personal** [1] - 39:5
**personally** [2] - 3:3, 3:18
**phone** [3] - 29:2, 29:10, 42:12
**phones** [2] - 28:24, 30:11
**photo** [9] - 10:14, 16:14, 16:16, 16:21, 16:24, 17:9, 17:13, 34:16
**photos** [1] - 27:6
**phrase** [1] - 23:6
**physical** [2] - 38:18, 44:8
**picking** [1] - 30:6
**picture** [2] - 32:6, 34:7
**piece** [1] - 21:7
**pieces** [1] - 15:3
**PII** [1] - 17:15
**pistol** [2] - 57:13, 57:14
**place** [3] - 24:13, 31:10, 35:4
**placement** [1] - 53:8
**places** [2] - 3:6, 27:11
**Plaintiff** [2] - 1:4, 1:12
**plan** [1] - 43:24
**planning** [1] - 35:11
**play** [3] - 28:16, 28:22, 29:9
**played** [1] - 28:20
**players** [1] - 24:11
**plea** [5] - 19:17, 39:20, 57:16, 57:24, 61:24
**pleading** [2] - 31:7, 57:21
**pleadings** [1] - 38:7
**pled** [5] - 3:4, 19:3, 25:13, 48:20
**PLLC** [1] - 1:16
**point** [15] - 11:6, 12:9, 13:21, 20:14, 22:12, 24:17, 32:21, 38:25, 44:2, 52:23, 56:7, 57:24, 59:15, 61:18, 64:20
**pointed** [2] - 14:18, 31:9
**pointing** [1] - 51:16
**points** [11] - 19:10, 19:20, 19:21, 19:22, 19:24, 20:1, 20:2, 20:3, 20:4, 20:6
**politely** [1] - 15:22
**popping** [1] - 17:12
**population** [1] - 52:6
**portion** [2] - 51:17, 54:16
**portions** [2] - 22:15, 43:18
**position** [4] - 13:7, 19:7, 20:24, 36:11
**positioned** [1] - 42:12
**positions** [1] - 36:10
**positive** [3] - 48:20, 53:12, 62:12
**possess** [1] - 53:6
**possessed** [1] - 45:22
**possession** [1] - 10:20
**possibility** [1] - 34:18
**possible** [2] - 32:23, 36:20
**possibly** [1] - 12:18
**potential** [3] - 11:7, 18:13, 18:19
**potentially** [1] - 35:5
**practical** [1] - 16:6
**preclude** [1] - 63:4
**predecessor** [1] - 18:22
**predecessor's** [1] - 22:22
**prefer** [1] - 35:14
**preliminary** [1] - 2:22
**prepared** [2] - 18:14, 51:13
**present** [1] - 2:11
**presentence** [8] - 19:6, 19:8, 22:12, 22:14, 22:15, 53:2,

56:19, 56:23
**presumably** [2] - 5:8, 51:14
**pretenses** [1] - 40:13
**Pretrial** [6] - 10:2, 14:16, 16:12, 19:5, 29:18, 35:14
**pretrial** [4] - 11:17, 32:23, 35:1, 55:2
**PRETRIAL** [2] - 16:15, 16:20
**Pretrial's** [1] - 17:24
**prevent** [1] - 62:22
**previous** [1] - 18:16
**primary** [1] - 31:16
**principle** [1] - 18:17
**Prison** [1] - 65:1
**Prisons** [3] - 37:6, 52:18, 62:19
**private** [3] - 40:19, 41:2
**PROBATION** [5] - 4:7, 5:3, 5:6, 5:10, 59:25
**Probation** [1] - 56:20
**probation** [39] - 3:25, 4:22, 5:1, 6:9, 7:14, 7:18, 9:18, 14:15, 15:24, 16:13, 17:5, 17:10, 17:16, 17:22, 18:3, 20:12, 22:6, 30:20, 31:9, 37:4, 53:1, 53:10, 53:15, 53:23, 54:5, 54:7, 54:14, 55:1, 55:4, 55:10, 55:14, 56:18, 56:24, 59:23, 60:25, 64:6, 64:12, 65:8, 65:11
**problem** [7] - 9:1, 11:23, 12:4, 12:13, 31:23, 37:18, 49:9
**problems** [2] - 35:25, 63:19
**procedure** [2] - 22:16, 57:2
**proceed** [1] - 18:25
**Proceedings** [1] - 65:17
**proceedings** [1] - 66:6
**proceeds** [6] - 3:2, 24:16, 45:6, 45:10, 47:2, 47:13
**procured** [1] - 44:5
**profited** [1] - 21:20
**program** [5] - 37:12, 53:22, 53:23, 53:24, 61:9
**programs** [4] - 10:23, 48:15, 48:17, 62:19
**prohibited** [2] - 54:3, 55:19
**project** [2] - 29:20, 31:11
**property** [3] - 30:9, 57:4, 57:5
**prosecution** [1] - 31:5
**prosecutors** [1] - 36:15
**protocol** [2] - 53:10, 53:11
**provide** [5] - 7:11, 7:18, 9:18, 36:11, 54:4
**provided** [9] - 2:24, 4:23, 15:18, 41:8, 42:22, 46:20, 47:5, 51:2, 64:6
**provider** [1] - 53:24
**provides** [1] - 44:10
**provisions** [1] - 52:15
**pull** [1] - 28:6
**pulled** [1] - 6:9
**pulling** [1] - 5:8
**purchase** [5] - 40:18, 44:25, 45:19, 47:7, 47:20
**purchased** [2] - 43:10, 43:13
**purchases** [2] - 44:14, 45:6
**purchasing** [1] - 43:6
**purpose** [1] - 62:7
**purposes** [3] - 19:16, 30:19, 40:11
**pursuant** [5] - 52:13, 54:25, 55:4, 55:25, 57:1
**put** [15] - 6:7, 6:10, 22:3, 28:11, 29:19, 33:7, 33:18, 35:4, 39:21, 50:10, 59:19, 59:22, 61:10
**puts** [1] - 58:18
**putting** [2] - 21:24, 54:15


## Q


**questioning** [1] - 34:17
**questions** [1] - 26:7
**quick** [2] - 4:20, 31:21
**quickly** [1] - 36:16
**Quickly** [1] - 31:2
**quite** [1] - 50:10
**quote** [4] - 30:25, 31:2, 43:2, 43:22


## R


**racketeering** [1] - 31:3
**raise** [2] - 15:25, 35:15
**raised** [4] - 17:4, 17:21, 63:10, 64:1
**raising** [1] - 18:5
**range** [4] - 30:20, 31:20, 49:8, 60:3
**ranging** [2] - 40:21, 41:3
**ratcheting** [1] - 23:22
**rate** [1] - 56:6
**rather** [2] - 33:18, 35:21
**RDAP** [3] - 37:12, 37:13, 61:9
**read** [2] - 39:18, 57:6
**ready** [1] - 36:5
**realistic** [1] - 29:24
**really** [5] - 48:18, 48:25, 50:13, 51:15, 52:3
**rear** [1] - 42:16
**reason** [9] - 2:15, 25:19, 32:10, 34:22, 56:10, 62:25, 63:1, 63:4
**reasonable** [4] - 38:9, 55:5, 55:8, 55:9
**reasonably** [1] - 45:24
**reasons** [2] - 11:25, 50:17
**rebecca** [1] - 66:11
**REBECCA** [1] - 66:3
**Rebecca** [1] - 1:20
**receive** [2] - 64:25, 65:8
**received** [7] - 10:2, 11:6, 41:18, 45:12, 46:13, 47:1, 59:1
**recently** [1] - 33:15
**recess** [1] - 14:9
**Recess** [1] - 14:10
**recommend** [3] - 37:7, 37:9, 37:13
**recommendation** [4] - 22:7, 59:20, 59:22, 61:8
**recommended** [3] - 30:17, 53:1, 53:21
**recommending** [2] - 25:19, 37:4
**record** [4] - 2:5, 38:7, 45:18, 57:6
**records** [1] - 8:18
**red** [1] - 17:4
**RedotPay** [6] - 44:7, 44:10, 44:13, 44:14, 44:16, 44:22
**refer** [5] - 6:24, 7:1, 7:5, 7:20, 9:9
**referring** [3] - 21:1, 43:5, 43:23
**Reform** [1] - 52:14
**refrain** [1] - 53:7
**registration** [1] - 44:14
**regularly** [1] - 12:20
**regulations** [1] - 53:23
**rehab** [1] - 48:13
**relate** [1] - 6:8
**related** [4] - 5:17, 5:18, 6:10, 7:6
**relates** [3] - 2:23, 7:22, 8:10
**relating** [5] - 10:19, 14:12, 51:23, 57:15, 59:20
**relationship** [1] - 39:16
**release** [16] - 14:22, 15:6, 17:8, 18:13, 18:20, 20:11, 26:1, 30:23, 32:23, 39:3, 52:20, 54:6, 56:7, 56:19, 58:10, 58:11
**relocated** [1] - 39:6
**rely** [2] - 22:21, 25:10
**remember** [1] - 62:14
**reminded** [1] - 27:14
**rental** [2] - 40:19, 41:1
**rentals** [2] - 40:19, 41:2
**renting** [1] - 25:5
**repeated** [1] - 28:18
**report** [23] - 10:2, 14:17, 16:10, 19:5, 19:6, 19:8, 22:13, 22:14, 22:15, 29:19, 33:4, 33:13, 37:5, 53:2, 56:19, 56:24, 63:8, 65:2, 65:9, 65:10, 65:12, 65:13
**reported** [2] - 12:19, 12:21
**Reporter** [3] - 1:20, 1:20, 66:11
**REPORTER** [1] - 66:1
**reporting** [6] - 12:22, 12:24, 60:22, 64:10, 64:16, 64:19
**reports** [1] - 34:25
**represent** [1] - 34:13
**representation** [1] - 17:24
**representative** [1] - 14:15
**request** [2] - 14:12, 21:14
**requested** [4] - 52:11, 54:5, 61:12, 65:10
**requesting** [2] - 21:16, 64:23
**requests** [1] - 59:16
**required** [1] - 38:3
**reserve** [1] - 59:3
**residence** [4] - 9:4, 37:8, 42:16, 56:21
**resident** [2] - 27:21, 30:12
**residential** [6] - 40:8, 40:9, 41:6, 41:19, 42:4, 46:9
**resides** [2] - 39:7, 39:8
**resolve** [2] - 19:8, 33:19
**resolved** [1] - 36:16
**resolving** [1] - 16:12
**respect** [1] - 64:10
**respects** [1] - 63:11
**responding** [2] - 28:5, 28:8
**responsibilities** [2] - 34:1, 40:6
**responsibility** [9] - 20:2, 20:6, 30:25, 31:1, 31:6, 31:21, 62:15, 64:7, 65:3
**responsible** [1] - 9:23
**rest** [1] - 62:3
**restitution** [17] - 6:25, 20:13, 21:3, 21:6, 21:8, 21:12, 21:15, 21:22, 21:24, 26:2, 37:15, 53:15, 53:17, 54:8, 56:1, 56:5, 58:9
**restricted** [2] - 11:2, 44:16
**result** [1] - 3:3
**resulted** [1] - 47:13
**retail** [2] - 44:9, 44:25
**retain** [1] - 58:14
**retroactive** [1] - 59:6
**return** [1] - 56:23
**review** [1] - 15:2
**reward** [1] - 3:19
**RICO** [4] - 19:3, 23:11, 26:12, 49:2
**rifle** [1] - 57:14
**rightly** [1] - 14:17
**rise** [1] - 14:8
**rises** [1] - 38:22
**road** [3] - 9:16, 39:11, 62:10
**robbery** [1] - 43:5
**Robinson** [1] - 15:5
**Roblox** [12] - 10:15,

10:22, 11:5, 11:10, 11:11, 13:11, 15:10, 15:12, 33:5, 33:25, 34:2, 36:6
**roblox** [1] - 15:13
**role** [3] - 41:19, 46:23, 47:16
**roles** [2] - 40:6
**Rolls** [2] - 52:5, 57:8
**Rolls-Royce** [1] - 57:8
**Rolls-Royces** [1] - 52:5
**Room** [2] - 1:21, 66:12
**Royce** [1] - 57:8
**Royces** [1] - 52:5
**RPR** [2] - 1:20, 66:11
**rule** [2] - 3:23, 22:16
**Rule** [1] - 57:1
**rules** [2] - 53:22, 57:1
**run** [4] - 34:19, 35:5, 35:11, 36:5
**running** [1] - 35:5
**rush** [1] - 43:20

## S

**safe** [2] - 24:2, 41:9
**satisfied** [1] - 16:1
**saw** [1] - 28:14
**scary** [1] - 27:6
**scheme** [4] - 3:19, 23:5, 26:14, 30:15
**school** [4] - 28:16, 28:19, 28:20, 38:12
**science** [1] - 38:13
**scope** [1] - 57:22
**score** [1] - 31:18
**scoured** [1] - 42:18
**search** [10] - 9:4, 11:1, 11:22, 12:6, 13:10, 13:11, 42:7, 54:22, 55:4, 55:8
**searches** [5] - 12:7, 54:25, 55:15, 55:18, 55:25
**searching** [1] - 55:2
**second** [4] - 10:21, 16:14, 27:19, 31:4
**section** [1] - 19:25
**Section** [2] - 54:20, 55:12
**sections** [1] - 38:10
**Sections** [1] - 53:16
**security** [1] - 41:2
**see** [28] - 2:6, 4:4, 6:23, 7:7, 11:22, 12:12, 13:17, 13:19, 16:13, 26:15, 29:14, 33:11, 33:21, 35:24, 38:24, 48:14, 48:23, 49:21, 50:12, 51:3, 56:7, 59:7, 60:6, 60:12, 62:1, 63:3, 63:22, 64:20
**seeing** [1] - 51:6
**seized** [3] - 5:21, 6:4, 7:3
**self** [1] - 37:5
**self-report** [1] - 37:5
**semantics** [1] - 34:11
**send** [3] - 10:23, 11:21, 17:8
**sending** [4] - 12:6, 13:15, 17:12, 17:14
**sense** [4] - 4:12, 4:24, 52:9, 63:12
**senses** [1] - 23:25
**sent** [7] - 10:14, 11:23, 13:11, 16:24, 43:1, 43:4, 43:8
**sentence** [24] - 25:20, 25:25, 30:17, 31:4, 31:12, 31:18, 32:25, 36:20, 36:23, 37:3, 38:9, 49:7, 52:10, 52:11, 52:12, 52:13, 56:22, 58:8, 58:11, 58:12, 58:15, 58:18, 58:21
**sentenced** [2] - 26:24, 52:19
**sentences** [3] - 26:16, 32:1, 60:18
**Sentencing** [1] - 52:14
**sentencing** [23] - 6:21, 12:14, 13:20, 17:11, 18:8, 19:1, 19:2, 19:7, 19:9, 20:9, 22:22, 25:11, 30:17, 30:19, 31:14, 34:18, 34:22, 35:4, 38:6, 52:16, 53:2, 60:11
**SENTENCING** [1] - 1:8
**separate** [5] - 3:8, 4:14, 6:11, 9:17, 21:3
**separated** [1] - 3:25
**separately** [1] - 12:5
**September** [2] - 43:4, 45:8
**serial** [2] - 27:7
**series** [2] - 43:2, 57:9
**serious** [5] - 24:3, 24:17, 27:6, 46:8, 48:12
**seriousness** [3] - 27:1, 46:7, 47:17
**Serrano** [8] - 43:16, 43:20, 43:23, 44:19, 44:21, 44:24, 47:8, 50:23
**serve** [1] - 52:19
**served** [1] - 40:5
**Service** [2] - 35:15, 65:1
**service** [4] - 11:4, 13:14, 14:18, 14:20
**SERVICES** [2] - 16:15, 16:20
**services** [7] - 40:21, 41:23, 42:4, 44:12, 45:1, 45:15, 46:16
**Services** [4] - 10:2, 14:17, 19:5, 37:6
**set** [7] - 2:16, 17:21, 23:13, 23:17, 27:24, 38:9, 58:10
**several** [3] - 15:3, 23:22, 43:22
**severity** [2] - 25:21, 28:1
**shall** [3] - 55:18, 56:19, 56:23
**share** [2] - 47:1, 54:7
**shared** [1] - 44:23
**shaved** [2] - 27:7
**sheet** [1] - 9:5
**shell** [1] - 29:16
**ship** [1] - 43:12
**shipment** [1] - 45:20
**shit** [1] - 44:3
**shoes** [1] - 8:14
**Shook** [1] - 38:4
**shopped** [1] - 46:24
**short** [2] - 3:9, 13:16
**should've** [1] - 15:18
**show** [4] - 34:18, 63:13, 63:20, 63:21
**showed** [2] - 34:25, 43:10
**shows** [1] - 10:23
**sibling** [1] - 39:13
**sic** [2] - 22:9, 49:8
**side** [1] - 48:20
**Signal** [1] - 23:3
**signed** [1] - 39:19
**similar** [1] - 26:15
**similarly** [1] - 31:16
**simply** [3] - 12:17, 28:25, 29:17
**single** [1] - 35:9
**sister** [1] - 39:13
**sitting** [1] - 23:20
**situated** [1] - 31:16
**situations** [1] - 64:25
**skill** [2] - 30:5, 30:14
**skills** [5] - 23:13, 23:17, 30:4, 30:7
**slightly** [1] - 50:9
**small** [1] - 52:6
**smashing** [1] - 42:17
**smoothly** [1] - 36:16
**so..** [1] - 15:19
**social** [2] - 39:22, 39:23
**software** [4] - 55:11, 55:20, 55:21, 55:23
**solicited** [2] - 42:24, 46:21
**solves** [1] - 15:16
**someone** [10] - 23:4, 23:11, 23:12, 24:20, 24:21, 25:6, 25:7, 27:22, 34:24, 36:5
**someplace** [1] - 12:7
**sometimes** [6] - 10:18, 29:3, 59:6, 63:23
**somewhat** [1] - 25:14
**sophisticated** [9] - 19:22, 19:25, 23:2, 23:5, 26:14, 48:7, 49:1, 49:24, 51:24
**sophistication** [1] - 25:22
**sorry** [5] - 4:4, 5:15, 7:24, 16:19, 61:15
**sort** [8] - 11:7, 13:21, 19:1, 27:24, 33:15, 50:17, 51:3, 57:10
**sorts** [2] - 24:8, 52:5
**source** [4] - 40:14, 41:17, 45:4, 46:5
**special** [8] - 22:5, 30:4, 30:5, 30:7, 30:14, 52:21, 53:18
**specific** [10] - 7:19, 9:11, 20:22, 23:13, 23:17, 26:22, 50:14, 50:17, 59:21, 65:2
**specifically** [6] - 4:17, 5:12, 8:10, 45:12, 54:17, 61:11
**specifics** [1] - 8:6
**specified** [2] - 45:6, 45:10
**speed** [1] - 22:21
**spend** [3] - 44:8, 44:19, 46:3
**spending** [2] - 43:9, 45:4
**spent** [2] - 29:15, 48:10
**sports** [1] - 28:20
**sprawling** [1] - 22:25
**stage** [1] - 30:11
**stake** [1] - 9:16
**stand** [2] - 18:21, 50:20
**stands** [4] - 14:8, 22:24, 24:19, 65:16
**stark** [1] - 50:10
**start** [4] - 14:11, 28:5, 28:8, 56:6
**started** [3] - 29:10, 32:24, 36:19
**starting** [2] - 2:5, 5:5
**state** [1] - 53:5
**State** [1] - 38:14
**statement** [3] - 16:12, 19:20, 39:19
**States** [7] - 1:21, 2:3, 2:8, 39:6, 40:13, 44:15
**STATES** [3] - 1:1, 1:3, 1:10
**stating** [2] - 43:2, 43:4
**stats** [1] - 49:9
**statute** [6] - 19:23, 54:20, 57:21, 57:23, 57:24, 58:3
**statutes** [1] - 53:17
**statutory** [2] - 19:4, 58:13
**steal** [6] - 23:19, 41:9, 46:22, 47:18, 49:23, 50:21
**stealing** [2] - 40:12, 49:13
**steals** [2] - 24:21
**stenographic** [1] - 66:5
**step** [1] - 50:24
**stepped** [1] - 18:15
**stepping** [1] - 51:9
**steps** [2] - 24:6, 24:16
**stern** [1] - 3:11
**still** [7] - 5:14, 6:10, 9:22, 19:11, 28:20, 32:15, 50:24
**stole** [4] - 41:13, 43:16, 46:10, 50:5
**stolen** [18] - 24:9, 40:15, 41:18, 41:24, 41:25, 43:7, 43:13, 43:21, 44:8, 44:20, 44:21, 46:1, 46:3, 46:5, 46:13, 46:25, 47:1, 47:21
**stop** [1] - 12:15
**storage** [1] - 54:21
**stored** [1] - 44:11
**stores** [1] - 44:25
**Street** [1] - 1:14
**stress** [1] - 38:20
**Stripe** [2] - 13:2, 13:9
**studies** [4] - 31:11, 51:19, 51:20, 51:21

**study** [2] - 29:20, 31:14
**stuff** [2] - 23:3, 23:21
**stupid** [2] - 43:23, 44:4
**subject** [3] - 54:25, 55:16, 55:25
**submit** [3] - 53:8, 54:1, 54:19
**submitted** [2] - 25:11, 30:16
**subsequent** [1] - 38:10
**substance** [11] - 35:22, 38:23, 39:1, 48:15, 48:18, 53:6, 53:7, 53:22, 54:1, 54:2, 54:3
**substantial** [1] - 19:21
**substantive** [1] - 33:22
**substitute** [1] - 3:7
**successfully** [1] - 27:16
**sufficient** [2] - 30:18, 51:22
**sufficiently** [1] - 33:21
**suggest** [2] - 35:2, 48:16
**suggested** [2] - 12:11, 33:4
**suggesting** [2] - 33:8, 51:21
**suggests** [1] - 25:24
**Suite** [1] - 1:17
**sum** [1] - 37:1
**summarize** [1] - 47:16
**summary** [1] - 21:5
**summons** [3] - 18:18, 18:24, 26:4
**super** [1] - 29:3
**supervise** [1] - 53:24
**supervised** [5] - 20:11, 26:1, 30:23, 52:20, 58:10
**supervision** [6] - 10:12, 12:6, 52:24, 53:4, 53:9, 55:6
**support** [4] - 47:15, 48:23, 52:7, 63:14
**supported** [3] - 34:9, 38:17, 63:17
**supports** [2] - 30:18, 30:22
**supposed** [1] - 12:24
**surgery** [1] - 43:2
**surveillance** [6] - 27:24, 30:8, 30:12, 42:13, 42:21, 42:23
**suspicion** [1] - 55:5
**suspicious** [1] - 33:24
**sweating** [1] - 44:2
**system** [1] - 17:15

## T

**T.C** [1] - 41:7
**tamper** [1] - 54:4
**Tangeman** [3] - 26:11, 26:23, 49:1
**target** [3] - 30:13, 40:7, 42:20
**targeted** [2] - 23:6, 23:7
**targeting** [2] - 40:8, 43:3
**targets** [4] - 23:7, 27:9, 42:24, 43:5
**team** [1] - 41:2
**techniques** [1] - 40:16
**technology** [4] - 28:24, 54:18, 62:7, 62:9
**Telegram** [1] - 43:20
**telephones** [1] - 44:11
**temptation** [1] - 50:1
**tend** [1] - 29:24
**tens** [2] - 40:22, 40:25
**term** [4] - 52:18, 52:20, 58:8, 58:9
**termination** [1] - 56:25
**terms** [48] - 3:20, 3:22, 3:25, 6:14, 12:16, 13:6, 13:19, 15:16, 15:17, 16:3, 16:12, 19:9, 19:11, 19:12, 20:25, 22:7, 26:12, 26:14, 32:4, 32:13, 38:12, 38:17, 38:24, 39:18, 47:17, 48:3, 48:13, 48:18, 48:24, 48:25, 49:7, 49:12, 50:7, 50:9, 50:19, 51:4, 52:7, 52:13, 54:9, 54:15, 57:15, 58:16, 60:10, 60:15, 63:2, 63:7, 64:16, 64:19
**test** [2] - 53:8, 53:9
**testing** [3] - 54:1, 54:2, 54:4
**tests** [3] - 39:3, 53:12, 53:13
**Texas** [5] - 27:16, 41:7, 41:12, 41:21, 46:9
**thankful** [1] - 32:22
**THE** [107] - 1:1, 1:1, 1:9, 2:2, 2:9, 2:17, 2:20, 3:13, 3:20, 4:3, 4:9, 4:18, 4:22, 5:5, 5:7, 5:14, 5:23, 6:3, 6:19, 6:21, 6:24, 7:8, 7:13, 7:20, 7:24, 8:4, 8:7, 8:9, 8:12, 8:14, 8:17, 8:21, 8:24, 9:8, 9:19, 9:21, 10:1, 10:7, 10:9, 10:12, 11:13, 11:19, 12:1, 12:4, 12:22, 13:1, 13:24, 14:1, 14:5, 14:7, 14:8, 14:11, 14:23, 15:8, 15:15, 16:2, 16:18, 16:24, 18:2, 18:4, 18:7, 18:11, 18:25, 19:15, 19:19, 20:25, 21:8, 21:11, 21:18, 21:24, 22:3, 26:8, 26:10, 26:20, 28:3, 28:6, 31:23, 32:18, 33:10, 34:8, 34:11, 35:12, 35:14, 36:7, 36:24, 37:18, 37:22, 37:25, 38:2, 38:4, 38:5, 60:1, 60:6, 60:9, 60:18, 60:21, 61:3, 61:7, 61:10, 61:15, 61:18, 61:24, 64:14, 64:19, 65:5, 65:7, 65:16
**theft** [3] - 43:17, 43:19, 49:20
**thefts** [1] - 42:5
**thereafter** [1] - 53:10
**therefore** [4] - 11:21, 51:7, 56:3, 56:12
**they've** [6] - 32:19, 35:16, 50:9, 63:15, 63:16, 63:17
**thinking** [1] - 17:18
**third** [3] - 31:9, 35:7, 50:18
**thousands** [3] - 40:23, 40:25, 45:13
**three** [3] - 20:11, 26:1, 52:20
**three-year** [1] - 52:20
**throughout** [2] - 40:12, 45:1
**throwing** [2] - 24:25, 30:6
**TikTok** [1] - 29:2
**today** [5] - 17:18, 17:23, 18:14, 34:22, 36:17
**together** [1] - 36:8
**took** [5] - 24:5, 24:13, 31:10, 42:18, 46:18
**top** [1] - 52:12
**total** [1] - 31:17
**totally** [1] - 54:17
**touch** [1] - 30:22
**towards** [2] - 30:5, 31:12
**tracked** [1] - 42:13
**tracking** [1] - 9:20
**trail** [1] - 24:24
**training** [1] - 48:17
**transactions** [2] - 24:23, 45:5
**TRANSCRIPT** [1] - 1:8
**transcript** [2] - 66:4, 66:6
**transfer** [1] - 44:12
**transferred** [3] - 41:16, 46:11, 47:6
**transfers** [1] - 40:17
**travel** [3] - 41:2, 41:8, 42:6
**travelled** [1] - 41:12
**treatment** [3] - 53:22, 56:23, 56:25
**trickier** [1] - 10:1
**trouble** [2] - 33:2, 63:13
**truck** [1] - 39:11
**true** [2] - 66:4, 66:5
**trusted** [1] - 44:1
**truth** [1] - 35:6
**try** [5] - 5:25, 9:16, 24:21, 24:23, 33:2
**trying** [5] - 4:9, 21:11, 24:17, 28:9, 28:21
**turn** [4] - 18:17, 18:23, 26:5, 30:24
**turnaround** [1] - 4:21
**turned** [1] - 16:18
**turning** [1] - 26:3
**turns** [1] - 56:8
**twice** [1] - 63:18
**two** [22] - 2:22, 3:6, 10:13, 12:23, 13:10, 19:24, 20:5, 27:2, 27:10, 27:15, 30:23, 31:7, 36:15, 45:23, 47:14, 51:15, 53:9, 57:12, 57:13, 60:11, 64:8, 64:12
**type** [7] - 29:24, 32:12, 35:11, 48:25, 49:16, 49:20
**types** [1] - 45:14

## U

**U.S** [3] - 1:13, 56:15, 56:20
**U.S.-based** [1] - 47:3
**U.S.C** [8] - 19:23, 38:10, 52:15, 52:22, 53:16, 54:20, 55:12, 59:3
**ultimately** [1] - 36:23
**unable** [1] - 42:19
**unannounced** [1] - 55:15
**unconstitutional** [2] - 57:21, 58:2
**under** [10] - 2:15, 12:6, 19:17, 19:23, 19:25, 20:9, 22:16, 31:17, 54:20, 59:15
**undercover** [1] - 24:22
**understood** [6] - 6:10, 7:17, 8:11, 8:16, 8:20, 24:15
**undisputed** [2] - 22:14, 22:15
**unfortunate** [1] - 62:4
**unit** [1] - 39:13
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [7] - 1:21, 2:2, 2:8, 39:6, 40:13, 44:15
**University** [1] - 38:14
**unknown** [1] - 40:2
**unlawful** [5] - 45:7, 45:11, 47:13, 48:6, 53:7
**unlawfully** [1] - 53:6
**unless** [1] - 11:22
**unlike** [1] - 55:2
**unlikely** [1] - 47:24
**unprescribed** [1] - 39:2
**unquote** [1] - 44:4
**unreasonable** [1] - 17:25
**unusual** [1] - 6:7
**up** [38] - 3:16, 7:15, 11:8, 16:3, 17:12, 22:20, 23:9, 23:22, 25:8, 27:24, 28:6, 28:15, 30:6, 33:11, 33:15, 33:20, 34:18, 34:25, 35:19, 35:20, 35:22, 36:5, 36:13, 38:3, 39:15, 39:24, 40:21, 40:24, 41:4, 57:18, 58:7, 58:23, 62:25, 63:13, 63:16, 63:20, 63:21, 64:22
**US** [1] - 54:7
**useful** [1] - 31:25
**users** [2] - 44:12, 47:3

## V

**valid** [2] - 51:20, 51:22
**value** [1] - 41:3
**valued** [5] - 40:22, 40:24, 40:25, 41:11, 46:11
**variance** [13] - 22:7, 30:19, 31:4, 31:12, 32:10, 37:2, 49:11, 50:7, 50:13, 50:17, 50:19, 60:13
**various** [6] - 41:16, 42:19, 46:12, 47:2, 47:20, 57:9
**vary** [1] - 50:16
**Vegas** [1] - 39:8
**vehicles** [1] - 57:8
**verify** [1] - 33:9
**versus** [2] - 2:3, 32:14
**victim** [5] - 41:7, 41:10, 42:10, 42:15, 43:17
**victim's** [6] - 41:9, 41:13, 42:12, 42:13, 42:20, 46:10
**victims** [4] - 40:12, 47:23, 47:24, 48:11
**victims'** [1] - 47:17
**video** [2] - 42:22, 46:20
**violate** [1] - 12:14
**violating** [1] - 13:21
**violation** [13] - 10:25, 11:7, 12:13, 14:22, 15:19, 16:1, 16:6, 16:11, 33:4, 33:8, 36:6, 55:6, 55:7
**violations** [8] - 12:20, 15:6, 18:13, 18:19, 32:23, 32:25, 36:20, 36:22
**virtual** [9] - 14:25, 24:1, 34:3, 40:9, 40:12, 40:15, 40:16, 42:8, 42:11
**virtually** [1] - 23:21
**voluntarily** [3] - 51:24, 60:21, 63:9
**vs** [1] - 1:5

## W

**wait** [1] - 64:25
**waiting** [1] - 43:25
**waive** [3] - 52:22, 57:18, 58:7
**waived** [1] - 57:17
**waiver** [1] - 57:18
**waives** [2] - 56:3, 56:12
**waiving** [1] - 58:20
**walked** [1] - 52:2
**wallet** [13] - 14:25, 16:4, 16:10, 34:3, 41:10, 41:13, 42:8, 42:11, 42:18, 42:20, 46:10, 46:19, 49:14
**wallets** [5] - 23:15, 40:9, 46:22, 47:18, 50:22
**warn** [2] - 54:23, 55:23
**warrant** [1] - 9:4
**warranted** [1] - 17:5
**Washington** [4] - 1:5, 1:15, 1:22, 66:13
**watches** [2] - 40:24, 57:10
**ways** [2] - 55:2, 58:22
**weapons** [1] - 51:15
**website** [1] - 44:16
**week** [1] - 8:23
**weeks** [2] - 26:4, 64:12
**wheelchair** [1] - 27:22
**whereas** [1] - 36:18
**whole** [6] - 8:19, 19:11, 19:12, 47:25, 57:8
**whoops** [1] - 60:9
**Wilson** [11] - 1:16, 2:10, 8:25, 11:9, 15:22, 25:12, 28:3, 45:17, 60:23, 61:4, 61:7
**WILSON** [35] - 1:16, 2:10, 2:19, 9:2, 10:8, 11:11, 11:14, 11:24, 12:2, 12:17, 12:25, 13:23, 13:25, 14:4, 14:6, 28:4, 28:8, 32:17, 32:20, 33:23, 34:10, 34:16, 35:13, 36:1, 36:18, 37:1, 37:20, 37:24, 38:1, 61:8, 61:13, 61:16, 64:13, 64:24, 65:6
**window** [2] - 30:6, 42:17
**Winnsboro** [2] - 41:7, 41:12
**wire** [1] - 40:17
**wires** [1] - 45:16
**Wisconsin** [1] - 1:17
**wish** [2] - 35:18, 59:21
**wishes** [1] - 22:18
**words** [2] - 34:12, 58:25
**works** [2] - 39:8, 39:11
**worthy** [1] - 31:12
**wrapped** [1] - 25:8
**writ** [1] - 58:21
**writing** [2] - 33:8, 57:7
**written** [4] - 3:22, 7:16, 22:13, 59:21

## Y

**year** [7] - 12:19, 31:15, 34:21, 43:9, 52:20
**year-to-date** [1] - 43:9
**years** [9] - 19:4, 20:11, 29:6, 29:21, 30:23, 31:9, 37:17, 38:11, 39:14
**York** [1] - 39:25
**you-all** [1] - 16:16
**young** [12] - 25:24, 29:6, 29:8, 29:20, 29:21, 31:11, 34:20, 48:6, 49:18, 51:19, 52:7, 62:13
**younger** [1] - 23:4
**yourself** [5] - 2:4, 58:5, 62:5, 63:15, 63:19
**youth** [3] - 23:9, 48:5, 51:19
**youthfulness** [1] - 22:8

## Z

**zero** [1] - 20:4