IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - x

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

TUCKER DESMOND,

Defendant.

- - - - - - - - - - - - - - - - - - - x

Criminal Action No.
1:24-cr-00417-CKK-14
Friday, March 20, 2026
9:43 a.m.

---

TRANSCRIPT OF SENTENCING
HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the United States: **WILLIAM GOURLEY HART, ESQ.**
**DOJ-USAO**
555 4th St. NW
Washington, DC 20530
(202) 252-7877
william.hart@usdoj.gov

For the Defendant: **JOSEPH T. FLOOD, ESQ.**
**SHELDON & FLOOD, PLC**
10621 Jones Street, Suite 301-A
Fairfax, VA 22030
(703) 691-8410
jflood@sfhdefense.com

**EUGENE V. GOROKHOV, ESQ.**
**BURNHAM & GOROKHOV, PLLC**
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920
eugene@burnhamgorokhov.com

Court Reporter: Lisa A. Moreira, RDR, CRR
Official Court Reporter
U.S. Courthouse, Room 6718
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3187

P R O C E E D I N G S

THE COURTROOM DEPUTY: Criminal Case 24-417-14, *The United States v. Tucker Desmond.*

Counsel, would you please come forward and identify yourself for the record.

MR. HART: Good morning, Your Honor; Will Hart for the United States.

THE COURT: Good morning.

MR. FLOOD: Good morning, Your Honor; Joseph Flood and Eugene Gorokhov on behalf of Mr. Desmond.

THE COURT: All right.

And good morning, Mr. Desmond.

THE DEFENDANT: Good morning.

THE COURT: What I would like to do is to have a very quick conversation, but I wanted to do it on the record, as to how you want to handle sealed matters. I can indicate that things are sealed, but certainly we have people in the courtroom, and although they're told not to repeat it, it doesn't mean that that's going to happen.

So what I'd like to do is to ask people that are in the courtroom to step out just for a minute. I want to work out whatever rules you want about how you want some of this confidential information to be handled. And we'll bring you back in.

(Those seated in the gallery exit the courtroom)

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(This is the end of the sealed portion)

THE COURT: All right. We'll be proceeding.

From time to time I will say something is under seal, which means that the transcript will not -- it will be transcribed, the comments, but they will not be available generally to the public. In other words, in order to get it, the court reporter would have to get a court order to have this information shared. So if you hear that, the expectation of those in the courtroom is that if it's under seal, it's not expected to be discussed publicly.

All right. Mr. Desmond pled guilty to obstruction of justice. The statutory penalties: The maximum is 20 years in jail. Maximum fine is $250,000.

There was a criminal forfeiture of various items that I think were in the charging papers, but they're not part of the plea, so I'm assuming that they would not be part of the judgment. If they handled -- they would be handled separately.

Is that correct, government?

MR. HART: That's correct, Your Honor.

THE COURT: Okay. So what I have is a Pretrial Services report which indicates that he's in full compliance, a presentence report, the government's memorandum in aid of sentencing, the defendant's memorandum

in aid of sentencing, which has various attachments. One is a neuropsychological and forensic evaluation report by Dr. Bender and Dr. Boyd. It also includes their credentials that are attached.

There's a letter from the defendant; a letter from his mother and his father; a letter from Dr. Manavi -- M-A-N-A-V-I, A or E, it's not quite clear which one it is -- who is a clinical psychologist who provided some clinical treatment of the defendant early on. There's been some pick-up recently with it.

High school transcripts, transcripts from various college courses he's taken.

A letter from a great aunt by marriage as she describes it; two friends predominantly of his mother; a letter from a neighbor and a friend of the defendant and family; a letter from a friend, again of the family, who's known the defendant since he was born; another letter from a family friend who knows the defendant for about the last ten years; a letter from the friend who knows -- not the adults, but this is actually a friend who knows the defendant from middle school and then somebody who knows him from high school; a letter from a friend of the father; and two letters from parents of the defendant's friends -- so they're parents of them -- and the JSIN report, which is the judiciary report that keeps track of sentences that judges

impose.

There's a letter from Dr. Boyd, who reviewed the government's memorandum in aid of sentencing and documentary in which Mr. Desmond was interviewed, her assessment. And it's styled as a rebuttal to the government's comments relating to the documentary. And defendant's counsel's reply to the government's memorandum in aid of sentencing.

There are no outstanding objections for the Court to resolve.

The advisory sentencing guidelines. The base offense is 14; two extra points for destruction of records; minus three points for acceptance of responsibility. Because he has no criminal history, there is an -- he's not precluded, based on the additional restrictions, for 4C1.1, which is the zero-point offender.

There's an additional two points that were deducted. So the total offense level is 11.

And in terms of the guidelines for Offense Level 11, Criminal History 1, is, in terms of custody, eight months to 14 months. Supervised release is up to three years. Probation is one to five years. The fine would be a range of $4,000 to $40,000. Restitution's not applicable, and there is a special assessment of $100.

Now, in terms of recommendations that are on the record at this point, the probation office recommends 36

months of probation with location monitoring for approximately eight months and various other conditions relating to use of computers and other devices as well as various therapies and programs.

The government recommended four months in jail and four months of home confinement.

The JSIN has the median of eight to 12 months of custody.

So I'll hear at this point from the government, defense counsel, and Mr. Desmond, if he wishes to address the Court in addition to the letter.

MR. HART: Thank you, Your Honor.

I know Your Honor has read the government's memorandum very carefully and reviewed the multiple hours of footage that were attached --

THE COURT: Yes.

MR. HART: -- as Government Exhibit 1, so I will try to scope my remarks in such a way to hit on the highlights, if you will, throughout the 3553(a) factors.

I think the single-most important thing I want to emphasize to the Court is that this was not a one-off. This was not an isolated decision as the defendant's own statement of offense makes clear. He is charged with one count of 1512 for the destruction of the digital devices, but his association with the enterprise, which took more

than $250 million from victims and then dissipated it on things like luxury travel, handbags, nightclub services, and things of that nature, his association with that enterprise extended before and extended after the conduct at issue in this case in September of 2024.

So I think the first point of emphasis has to be that this idea that this was a -- I believe the defense uses the term "situational" doesn't quite necessarily capture and/or grapple with the full scope of the conduct as the defendant himself has admitted in his statement of offense.

The evidence makes clear that the defendant came into contact with these individuals first through I believe we call him Money Exchange or Money Launderer 1 several months prior to the obstruction at issue in this case, and that his initial task with respect to this enterprise was bulk cash pick-ups.

Your Honor is obviously well familiar with this case, having presided over it since its inception, but, as Your Honor knows, the issue that the members of the enterprise would face is that upon stealing the cryptocurrency from the victims and then laundering it through various instant cryptocurrency exchanges, they needed to find a way to convert it into fiat cash in order to spend their ill-gotten gains. And so that's where bulk cash pick-ups come in. It's a way to enable the members of

the enterprise to both enjoy, you know, their illicit proceeds as well as further launder them on things like cars, luxury handbags, things of that nature.

So it is a critical part, and the defendant did play a role in them.

The defendant, as the documentary makes clear, was also aware of other additional aspects of the money laundering operation. At one point he refers to another co-conspirator and the opening up of Squishmallows, which -- I believe we've included photos of them, but they are children's toys which are ripped up by the co-conspirators, stuffing material was removed, and they were stuffed with cash and then sent throughout the country again as a means of allowing the various members of the enterprise who might not necessarily be co-located in any one place to spend their ill-gotten gains. And so he references them in the documentary.

So yes, he's charged with obstruction, but the conduct in its totality extends beyond that.

And so just leading up to the obstruction itself, he was aware that these individuals were, you know, picking up cash in bulk and then sending it across the country in toy animals to other co-conspirators, which the government submits is not the operations of a normal legitimate business operation but rather bright red flags of criminal

activity.

And then obviously we turn to September of 2024 when Malone Lam is arrested in California, Jeandiel Serrano is arrested upon arriving at an airport in California, and the defendant is instructed, through various intermediaries, to go to the homes to destroy the devices.

And so at that point, you know, with the arrests of the two of the co-conspirators, the indictment at that point is unsealed, and then, as the statement of offense makes clear, there is some national media coverage of what's going on.

I don't think anyone can honestly contest that the defendant was not aware of what the members of the enterprise were involved in. I think that removes any and all doubt as to what these individuals who he had been associating with were really doing, and yet he makes the conscious decision to I think take a hammer or a bat or something to one of the devices in the home in Encino and then separately drives to a separate co-conspirator's home to destroy a further device after holding onto it for some period of time in his own residence and then later getting rid of it that night.

So these -- in a way, yes, it's one incident that he's charged with, but there are multiple conscious points in which he was voluntarily and deliberately engaging in

criminal conduct.

Now, I think most importantly in terms of the seriousness and the severity of the offense and how this Court should impose sentence was the unsealing of the indictment, and the arrest of his co-conspirators was not enough because he continued to engage with Malone Lam while Malone Lam was incarcerated. They continued to interact while Malone Lam was at the Alexandria Detention Center, and he continued to run errands for Malone Lam.

This is well after the indictment's unsealed. It's well after the co-conspirators are arrested. It's well after Mr. Desmond knows exactly where the money is coming from.

As this Court knows, Malone Lam was a 20-year-old kid from Singapore. He did not earn any of his money legitimately. He stole it. This was made aware for all to see through the unsealing of that first indictment, yet the defendant continued to associate with him.

The arrests of the co-conspirators and everything that happened up until that point was not enough to deter him from continued association with the enterprise, and so he further facilitates various things like money laundering by, you know, having the Birken bags shipped throughout the United States to girlfriends or paramours of Mr. Lam. Birken bags which could have only been purchased by other

people's money, money that Malone Lam was not entitled to, and this is something that the defendant knew.

So I think it's highly problematic that the defendant continued to engage in this behavior long after it was revealed to him the full scope of the enterprise, the illicit activities in which they were involved, and after he himself had been compromised by these individuals that he had previously associated with because they obviously involved him in further illegal activity.

So I take defense's point on manipulation. I take defense's point with respect to age, with respect to items in his background that might have made him susceptible to manipulation, but at some point that manipulation and that susceptibility, it becomes a knowing and conscious association with members of the criminal enterprise.

There's no reason that he needed to continue to associate with Malone Lam after Malone Lam was incarcerated 3,000 miles away from where he lived. That doesn't make any sense. No one was forcing him to interact with Malone Lam. He did that of his own free will.

And so I don't think that his background and his unique vulnerability to the malign influence of other peers gets you all the way there of totally explaining away his conduct in such a way that we don't have to worry about this repeating. I think that at some point the Court and counsel

have to acknowledge that he had a number of off-ramps to take. He had off-ramps to take when it became clear to him that individuals in the enterprise were picking up bulk cash and shipping them across the country in toy stuffed animals. He had an opportunity to decline the invitation of intermediaries to destroy evidence after everyone got arrested. He had an opportunity, upon destroying that evidence, to cut off communication with members of the enterprise.

So he had any number of chances to distance and disassociate himself with the criminal activity at issue. He did not.

So I appreciate counsel's point that some of this can be explained away by youthful immaturity, brashness, and lack of development of the prefrontal cortex, but what I think the government will dispute is that it can explain everything, and that it can explain everything to such a point to demand the downward variance that they're asking for.

So I think that is one of the key things that the government wanted to bring to the Court's attention both with respect to the nature and circumstances of this offense and the totality of the conduct at issue as well as the defendant's history and characteristics, which have been commented on and undoubtedly will be commented on further.

I would also note that with respect to those history and characteristics and with respect to the mitigating factors that have been brought up, the government has provided Mr. Desmond with the most lenient plea offer as any defendant charged in this case. It is fully well aware, as I believe we write on our very first page of our sentencing memorandum, that he is not among the highest-ranking lieutenants of this enterprise.

We have attempted to craft an agreement and allocution that addresses all of the mitigating factors that they are eliciting. We are pleading him to the 1512. We are going to dismiss, to the extent it's already rendered nunc pro tunc by the second superseding indictment, the money laundering charge. We also did not charge him with conspiracy to participate in the RICO itself even though the government believes that the evidence would likely bear that out. We have multiple racketeering activities, including obstruction and money laundering, and in addition we do not believe we would be very hard-pressed to prove conspiratorial agreement.

But we didn't do that. We offered the 1512 to take into account these various mitigating factors.

And in addition, that charge enables him to get to Zone B in which he is able to argue -- well, obviously he can always argue for probation, but in which it's not an

incarceration-only zone.

And so just to break that down a little bit, I did a little bit of the math. But if he were to be charged in the racketeering conspiracy, his base offense level is going to be 19 at the very least under 2E1.1. Assuming he takes a plea in that case, he'll get three points for acceptance, and he's get a further two points as a zero-point offender. That still puts him in Zone 14. And even in Criminal History Category 1, he will be looking at something in which the guideline-compliant sentence would be incarceration only.

So here we're not even in that territory. Incarceration's an option but there are a number of other options, and within that we have argued for a bottom of the guidelines sentence in which we're only saying that half of it needs to be served in a carceral facility.

So this is not a heavy-handed over-the-top recommendation. This is a very carefully circumscribed both plea agreement with the defendant as well as an allocution from the government in terms of what we're recommending to take into account these various factors both with respect to his background, his lack of criminal history, his youth at the time of the offense, and obviously his relative culpability vis-à-vis other offenders.

So for all those reasons, we believe that this is

more than sufficient to take into account what defense counsel has put forward in their memoranda and what is covered by the PSR.

I do want to spend a minute on the documentary at a very high level.

THE COURT: Can I ask, are the documentary -- the proffer was done before he was charged, before he got the plea. Am I correct? I just want to make sure factually I'm correct. The proffer itself, not the --

MR. HART: The proffer, I believe -- and unfortunately, Your Honor, this was -- I was not involved in the case at this point --

THE COURT: No, I understand.

MR. HART: -- so I will readily defer to defense counsel, but I believe the proffer was in September of 2024. Sorry, 2025. He was charged in the first superseding, and that would have been May of 2025. And so I --

THE COURT: He would have been charged, but he wouldn't -- he had not been --

MR. HART: He had not pled guilty.

THE COURT: He had not been offered the plea at that point --

MR. HART: I don't believe so, Your Honor.

THE COURT: -- in terms of the proffer.

MR. HART: I think that -- sorry.

THE COURT: I'm talking about the potential cooperation or whatever and the documentary. He would not have had the -- he would certainly have been charged, et cetera, but he would not have been obviously after the proffer.

But I don't think he had gotten the actual plea based on the discussion. It sounded as if -- because he mentioned the various possibilities in terms of he could be charged with RICO, various other things.

MR. HART: Right.

THE COURT: So obviously somebody had talked to him about the range of what he -- potentially. But I don't think he'd actually been offered a specific plea at the point that he did it.

I'm just throwing out what I understand.

MR. HART: Yes, so my understanding is that he did say to the documentarians that he was taking a plea. I don't think the plea had been entered yet though.

THE COURT: Right. But all of the aspects of it doesn't sound like -- because there was one thing that they were working towards that didn't come about.

MR. HART: Uh-huh.

THE COURT: So I'm assuming that he hadn't actually been offered it.

They can correct me if I'm wrong. I just want to

figure it out for the record.

MR. HART: Right.

THE COURT: At that point it sounded as if he was planning on pleading. I mean, it didn't sound like he was still debating about it. What was going to be exactly offered, what options there were sounded like it was still a little bit up in the air, but, you know, I'll let them...

I'm going by what has been written and what -- in the documentary itself since the documentary wasn't discussed, frankly, beforehand. So it was part of the sentencing that I sort of learned it.

MR. HART: Understand.

Yes, he -- the defendant, I believe, had been participating in the documentary even prior to charging. I believe --

THE COURT: That's -- it wasn't clear. It sounded like maybe he had been, but the papers weren't --

MR. HART: Right.

THE COURT: It was definitely before he pled. That I know.

MR. HART: Right. There are multiple multihour interviews with the documentarians. We didn't want to subject that to Your Honor. I thought the most critical point was --

THE COURT: I appreciated the fact that both sides

did pinpoint some things that I definitely listened to. I went through some of it more quickly in terms of wanting to get a sense of what was involved because there was an extra filing on the defense's part. I wanted to, you know, listen to enough of it to get a sense of what it is.

I will not say I sat through all three hours, but I did the important parts that were brought to my attention as well as just going through it and then stopping at various places where he started talking about certain things that I thought the Court should be aware of.

MR. HART: Right. And then I will say, too -- I think I put this in a footnote -- that we only received the unedited footage, so there are periods you can hear the producers in the background say "we have to switch tape" or "we're going to go off for a moment"; so it is very much the raw footage as we subpoenaed it.

So on the documentary itself, I mean, obviously there are multiple problems from the government's perspective. I'm not going to dwell on this, but I believe the government's expectations of confidentiality were adequately communicated. I think when Former AUSA Rosenberg says he doesn't want the proffer ending up in the documentary, that should have been sufficient.

So I don't --

THE COURT: Yes. Let me just ask this so that you

can comment, both sides. According to at least what was filed -- and let me be accurate about this -- it sounded as if the proffer letter, according to the defense, did not have -- was silent as to any warnings. It also sounded as if the government itself did not discuss with the defendant -- you know, there is evidently a conversation between defense counsel and the government about keeping it confidential, but it doesn't sound like there was direct contact between the government and the defendant about confidentiality, and it also sounded as if the discussion from defense counsel is more around what they are hoping to get from the actual specifics of the plea.

So it's not clear to me that he got a direct warning about what he would talk about. At least that's what was filed. So I don't know whether there's anything else that I should be aware of.

MR. HART: No, I would just note for the record to create my record that Mr. Rosenberg writes to Mr. Gorokhov on August 29, 2025.

THE COURT: Oh, yes. There's definite -- between the counsel there's definitely a discussion. I'm just talking about what got -- what actually got communicated to him because certainly in terms of what got communicated you would ordinarily, if he was told specifically about it, he would not have -- he would not have discussed a number of

things that are in there that would not generally be repeated from a proffer.

I would agree with the government, having listened to it, that there's a number of things in there that discretion would have suggested that he not say anything about and not answer those specific questions. But it's not clear to me on the record I have that anybody directly told him to be careful about what he said and to give some consideration to his answers before he started talking about it.

MR. HART: No. I mean, I think that's a fair point, Your Honor. I just --

THE COURT: It doesn't change the fact that there's things in there that would be better not said on the record.

MR. HART: After he was charged with obstruction of justice.

THE COURT: Right.

MR. HART: And he's revealing government investigative strategy to a pair of documentarians.

Yes, I believe that shows an incredible lapse of judgment contemporaneous with when he's taking the plea, and so, you know, just on that point I am not going to belabor every single point about what he said in the documentary, including the various derogatory comments about my

predecessor, but I do think that at least the unedited footage to not a judge or a lawyer or a probation officer conducting a presentence review, but the documentarian does at least provide some insight into his state of mind in a way in which it's not scripted. It's not prepared. It's not rehearsed. It's just him speaking, and I do think there's inherent value in that.

So I think one of the reasons why we just wanted to give everything is because I think it shows -- I think it shows both sides. The government's not going to contest that at various points he does appear to be remorseful in the documentary. I just don't believe that this is an unalloyed acceptance of responsibility that he's demonstrating throughout the process.

At various points he makes a variety of jokes about, well, there might have been nine million in the items that I destroyed or something like that, which would seem to show a lack of seriousness for what he actually did and a lack of remorse.

At other points and at other turns he appears deeply affected by what happened to him and his family.

And so I don't think our argument is that he's totally unremorseful, and the documentary shows how horribly callous he is. That's not what I'm up here saying.

I'm up here saying that the picture that's

represented in the documentary footage is one that is far more complicated and far more ambiguous than his letter and statements of counsel and things of that nature. I think it shows, at times, a lack of regard for the process and a lack of discretion in naming government investigative targets after being charged with obstruction of justice. That would be obvious that those targets could then, if that were to get out, go out and destroy their own devices just like the defendant did. Obviously he doesn't believe he's going to get a carceral sentence, which is what he tells the documentary filmmakers at that point, and at one point he says how he has sympathy for Mr. Lam while, in fairness, saying he should get something.

So I think it's just a decidedly mixed bag, and I think it's just important to recognize that, A, the defense is asking for a variance, but one of the bases for the variance that they're asking for is that the defendant has had a Saul-on-the-road-to-Damascus moment where he realizes the error of his ways and has done a complete turnaround, and I believe that the raw unedited footage of the defendant's statements complicates that picture considerably because there are various points where one could argue that he does not display true sincere appreciation of what's going on, and especially with the comments with respect to the devices.

So I think for all those reasons, Your Honor, the government's recommendation is amply supported. This is a below -- this is a bottom-of-the-guidelines sentence. It is not entirely carceral. It allows for 36 months of supervised release in which he can get the help that he needs, but I do believe that it adequately balances the 3553(a) factors.

And to the point about he can't be incarcerated because he's going to be surrounded by manipulative individuals, well, I mean, that's going to happen in the real world, too. I mean, that's exactly what happened in this case. The defense argues that's what happened more recently with the documentary filmmakers. So keeping him in the community is not a surefire way to ensure that he will avoid any and all malign influence.

And then on the point of incarceration, I think it's just important to note that, you know, no carceral sentence whatsoever I believe has had -- has no deterrent value. This was a serious crime. We're not saying the defendant was among the most culpable individuals, but this enterprise stole hundreds of millions of dollars from people and fleeced them out of that and then they wasted all of it after laundering it on nightclubs and cars and handbags. And they continued to do it after they were incarcerated, which the defendant helped with.

This is a very serious offense. A slap on the wrist of probation is not sufficient to send a message to other wrongdoers or other members of social engineering enterprises that this conduct will be taken seriously, and I believe that we need some impingement on liberty and some incarceration to fully drive the message home about the severity of the conduct and the association with the enterprise.

The government is not saying it needs to be an overwhelming amount, but we are saying that there needs to be something there for a general deterrent and a specific deterrent effect as well as a general communicative value of it.

So with that, Your Honor, if there are no further questions, I'll conclude my allocution.

THE COURT: No. And I know that from the government's perspective, because where this is an ongoing issue in terms of people pleading, et cetera, and different sentences in the process, that the government has kept and does discuss parity, which I appreciate, among the groupings since there are varying degrees in terms of how you would decide, and I do as well, so that there's an explanation of why he got this sentence versus something else. Although obviously the sentencing guidelines purpose is to instill parity in the ultimate sentence that you impose, but still

looking at it between -- so I appreciate the discussion in terms of how you would place him among the different groupings.

MR. HART: Understood. You're welcome, Your Honor.

THE COURT: All right.

MR. FLOOD: Thank you, Your Honor.

Tucker Desmond is a very decent young man. He got sucked into a promise of quick financial and social success at a particularly vulnerable point in his life. He was 19 years old. He began to associate with defendants at a time when he was struggling emotionally, struggling academically, and lacking in meaningful guidance.

Due to numerous adverse childhood experiences, Tucker craved social identity and success, and that left him open to exploitation. He was exploited because he was gullible. He was exploited because he is overly trusting. He was exploited because he developed a misguided sense of loyalty to this group of people who he thought of as friends. Prior to this association, Tucker had no criminal history whatsoever.

This experience has been devastating to Tucker, and it's been devastating to his family. Instead of wallowing in self-pity, though, Tucker admirably took full responsibility for his crime and is taking responsibility

for making the corrections in his life to ensure that he never runs afoul of the law again.

Based on the unique circumstances of Tucker's life, the nature of the offense, and a consideration of the 3553 factors, particularly the need to avoid unwarranted sentence disparities, there's overwhelming evidence to support a probationary sentence in this case. Because Tucker is a zero-point offender in Zone B on the table, a sentence other than imprisonment is generally appropriate. That's United States Sentencing Guideline 5C1.1 Note 9.

That's a policy statement that it would be appropriate for a probationary sentence. And we respectfully ask the Court to impose a probationary sentence consistent with that policy guideline.

Despite the government's implication, Tucker fully accepts responsibility for his offense. He pleaded guilty at the first opportunity. He acknowledged that he had no excuse or justification for his crime, and he's not making any excuses here. If we had had an excuse or a justification, we would have went to trial. He pled guilty, and he took responsibility acknowledging that no such excuse exists.

Tucker has owned up to his behavior, both his crime and mindset that led to him becoming involved. He has written the Court a heartfelt letter that shows he's spent

time reflecting on his crime, reflecting on his prior bad decision-making, and his need for help and support.

His remorse is genuine. It is possible to be immature and gullible and still regret and feel remorseful. It is not inconsistent, as the government seems to suggest, with being gullible or overly trusting or having a misguided sense of loyalty to people who did not have his best interest. These things can co-exist, and they do co-exist, and the only cure for that is growing up. Tucker is before this Court as a 20-year-old young man. His brain is not completely developed.

Being remorseful doesn't mean that Tucker immediately obtains good judgment or great decision-making, that he's not impulsive or influenced by other people. He will be that way based on the things that we talked about earlier and we put in our sentencing memorandum. But what he needs is not incarceration to correct that. He needs meaningful social supports.

Any suggestion to the contrary that somehow you cannot be remorseful if you continue to engage in some bad judgment, not criminal bad judgment -- I don't agree that he should have done this interview. I wasn't aware of it, and he did it, but no one ever told him he couldn't do it. Unfortunately he went ahead with it.

But that doesn't mean he's not remorseful. It

means that he's immature and needs to grow up.

Throughout the government's argument they made several comments that make this point. They described his behavior as not making sense, a lapse in judgment, a lack of discretion. By definition that's what it means to be an adolescent male. All of those things are consistent with his age, his lack of experience, and an underdeveloped brain.

The government spends some time talking about the RICO offense and saying it wasn't a one-off. They didn't charge RICO because it was insufficient, particularly as it related to Tucker's knowledge of the enterprise and the criminal intent involved. At best, Tucker was an errand boy who provided very minimal contributions to the enterprise and received meager benefits. The next closest defendant was Cortes, who got a Lamborghini. Tucker got almost nothing.

Essentially referring to a RICO charge that was never brought is an attempt to backdoor a much heavier charge and the associated punishment. That's not a legitimate 3553 factor, what the government thinks it could have charged or what Tucker would have been -- would have done if he had been charged with such a crime.

If he had been charged with RICO, we would have gone to trial and I'm confident we would have won because

there was insufficient evidence of that charge. But by injecting that into the Court's -- into its argument, the government is essentially trying to get this Court to punish him partly on a deficient charge.

Despite his offense, Tucker's conduct under the influence of criminally minded peers in no way reflects his true character. This offense does not define Tucker. It is an aberration. He had no criminal history prior to this, and he is a law-abiding person in general.

He is also a person of good moral character. We've submitted numerous letters from people who have known Tucker all or most of his life and to a person they describe him as a kind, respectful, and compassionate person. They all describe him also as gullible and naive, and that's what we see in how he became involved.

Dr. Boyd, in her report to this Court, recognizes or notes that a critical lesson from adolescent research findings is that glimpses of behavior during adolescence often do not reflect a stable trait of the individual, and consequently most juvenile authorities on risk assessment encourage evaluators to recognize adolescence as a time of rapid change and adolescent evaluees as moving targets with many opportunities for effective intervention.

Because of Tucker's lack of a prior criminal history, good character, his very minimal role in this

offense, strong community support, he is at very low risk of recidivism. A term of imprisonment is simply not necessary in this case.

Pursuant to 18 USC 3553(a)(2)(D), the Court must consider the need to provide the defendant with necessary educational vocational training, medical care, or other treatment in the most effective manner available. This factor strongly supports a probationary sentence because it will ensure Tucker receives the needed education and treatment in the most effective manner.

The defense engaged Dr. Boyd and Dr. Bender to do a comprehensive evaluation, and based on that evaluation they've made a series of recommendations that we encourage the Court to adopt. They recommend several evidence-based theories including dialectical behavioral therapy, acceptance and commitment therapy, co-joint therapy, which is a form of family therapy, and behavioral activation. They recommend that he receive occupational counseling, that he be ordered to volunteer in the community through an organization related to poverty, he avoid negative social influences, and he seek stable employment.

None of these resources are available in prison, so any period of incarceration will actually interfere with the provision of the needed education and therapy because it will not be delivered in the most effective manner. More

importantly, not only will he not receive those kind of interventions and support, he will be exposed to people who will likely recognize him as an easy mark and seek to manipulate and exploit him.

Because Tucker is a zero-point offender, a sentence other than imprisonment is generally appropriate, and we would ask the Court to impose such a sentence.

Under 3553(a)(6), the Court must also consider the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. Consideration of relevant comparison cases strongly supports a probationary sentence because defendants with similar criminal records and guideline ranges who are far more culpable received a sentence of probation.

After receiving the PSR in this case, the defense engaged in a painstaking investigation and research to identify the relevant JSIN cases. They were anonymized in the PSR, and it took some work to identify these cases, but we were able to do that.

The government, in contrast, appears to have made no effort to identify or analyze these cases, and this omission is telling either because the government doesn't think the (a)(6) factor is sufficiently important to do research and provide their analysis to the Court or, like

us, they actually did identify the cases but elected not to discuss them in its papers to this Court or in oral argument today. Either way, consideration of these nine relevant factors overwhelmingly supports a sentence of probation.

The nine cases involved defendants who committed a variety of crimes but were charged with obstruction of justice. They all had the same primary guideline, 2J1.2, same offense level, and same criminal history category. Of the nine, six received probationary sentences. That's two-thirds. Only three received periods of incarceration. At the high end there was one spy who received 20 months for a pattern of behavior that went on for three years, involved numerous trips abroad to sell proprietary information from the aeronautical industry to our Chinese adversaries, and then the two others received eight and seven months respectively.

Of the five of the remaining six who I was able to identify, they received only probation, but their background, their nature of their crime, all showed that they were far more culpable than Tucker was. The culpability is based on several different indices.

First, all of them were significantly older than Tucker, and most of them were over 40. They all had dramatically greater life experience. All of these people to some degree attained success in life. Many of them had

advanced degrees. All of them had some college. They had long work histories, life experiences. They had children. They had spouses, and they had completely developed brains.

But all of the defendants in the JSIN data and the one that we found outside the JSIN data committed far more aggravated crimes based on the length of their criminal conduct involved, the fact that their conduct involved threats to safety or individuals. Some of them were insurrectionists, and several were convicted of multiple criminal offenses. Five of these defendants abused positions of trust, either because they were ranking police officers, one was a minister, and one had a security clearance and worked for a defense contractor. One was a mental health counselor who was responsible for the treatment of incarcerated individuals.

Even despite those aggravated aspects of the crimes, by and large they didn't serve time in prison. Four of the defendants either denied responsibility all together or behaved in ways that showed that any expression of remorse or acceptance of responsibility was not accurate.

Although Tucker's crime is, in fact, serious, his conduct pales in comparison to the cases that we've identified that come from the JSIN data of individuals who had similar criminal records, no criminal record actually, committed the same type of offense, and they support a

sentence of probation.

Because Tucker is a zero-point offender and a sentence other than imprisonment is generally appropriate, the 3553 factors strongly support a sentence of probation in this case with recommendations or requirements that he participate in therapy and other programming.

Thank you, Your Honor.

THE COURT: All right.

All right. Mr. Desmond, do you wish to make a statement in addition to your letter or not?

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Good morning.

THE DEFENDANT: I want to say that I'm very sorry for my actions. No one is to blame but myself, and I'm ready to accept any consequence that you bestow upon me.

Since my arrest, I've been going through and seeing where my thinking got distorted, and looking back -- sorry -- I was in a really bad place. I was doing bad academically, and I was looking for any form of success to make the people around me proud. And I started drinking and using drugs, and I got obsessed with the image of success rather than actually becoming a hard-working individual and obtaining it myself.

Throughout my childhood, my dad always showed me an image of working hard and obtaining success for himself,

and to be fair, he worked super super hard so I could have the life I have right now.

Sorry.

I deeply regret getting involved with all my co-defendants, and it's completely against my true values. It's not who I am as a person whatsoever, and I'm focused on actually achieving success for myself and working hard.

I'm back in school. I'm taking three classes at the moment. I have two more that are supposed to start. I'm going to therapy. I'm going to church. And I want to create something for myself.

Being involved in this case is the absolute worst experience I've ever had in my life. The fear and the shock that have been burned into my mind, being taken out of my house in cuffs and watching my dad's eyes look at his only son get arrested not knowing what is going on, has broken my heart, and what it's done to my family and the people around me and people who have trusted me in the past looking at me completely different is indescribable. And all I want to do is make up for my actions and rebuild that trust in the people around me, my family, the community, the government especially, and become something that is worth being here, to be honest with you.

Thank you.

THE COURT: In terms of school, are you doing it

online, or are you doing it in person?

THE DEFENDANT: I'm online at the moment, yes, ma'am.

THE COURT: Okay. And the therapy is with whom?

THE DEFENDANT: Dr. Manavi.

THE COURT: Okay. So you're now going back specifically with her?

THE DEFENDANT: Yes.

THE COURT: Okay. You can go ahead and sit down.

THE DEFENDANT: Thank you so much.

THE COURT: What I'd like to do is to take five minutes. I want to look through my notes quickly, and then I'll come back and impose the sentence.

It's 11:00. Five after 11:00. It won't take that long.

And I'd like to talk to probation about something.

(Recess taken)

THE COURT: All right. Since the presentence report is undisputed, I'm accepting all portions of the undisputed presentence report as findings of fact in the Federal Rule of Criminal Procedure 32(i)(3)(A), so I'll adopt the presentence report as written.

In addition to the advisory sentencing guidelines, the Court considers the pleadings, arguments, record in this case, in addition to the following information in

determining a fair, appropriate, and reasonable sentence in conformance with the factors set out in 18 USC 3553(a) et seq. except for (e).

Mr. Desmond is 20 years old. He has no criminal history.

Education. He is a high school graduate I believe in 2023, has taken some college classes although did drop out. He was not doing well at the time he became involved in this criminal enterprise. Evidently he is reenrolling in the spring of 2026.

And I would certainly encourage you to continue to do so. You may at some point want to consider not just doing it online but actually doing it in person, but that's something that you've got -- there are a series of things that need to be worked out before that happens.

Job history. It appears that in 2020 you had a summer job. There's no other job history.

No assets. No income. No financial ability to pay a fine.

In terms of physical condition, there are no issues at the present time. Evidently there were in the past some issues in terms of asthma, and you were hospitalized at one point.

(The following portion has been sealed)

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(This is the end of the sealed portion)

THE COURT: In terms of the statement of offense -- and this is no longer in the "under seal" category -- this is what you agreed to.

It talks about the social engineering enterprise, which was made up of a group of individuals based in California, Connecticut, New York, Florida, and abroad, and this enterprise began on some unknown date but no later than October of 2023 and continued until around March of 2025, and members and associates of this enterprise served different roles and had different responsibilities. The roles included database hackers, organizers, target identifiers, callers, money launderers. There were some residential burglaries that took place targeting hardware, virtual currency wallets.

The purpose of the enterprise included but wasn't limited to stealing virtual currency from victims throughout the United States through fraudulent pretenses disguising, concealing, and obfuscating the source and ownership of the stolen funds through the use of virtual currency laundering techniques and converting laundered virtual currency into fiat currency and wire transfers. These were used at nightclubs to purchase exotic cars, jewelry, luxury handbags, clothing, private jet rentals, rentals of mansions in Los Angeles, the Hamptons, and Miami.

Members and associates of this enterprise used stolen virtual currency to purchase, among other things, nightclub services ranging up to $500,000 per evening; luxury handbags valued at tens of thousands of dollars, which were given away at these nightclub parties; luxury watches valued between $100,000 up to $500,000; luxury clothing valued in the tens of thousands of dollars; rental homes in Los Angeles, the Hamptons, and Miami. Also use of private jet rentals for travel, a team of private security guards, a fleet of exotic cars ranging in values from $100,000 to $3.8 million.

Obviously all of this evidently was quite attractive to you.

In and around early 2024 you met with members of this enterprise. You were introduced to the enterprise through what we've called Money Exchanger 1. There is a version that actually indicates who that person is. A money launderer for the enterprise. You assisted this money exchanger by retrieving bulk fiat cash from this money exchanger and delivering it to members of the enterprise as part of that money exchanger crypto-to-cash money laundering services, and over time, although you may not have initially known, you learned how the members of the enterprise was earning this money, which was by stealing cryptocurrency by way of social engineering schemes.

On or about September 18, 2024, two members of the enterprise were arrested in the *United States v. Malone Lam.* Jeandiel Serrano was arrested at Los Angeles International Airport, and Malone Lam was arrested in Miami. The arrest and multiple Miami search warrants made national news and were widely reported. You had previously traveled with members of the enterprise to Miami on a private jet but returned to the Los Angeles area shortly before Mr. Lam's arrest.

Soon after his arrest another member of the enterprise asked you to travel to Mr. Lam's Los Angeles rental homes and retrieve electronic devices belonging to Lam and Marlon Ferro. You agreed and traveled to the rental homes owned by Lam, collected one cellphone and two computers belonging to Lam and Ferro knowing that they contained incriminating evidence and knowing that the FBI was investigating Lam and others.

You then destroyed the devices to impair their integrity or availability for use in the official proceedings, that being the *U.S. v. Lam* case, which is the beginning of the case and all of the co-conspirators, and also to prevent the FBI from recovering the devices as part of their investigation since it would have had incriminating evidence on it.

So attached also to the memorandum in aid of

sentencing is some additional information. This portion of it I will put under seal.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Then moving on to another topic, which doesn't have to be under seal.

You did participate in an interview for a documentary in this case relating -- the documentary seems to be about the cryptocurrency thefts. As far as I can tell -- I know that you had a proffer with the government, and this interview seems to have been prior to your actually accepting the plea. It's not clear to me whether you had the offer or not. I don't think so. I think there were negotiations going on, and there were some hopes that they had about some particular kind of plea, which didn't totally materialize.

The government was critical that you divulged sensitive information in the interview for the documentary, and the attorney filed a reply addressing this issue indicating that the three-page proffer that you signed prior to it doesn't address keeping the information confidential. I don't know whether that's true or not, but that's what they said. And that they never -- the government never addressed this issue specifically with you.

There were communications between government counsel and defense counsel about keeping information that would have come up at the proffer session, but it would appear that that wasn't specifically presented to you in terms of -- there were more of a discussion about what the parameters of the plea might be.

I will say -- I'll get to this a little later, but maybe I'll bring it up now. I did, as I indicated, look at the video. What was given was three hours, so I must admit I didn't sit there for the three hours intensely looking at it. There were particular sections that were noted in the material, so I did make sure I looked at that. And I played the whole thing. I just didn't focus on every last thing on it. But there were on certain things that came through.

You answered most questions. I would say you were generally unguarded in your responses. I think you should have been warned about the discussion. I saw it as no

filter during the interview, not particularly discreet in answers in terms of both from your own perspective as well as what would have been discussed with the government. I don't know what's going to happen with the -- you know, with the documentary, but it's out there.

The documentary did certainly indicate your acceptance of responsibility. There are discussions about what possible penalties might be involved and a series of other different things. It did probably go into more of what could be discerned as what would have been discussed with the government as part of the proffer, but it ranged over numerous topics. And as I said, I understand it's unedited so I don't know how it ultimately will or will not get used.

So let me move now to -- so I don't see this as even though, you know, ordinarily you would view this as discussing things that should not have been discussed from the proffer, because ordinarily you would have been warned and told to be very careful about what you said both in terms of what you told them as well as what they asked or what their focus was because this would provide information for others in terms of what -- how they were going about their investigation, all of which are things that are generally not done publicly, and so I would view this as a far more serious breach.

I think, since it doesn't appear anybody actually sat you down and talked to you carefully about it in terms of the -- whether it was wise to have the interview at the point that you did, whether you would have known and anticipated what you might be asked so you could give some thought to what you wanted to answer and how you would want to answer, that didn't occur. So although some of this is consistent with other things, I would view it as a far more serious breach. But since it doesn't appear, from what I've got as a record, that anybody actually sat down, talked to you, and made it clear what you could and could not talk about, I don't see it as a major breach of your proffer agreement with the government.

It obviously didn't show good judgment in terms of going into these things, but I don't see it as something where you ignored an agreement with the government, which would have been part of the proffer agreement, to keep this information confidential. So I don't put it at the level that the government does.

I'm not excusing it, but I don't think, since you weren't told about it, that I can hold you totally responsible for getting into all of these different issues.

It was useful, since it was no filter, to simply listen to you because you -- they asked questions. You sort of just sort of talked. Obviously the letter is a more

studied presentation than the documentary, but you still get the sense that you have an appreciation that you showed very poor judgment.

You did indicate that there were explanations for it, but you didn't -- you recognized that there was no excuse no matter what the explanations are for engaging in this kind of criminal conduct, which is, of course, accurate.

So looking at 3553 factors, which is the principal one, which is the seriousness of the offense.

You joined a social engineering enterprise led by co-conspirators, particularly Malone Lam. You evidently were not in there stealing the cryptocurrency itself, but your role was to assist Mr. Lam with a variety of tasks, and you eventually learned that the co-conspirators were fraudulently obtaining and spending these millions of dollars of cryptocurrency that they had stolen from numerous victims. So these were funds that they were using and that you benefited from that were stolen funds.

Your role appears to have been with Mr. Lam, helping with retrieving the bulk cash, the fiat currency, and delivering it to the co-conspirators and transporting various luxury items that had been bought with the stolen proceeds. So although at the beginning you may not have been aware of precisely where the source of the funds was

coming from, you certainly did become well aware of the unlawful conduct of the co-conspirators in terms of their theft, and you joined in it and participated in terms of benefiting in this private jet travel, living in luxury rental homes, visiting nightclubs. And you didn't pay for any of these luxuries. These were things that were provided to you through the stolen funds.

In 2024 Mr. Lam and Mr. Serrano were arrested. There were also numerous search warrants that were executed. This was on national news. You would have been aware of this, the arrests, and certainly you were contacted and asked to travel to Mr. Lam's rental homes to get the electronic devices, cell phone, two computers that belonged to Mr. Lam and Mr. Ferro, and destroying them. And you knew when you destroyed them that they contained incriminating evidence of their criminal activities, and this would have all been, of course, to prevent the FBI and others from having this information as part of their investigation of Mr. Lam and others.

These acts were deliberate decisions on your part. You were asked to do it. You had to travel to do it so there was time to think about it. You didn't immediately destroy some things so you also gave some additional thought. So these were deliberate decisions on your part with knowledge that these actions were unlawful and

certainly would obstruct the FBI and others investigating this criminal enterprise, so it is a very serious offense.

Although it's not in the statement of offense, you also continued with your contact with Mr. Lam. Mr. Lam evidently had sort of brought you in to his circle of influence. This is after his arrest. He's detained at this point, and he's not detained anywhere near you, and you know this. And with knowledge, you know, that they had these criminal charges, there's an ongoing investigation into the criminal activities of Mr. Lam and the co-conspirators, and you assisted Mr. Lam at his request in purchasing this very expensive handbag with clearly the proceeds of their criminal activities, which were being investigated, and have it delivered to Mr. Lam's girlfriend, which you did. You went to Miami while Mr. Lam was locked up at that time and delivered it. So you didn't end your association with the criminal enterprise after you had obstructed and destroyed these issues.

Now, as I told you, I already mentioned about the video and the interview, so I won't go over that again.

In terms of the video itself, I will add a couple of additional things in terms of I've indicated what I might -- my assessment of what was -- what the video depicted, the interview, and your process, and also the fact that it appears that you were not specifically told the kind of

information you were disclosing was both sensitive and confidential and should not have been disclosed.

As I said, there was no filter during the interview. You were not discreet, and I viewed -- the licensed psychologist describes it as you're coming through as immature, agreeable, generally unguarded in your responses, which is how the licensed psychologist would describe what you did.

Now, the rest of the factors, you do have rehabilitation needs, which I've indicated, you know, the evaluation for different kinds of therapies, which you definitely need, substance abuse evaluation to see if that's needed, education, job training.

In terms of parity, your criminal conduct in terms of what you actually did, not what you would have been aware of in terms of the enterprise, is somewhat different than the other defendants.

Mr. Lam and others persuaded quite a number of young men in the 18- to 20-year age group. There's a number of you, so I had a group to look at in terms of parity. And yours is a little bit different in terms of the obstruction of justice and transporting the fiat currency than some of the other individuals that were involved.

So I didn't find in terms of the conspiracy itself, at least those that I've sentenced and I'm aware of,

that you sort of fit into the pattern in terms of being able to come up with something that would provide really a better sort of parity. So I did look at the JSIN and am making decisions based on generally what I know about the cases and the information that I have.

On a positive note, you did plead guilty. You haven't equivocated once you decided to plead guilty. I didn't see, in any of the materials I got, the interview or anything else, that there's any real equivocation. You mused about the different possible sentences you could get from no jail time to jail time, but in terms of the conduct itself, you did not equivocate.

As I've indicated to you, you clearly have family support, and you have community support. You've obviously got people that you grew up with that see you in a positive light and expect you to take a different path.

I believe that you're remorseful. You know you have disappointed your parents in terms of what their expectations are, and I think they were quite surprised in terms of what you got involved with.

You also appear to recognize that you need to change your behavior. Youth is something that the Court can consider. You were around 19 at the time of the offense. You're 20 now. Your judgment isn't fully developed in terms of people considering the consequences of actions, not fully

comprehending in that, and there are studies to that effect.

In terms of the deterrence to you, I don't see you getting involved in this kind of enterprise again. I do have some concerns about making sure that you figure out how to deal with relationships, what are positive relationships and what are going to be toxic relationships, and to recognize, learn something more about yourself, and then how you're going to, which everybody does, have to learn in terms of relationships and what you should get involved with and what you should stay away from.

Now, the government has requested incarceration of four months, which is, as they've indicated, at the bottom, and they've highlighted, apart from the crime and the seriousness of the offense, you pled guilty, the interview with the documentary, and the fact that you remained in contact after their arrests and certainly your knowledge of the criminal conspiracy and, you know, still remaining involved in dealing with Mr. Lam. I mean, the money that was used for the handbag was the criminal proceeds. It wasn't as if this money wasn't part of the criminal enterprise.

So in weighing the government's considerations in terms of that you should receive, to make a point both to you as well as to others in terms of deterrence, some jail time, as I said, to emphasize the deterrence of any future

criminal conduct as well as to make the point to everybody in the community that this is not the kind of conduct you can engage in, and weighing it against the possible contraindications -- negative effects of placing you, frankly, in a jail community, which would require that you navigate dealing with relationships with other inmates, which would -- which happens to everybody that does get locked up, is that that's one aspect of it.

I've ultimately determined that your involvement with the criminal enterprise can partially be explained by your learned behavior as a result of the dynamics of your relationships, what you've learned as to what works with relationships and what doesn't, and the demands that were made on you which, from your parents, were often contradictory, and you became what I think one of the psychologists indicated, a people pleaser who can easily be manipulated in order to avoid conflicts. So I've concluded that there's not going to be a real benefit, frankly, to locking you up, and that you're worth giving a chance.

So I'm going to adopt what the probation office recommended, which is more than what defense counsel has requested. I'm going to say to you that if you violate these conditions -- because there are going to be a number of conditions through a period of time, three years of probation -- you will get locked up. I'm giving you one

chance. I think taking everything into account that I think it weighs in favor of giving you an opportunity to see if you can get yourself together and move forward in a more positive way.

I think I've looked at your letter, some parts of the interview, certainly your letters of support, the fact that your family is supportive and understands to some degree what role they may have played in it and are definitely not interested in any way in affecting you such that it's a negative influence going forward.

You're obviously intelligent. You need counseling and therapy, and I think the sooner you get it the better.

I know it sounds simplistic, but you need to figure out who you are and who you want to be in terms of going forward and learning the dynamics of a healthy relationship with others. And I think you need help for that.

I think you're young enough that you can be salvaged, and you will have to prove to me that you merit this break. I'll be around long enough that if you mess this up, I'll be around to take action, so I want you to take this seriously and not view this as oh, I got away with it, you know, I didn't wind up getting jail time. Jail time still sits out there if you don't follow through with what you're supposed to do. Okay?

I want you to understand this. And I mean this seriously. I'm giving you a chance, but you're going to have to make sure that you, you know, figure this out, do what you're supposed to do, cooperate, not just do it superficially, but really engage in, you know, changing your behavior and moving forward in a positive way.

You're young enough. You have a whole life ahead of you. There's no reason for you not being able to do it. And everybody seems to think that you've -- you know, you have the ability and positive traits such that you can do it, but that's going to be up to you.

So pursuant to the Sentencing Reform Act of 1984 and in consideration of provisions of 18 USC Section 3553 as well as the advisory sentencing guidelines, it's the judgment of the Court that you, Tucker Desmond, are hereby sentenced to a term of 36 months -- three years -- of probation on Count 4. You are ordered to pay a special assessment of $100 in accordance with 18 USC Section 3013. You'll have to pay it at some point.

While on supervision, you'll abide by the following mandatory conditions as well as discretionary conditions recommended by the probation office in Part D of the presentence report, "Sentencing Options of the Presentence Report," which are imposed to establish the basic expectations for your conduct while on supervision.

The mandatory conditions obviously are you must not commit another federal, state, or local crime.

Not unlawfully possess a controlled substance; refrain from any unlawful use of a controlled substance; submit to one drug test within 15 days of being on supervision; at least two periodic drug tests thereafter. There is a protocol that the probation office has, depending on the results of your tests, how often you need to do the drug testing.

You must cooperate in the collection of DNA as directed by the probation office.

There are some special conditions in terms of location monitoring. You're being monitored by the form of location monitoring technology that's been in for a period of 240 days, roughly eight months. You must follow the rules and regulations of the location monitoring program. The cost of the program is waived so you're not going to have to pay for it.

Location monitoring technology is at the discretion of the probation officer. It can be radiofrequency monitoring, GPS monitoring, SmartLink, voice recognition. There's various ones. It depends on where you live and what your probation office will set up. This form of location monitoring technology will be used to monitor the following restrictions on your movement in the

community.

You're restricted to your residence at all times except for employment, education, religious services, medical, substance abuse and mental health treatment, attorney visits, court appearances, any court-ordered obligations or other activities that are preapproved by the officer of the home detention. So you're not going to be able to -- these things you can do in terms of going out, but otherwise you can't. So it's a home detention program for at least eight months.

Substance abuse treatment. You must be evaluated as to the need for treatment. If it's recommended, then you must participate in an inpatient or outpatient substance abuse treatment program, follow the rules and regulations of the program. The probation officer will supervise your participation in the program relating to provider location, modality, duration and intensity, and that's because of the past use, although it sounds as if prior to your arrest you self-report that you no longer were using it.

This is going to -- these three years with the different requirements that you're going to have in trying to make it in the community is obviously going to have some pressures on you, and I want to make sure that you don't drift back. So this program is assuming that they feel that you need it and whatever kind of it, maybe it's outpatient

or otherwise, but that's the reason I'm putting it in.

Substance abuse testing to determine if you've used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

Mental health assessment treatment. You have to participate in a mental health assessment, any recommended treatment program, follow the rules and regulations of the program. The probation officer in consultation with the treatment provider will supervise your participation in the program, and I think, based on the evaluation, there's a need for you to have some mental health assessment and treatment, but they will decide on what kind of a program is appropriate. I think the evaluation that was given had some programs that I thought, if they were available, would be useful frankly.

Community service. You have to complete 100 hours of community service within 18 months of the period on probation. The probation officer will decide what community program or service you're going to need. They'll supervise your participation by approving the program. You're going to have to show written verification of completed hours to the probation officer.

Vocational services. You must participate in a vocational services program. Again, follow the rules and regulations. This program can include job readiness

training, skill development, whatever, but in addition to just plain education, it's something that will move you forward in terms of you making a decision about how you're going to support yourself going forward.

Because of the type of crime, cybercrime management. You're ordered to participate in cybercrime management and will inform your officer of all computer devices that are possessed by you or accessible to you. This includes desktop and laptop computers, smartphones, smart watches, tablets, smart appliances, Internet of things, LOT devices, including HUB or personal assistant devices, all network accessing devices including Internet and connectible gaming systems. You will not acquire or access any new or additional computer devices unless your probation officer approves it.

You will also inform your probation officer of all your computer devices, Internet service provider, social media user accounts, local and online services when you enter supervision and in the event that you create or receive additional user accounts.

Your use of standard computer devices, desktop, laptop, computers, smartphones, tablets is restricted to legitimate and necessary purposes, so these would be such as employment, education, religious activities, treatment, medical services, communications with friends, family, and

your attorney, personal finance and legal obligations, so there's some limits about what you can use it for.

You must submit your computer devices and other electronic communications, network or cloud storage, data storage devices or media to a search conducted by a U.S. Probation Officer. The probation officer may conduct a search under this condition only when there's reasonable suspicion that you violated a condition of supervision and the areas to be searched contain possible evidence of that violation. Any search has to be conducted at a reasonable time and in a reasonable manner.

Failure to submit to a search may be grounds for revocation of release, and you must also warn other occupants in terms of whoever you're living with that the premises may be subject to searches pursuant to this condition. Since all of this involves the type of crime that you involved, not so much what you've destroyed, but the whole enterprise involved cybercrime, these are the reasons for these additional conditions.

As I've indicated, I'll find that you don't have the ability to pay a fine so I'm waiving imposition of a fine in the case.

You do have to pay the special assessment so that obligation is immediately payable to the Clerk of the Court here in D.C. Within 30 days of any change of address you

have to notify the Clerk of the Court here of that change until the financial obligation is paid in full.

The probation office shall release the presentence investigation report to all appropriate agencies, which would be the U.S. probation office in the approved district of wherever you're going to be living, in order to execute the sentence of the Court. Treatment agencies will return the presentence report to the probation office when you complete or are terminated from treatment.

And I've given explanations as to why all of these conditions are necessary, which the Court is required to do.

In terms of appeals, I'm going to read from the plea agreement as to -- since you agreed to limited appeals.

You're agreeing to waive, which means to give up, insofar as such waiver is permitted by law the right to appeal the conviction in the case on any basis, including but not limited to claims that the statute to which you're pleading -- you pled guilty is unconstitutional or your conduct doesn't fall within the scope of the statute. So what that means is you cannot take it up on appeal. At this point the statute's viewed as constitutional, and your conduct is viewed as being under that statute.

If a higher court comes down with a different ruling in a future case that indicates the statute's unconstitutional or what you did somehow wasn't unlawful

under the statute, you then have a right to take a collateral appeal. But otherwise, you're giving up your appellate right, and you've agreed to that as part of this plea.

You also agreed to waive the right to appeal the sentence, including but not limited to -- well, there's no imprisonment or a fine, forfeiture or restitution, but term or condition of supervised release, authority of the Court to set conditions of release, the manner in which the sentence was determined.

Now, there are sections. If I sentence you above the statutory maximum or guideline range, which I did not, so those are not a reason for you to be able to appeal the sentence. However, you do retain the right to appeal on the basis of ineffective assistance of counsel, but not to raise any other issues on conviction or sentence unless there's a different ruling from the Court of Appeals.

In terms of a collateral attack, other than the one I just spoke to, there's other vehicles for writs of habeas corpus and other ways of challenging convictions or sentences, and you're again giving up your right to do those or modify or change the sentence in a collateral attack. The exception is if you file a motion based on newly discovered evidence; in other words, you didn't know this at the time that you entered into the plea or on a claim that

you received ineffective assistance of counsel.

You also are allowed to -- if there's changes to the sentencing guidelines that would be of benefit to you, you're not precluded from trying to take advantage of them and see whether they would apply retroactively.

If, for some reason, you do fall into the very narrow areas of being able to appeal, you should be filing those within 14 days of judgment. Again, if you can't afford the cost of an appeal, you can ask to file it without cost to you. You can also ask to have counsel appointed for it.

So the last thing is that, at least in our circuit since 2016, under the *Hunter* case, are there any issues that I need to know in terms of -- that have not already been discussed relating to the sentence that need to be addressed?

Let me ask probation first.

THE PROBATION OFFICER: No, Your Honor. Thank you.

THE COURT: Government counsel?

MR. HART: No, Your Honor.

THE COURT: Defense counsel?

MR. FLOOD: Not as I'm aware, no.

THE COURT: All right. So, Mr. Desmond, I hope I don't see you back in here or if I do it's for something

good. Take this very seriously. Don't see this as I got away with it because you haven't, and if you don't follow through -- and it means being meticulous about knowing what you're required to do, asking questions if you don't understand it of either your counsel or the probation office. Their job is to monitor, but their job also is to make sure you know what you're supposed to do and to assist you. So don't view them as the enemy. They're there also -- the objective for them is for you to successfully complete this period of time.

Your family has gone through the trouble of showing up to support you and to indicate to me that -- and both parents came and are sitting next to each other, so they're obviously here to support you. You obviously have some issues to work out, which, you know, are for you and they to do, but I'm hopeful that you will be able to -- you have enough positive traits that you'll be able to make something of yourself in terms of going forward and put this behind you.

The thing is you make mistakes. You own up to them. You accept responsibility, the consequences, and then you move on. And that's what you should do. You've got a long life ahead of you.

All right. Take care. Everybody's excused.

(Whereupon the hearing was adjourned at 12:06 p.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 3rd day of June, 2026.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001